# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF FLORIDA

### Case No. 1:19-cv-24803-KMW

ELLA CLINTON, a Florida resident,
WILLIAM CARRICK, a Florida resident,
HOWARD ROSEN, a California resident,
TERRI L. STAUFFER-SCHMIDT, an
Arizona resident, DONALD P. COX and
MARTHA E. MILLER COX, Arizona
residents, WAI HEE YUEN, an Arizona
resident, MICHAEL A. WEBBER, an
Illinois resident, JEAN P. WRIGHT, a
Nevada resident, individually and on behalf
of themselves and others similarly situated,

        Plaintiffs,

    vs.

SECURITY BENEFIT LIFE
INSURANCE COMPANY, a Kansas
corporation,

        Defendant.

## FIRST AMENDED CLASS ACTION COMPLAINT

## AND DEMAND FOR JURY TRIAL

Plaintiffs bring this action on behalf of themselves, and all others similarly situated, arising out of a fraudulent, racketeering scheme orchestrated by Defendant Security Benefit Life Insurance Company ("Security Benefit") along with a number of unnamed co-conspirators.

## NATURE OF THE ACTION

1. In August of 2010, Guggenheim Partners LLC ("Guggenheim") acquired Security Benefit, rescuing the failing insurance company from the brink of insolvency. Soon thereafter, with the collaboration and active assistance of several independent marketing organizations ("IMOs"), including Advisers Excel, Creative Marketing, Gradient Financial and the Impact Partnership (collectively, the "IMO Associates"), Security Benefit devised and implemented a fraudulent scheme to exploit the market for equity-indexed deferred annuities ("EIAs"). EIAs have traditionally featured annual account value credits linked to well-known, third-party stock indices such as the Standard & Poor's 500 or the Russell 1000. As explained below, traditional EIAs credit account values with a portion of periodic increases in the underlying equity index at a rate less than 100%, known as the "participation rate" or limit the amount of any account value increase by an annual limit known as the "cap" rate.

2. Security Benefit's fraudulent scheme included the development and marketing of a series of misleading and deceptive annuity products professing to provide above-market returns through purported "uncapped" and 100% participation in the reported increases in certain "proprietary" indices engineered specifically for use in these new annuity products (the "Synthetic Indices"). Security Benefit's marketing of represented "uncapped" and "100% participation" in the performance of these Synthetic Indices was false and misleading without clear disclosure that Security Benefit's annuities linked to the Synthetic Indices were economically equivalent to traditional annuities with caps and participation

FIRST AMENDED CLASS ACTION COMPLAINT

rates less than 100% linked to the S&P 500 and Russell 1000. Contrary to Security Benefits' misleading marketing materials, its annuities linked to the Synthetic Indices would — by design — produce near-zero returns due to misrepresented and undisclosed features, risks, charges and attributes.

3.      In furtherance of this fraudulent scheme, Security Benefit enlisted unnamed conspirator Innovation Design Group to design annuity products incorporating the Synthetic Indices as allocation options, including specifically Security Benefit's "Secure Income Annuity" and "Total Value Annuity" products (collectively, the "Annuities"). With the active assistance of the IMO Associates, Security Benefit then marketed and sold the Annuities to Plaintiffs and thousands of other consumers, offering them the purported ability to earn favorable positive returns by allocating some or all of their account values to the Synthetic Indices that supposedly tracked certain "rules-based" indices tied to the performance of an underlying assemblage of assets.

4.      Using uniformly misleading marketing materials and illustrations to implement the scheme, Security Benefit and its IMO Associates deceptively illustrated and misrepresented the performance of the Synthetic Indices as capable of producing double-digit returns for the purchasers of a Secure Income or Total Value Annuity (in particular through the use of a grossly misleading, cherry-picked "backcasting" of the indices' represented performance, as if the Synthetic Indices had existed in the past). Security Benefit further deceptively enhanced its depicted performance of the Annuities by contrasting their illustrated performance with supposedly less-rewarding returns using "capped" non-proprietary indices, such as the S&P 500 or the Russell 1000. Security Benefit did so with present knowledge that the Secure Income and Total Value Annuities would not and could not, in fact perform as represented given their structure and the embedded costs, risks and product features of the Secure Income and Total Value Annuities.

5.    Over time, as a given Synthetic Index failed to produce the returns depicted in the illustrations and marketing materials that Security Benefit had rigged using cherry-picked backcasting techniques, Security Benefit added new Synthetic Indices as allocation options for the Annuities. As one Synthetic Index failed to produce positive returns, Security Benefit would add another Synthetic Index recently coming into existence to perpetuate a virtual shell game of misleading illustrations depicting unattainable future returns based on backcast modeling. Thus, Security Benefit in collaboration with the IMO Associates artificially engineered and introduced the "5-Year Annuity Linked TV Index" (the "ALTV Index") for the Total Value Annuity in 2012. On February 3, 2014, Security Benefit added the "Morgan Stanley Dynamic Allocation Index Account" (the "MSDA Index") as an allocation option for the Secure Income Annuity. The MSDA had launched less than 5 months earlier, on September 19, 2013. Then, in January 2015, Security Benefit added the "BNP Paribas High Dividend Plus Annual Point to Point Index Account – Year 2 (the "BPHD Index") as an allocation option for the Total Value Annuity. The BPHD Index had launched less than 6 months earlier, on July 28, 2014. Adding these new Synthetic Indices with no prior real-world track record allowed Security Benefit to continue illustrating unattainable future gains for the Annuities using projections based on unrepresentative backcast periods handpicked to produce favorable results.

6.    Security Benefit further deceptively misrepresented the nature, attributes and performance of the Synthetic Indices in a uniform and standardized Manner through "Statements of Understanding" ("SOUs") that it required be delivered to and signed by each prospective purchaser of the Secure Income and Total Value Annuities and by each insurance agent who procured the sale.

7.    Once consumers purchased the Annuities, they were locked into them by onerous surrender penalties, by bonus claw-back provisions, and by the very

structure of the Synthetic Indices themselves, which were designed to credit interest only at the end of fixed periods ranging from two to five years.

8.      Security Benefit knew that the Synthetic Indices by design would not and could not perform as represented, but instead would generate virtually *zero* returns over the fixed periods in which the consumer is locked into them under the terms of the Annuities. Security Benefit and the IMO Associates specifically targeted consumers in numerous states, who they intended to receive, review and rely upon the false, misleading and deceptive marketing and sales materials, in determining to purchase their products.

9.      Through this scheme, Security Benefit and the IMO Associates wrongfully induced Plaintiffs and thousands of similarly situated residents of Florida, California, Illinois, Arizona, and Nevada to purchase the Secure Income and Total Value Annuities through materially false and misleading representations and half-truths, in contravention of federal the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) & 1962(d), the California Unfair Competition Law ("UCL"), the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), the Arizona Consumer Fraud Act ("ACFA"), and the Nevada Deceptive Trade Practices Act ("NDTPA"). Alternatively, the fraudulent scheme perpetrated by Security Benefit and its IMO Associates constitutes common law fraud under the law of those states. Plaintiffs in this action therefore seek damages, rescission, restitution and other appropriate forms of equitable or injunctive relief to halt and remedy Security Benefit's scheme to use the Synthetic Indices to induce the sale of Secure Income and Total Value Annuities to Florida, California, Illinois, Arizona, and Nevada residents.

## THE PARTIES

10.      Plaintiff Ella Clinton ("Plaintiff Clinton") is domiciled in Florida, and thus a resident and citizen of the State of Florida.

FIRST AMENDED CLASS ACTION COMPLAINT

11.     Plaintiff William Carrick ("Plaintiff Carrick") is domiciled in Florida, and thus a resident and citizen of the State of Florida.

12.     Plaintiff Howard Rosen ("Plaintiff Rosen") is domiciled in Ventura County, California, and thus a resident and citizen of the State of California.

13.     Plaintiff Terri L. Stauffer-Schmidt ("Plaintiff Stauffer-Schmidt") is domiciled in Maricopa County, Arizona, and thus a resident and citizen of the State of Arizona.

14.     Plaintiffs Donald P. Cox and Martha Miller Cox ("Plaintiffs Cox") are husband and wife, domiciled in Maricopa County, Arizona, and thus residents and citizens of the State of Arizona.

15.     Plaintiff Wai Hee Yuen ("Plaintiff Yuen") is domiciled in Maricopa County, Arizona, and thus a resident and citizen of the State of Arizona.

16.     Plaintiff Michael A. Webber ("Plaintiff Webber") is domiciled in DuPage County, Illinois, is currently a resident of Manilva, Spain under a Spanish non-permanent residency visa, and is thus a citizen of the State of Illinois.

17.     Plaintiff Jean P. Wright ("Plaintiff Wright") is domiciled in Clark County, Nevada, and is thus a resident and citizen of the State of Nevada.

18.     Defendant Security Benefit is a life insurance company organized under Kansas law, with its principal place of business located at 1 Security Benefit Place, Topeka, Kansas 66636. Security Benefit is thus a citizen of the State of Kansas.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction based on 18 U.S.C. § 1964, federal question jurisdiction under 28 U.S.C. §1331, and diversity of citizenship under 28 U.S.C. § 1332. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

FIRST AMENDED CLASS ACTION COMPLAINT

20.     Plaintiffs further allege class claims on behalf of a national class and several state-wide classes, each of which includes persons who are minimally diverse from Security Benefit and presents aggregate claims in excess of $5,000,000. This Court accordingly also has subject matter jurisdiction over this case under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2).

21.     The Court has personal jurisdiction over Security Benefit pursuant to 18 U.S.C. § 1965(a) because Security Benefit "is found, has an agent, or transacts [its] affairs" in this District.

22.     Venue is likewise proper in this District for the same reasons under 18 U.S.C. § 1965(a). Venue is also proper under 28 U.S.C. § 1391 because Plaintiffs Clinton and Carrick reside in this District; Security Benefit maintains substantial operations in this District; thousands of Class Members either reside or did business with Security Benefit in this District; Security Benefit engaged in business in this District; a substantial part of the events or omissions giving rise to the claims at issue occurred in this District; and because Security Benefit entered into transactions and received substantial profits from consumers who reside in this District.

## COMMON ALLEGATIONS

### A.     Indexed Annuities

23.     A deferred annuity is a contract between the annuity owner and an insurance company in which the owner makes an up-front payment of premiums to the insurance company that are deposited into an accumulation account (the "Account Value") and left on deposit for a number of years. During this deferral period, the earnings on the annuity owner's premiums are tax-deferred.

24.     Equity-indexed deferred annuities offer owners the option of allocating the Account Value among several different indexes, theoretically empowering the owner to make his or her own investment risk-reward

FIRST AMENDED CLASS ACTION COMPLAINT

determination. Owners of EIAs select from a limited number of investment options permitting them to allocate their Account Value: (a) to an account crediting a fixed interest rate not less than a modest minimum guaranteed rate; and/or (b) to an account crediting interest determined by changes in a designated "index" based on the prices of a collection of equities, bonds, commodities or other assets.

25.     Because deferred annuities involve a long-term investment decision (in which the owner's premiums are essentially locked up for years due to hefty surrender charges and other restrictions), the represented performance of the annuity contract (i.e., how much the annuity owner can expect to receive in the future as a lump sum or a stream of periodic payments) is of paramount importance to the consumer. To make an informed decision about deferred annuities and the relative attractiveness of the annuities being sold by different insurance companies, it is critically important to consumers that the issuing insurance companies fully and truthfully disclose all features and risks associated with their annuities, including all material information necessary for prospective purchasers to understand the applicable product costs, charges, anticipated rates of return and penalties.

## B.     The Indexed Annuity Marketplace

26.     Insurance companies go to great lengths to extoll the supposedly exceptional performance of their annuities through a plethora of features and purported benefits calculated to portray superior investment returns and future account value growth. For example, although in a traditional deferred annuity contract the annuity's account value increased based only on the amount of interest the company credits each year, in the mid-1990's insurance companies began selling deferred *equity-indexed* annuities, which tie account value growth to the performance of an established equity index (typically the S&P 500 index although

sometimes also the nearly identical Russell 1000 index[1]). This feature purportedly allows the annuity owners to share in the long-term increases in the equity markets while their investment is locked into the annuity.

27.     The link between the S&P 500 or Russell 1000 performance and account value was typically constrained, however, by non-guaranteed limits unilaterally imposed by the insurance company. Some products, for example, "capped" the credited the S&P 500 or Russell 1000 appreciation at a maximum fixed percentage such that the annuity account value would be credited with no more than a set percentage (8% for example) no matter how great the given index increase. Other annuity products limited the consumer's "participation" in a given index's performance, for example, crediting to the account value only a specified percentage (65% for example) of the index's annual or other periodic increase. Many EIA products impose ***both*** cap levels and percentage participation rates on the account value's share of the chosen index's upside appreciation.

28.     In short order, therefore, the "cap" levels and "participation rates" associated with equity-indexed deferred annuities became key selling points as insurance companies sought to entice consumers with higher cap levels and participation rates. The higher the cap and participation rate, the more the annuity shares in any increase or appreciation of the index.

29.     As EIA sales soared, insurance companies increasingly used sales illustrations as a weapon to depict projected future performance of their respective annuities. These illustrations, used as sales presentation documents, depict projected future annuity values on both a "guaranteed" and a "current" basis. Such illustrations, which were first introduced to promote sales of traditional and universal life insurance products, unfortunately have a long and well-established

---

[1] The correlation between monthly changes in the S&P 500 index and the Russell 1000 from 2000 through 2019 is 0.998.

FIRST AMENDED CLASS ACTION COMPLAINT

history as deceptive, misleading and abusive marketing tools allowing companies to misrepresent and overstate the projected future performance of insurance products.

30.    By the mid-2000s, as interest rates declined to historically low levels, insurance companies faced declining returns on their invested assets and began to reduce the current caps and participation rates on their EIAs.

**C.    The Fraudulent Scheme to Develop and Market the Secure Income and Total Value Annuities**

31.    Guggenheim is a private equity financial services firm with more than $190 billion in assets under management. Beginning in 2009, Guggenheim launched a campaign to acquire financially strapped, vulnerable insurance companies. As part of this strategic plan, Guggenheim acquired Security Benefit in July 2010.

32.    In the years leading up to the Guggenheim purchase, Security Benefit had written substantial annuity business that had put stress on its surplus, which had fallen to $420 million at year-end 2009, giving Security Benefit a very weak solvency ratio (the ratio of total assets to total liabilities) of only 104.5%. In 2009, Security Benefit had acquired a mutual-fund manager with $20 billion in assets under management just as asset prices plunged as a result of the financial crisis. As a consequence, Security Benefit was forced to recapitalize its failing business.

33.    Guggenheim stepped in and acquired Security Benefit in 2010 for $400 million. Guggenheim promptly demutualized Security Benefit, so that its dividends would be paid to Guggenheim rather than its policyholders.

34.    When announcing the acquisition, Guggenheim's managing partner stated that "[t]his transaction enables us to accelerate Security Benefit's growth given the marketplace's increasing demand for robust retirement programs and investment strategies. We believe that Guggenheim Partners brings resources and

1    product development capabilities that will be advantageous to Security Benefit's
2    current and future clients."[2]

3       35.    Soon after the acquisition, Guggenheim deployed Security Benefit and
4    partnered with several industry participants to generate short-term cash by
5    designing, developing and marketing a series of EIAs falsely portrayed as
6    "uncapped" retirement products providing above-market long-term returns through
7    full participation in the performance of certain proprietary indices purportedly
8    protecting annuity owners from market volatility.

9       36.    To implement this fraudulent scheme, Security Benefit partnered with
10   Advisors Excel, an independent marketing organization ("IMO"), and with
11   Innovation Design Group, an insurance product design firm, to develop and roll out
12   the Secure Income Annuity in 2011. A year later, Security Benefit again partnered
13   with Advisors Excel and Innovation Design Group to develop and roll out the Total
14   Value Annuity in 2012. As alleged more fully below, the Secure Income Annuity
15   and the Total Value Annuity (collectively, the "Annuities") were both designed,
16   developed and marketed by Security Benefit, Advisors Excel, Innovation Design
17   Group and others as part of and in furtherance of the same overarching scheme.

18      37.    Security Benefit, Advisors Excel, and Innovation Design Group had
19   longstanding ties to one another. Todd Boehly, the Chairman of Security Benefit,
20   and Cody Foster, co-founder of Advisors Excel, attended Washburn College
21   together. Security Benefit and Advisors Excel partnered to develop the Secure
22   Income and Total Value Annuities. Security Benefit and Advisors Excel were
23   assisted in developing the Annuities by Innovation Design Group, a company
24   founded by Jorden Canfield, another Washburn College graduate.

25
26
27   [2]https://www.guggenheimpartners.com/firm/news/guggenheim-partners-
     announces-definitive-agreement (last visited on December 13, 2019).
28
                                          10
                        FIRST AMENDED CLASS ACTION COMPLAINT

38.    Security Benefit and its partners Advisors Excel and Innovation Design Group marketed the Secure Income and Total Value Annuities through an exclusive network of four "elite" marketing organizations: Advisors Excel, Creative Marketing, Gradient Life Brokerage, and Impact Partnership (collectively, the IMO Associates").[3] As alleged below, the IMO Associates and Security Benefit operated as an associated-in-fact enterprise and conspiracy in violation of the federal RICO statutes.

39.    The Secure Income and Total Value Annuities are both marketed and sold as retirement or investment vehicles and, consistent with that represented objective, the Annuities offer prospective annuity owners the option to purchase the Guaranteed Lifetime Withdrawal Benefit Rider (the "GLWB Income Rider") and other riders providing benefits for nursing home care and terminal illness protection. The GLWB Income Rider, which can only be purchased at the same time as the underlying Secure Income or Total Value Annuity, purports to provide annuity owners with a lifetime annual income during their retirement years, while imposing a rider charge that is applied as a percentage amount deducted each year from the annuity's Account Value.

40.    In addition, the Secure Income and Total Value Annuities contain provisions assessing (a) an Initial Annual Spread, which is a percentage amount deducted each year from the annuity's Account Value, (b) an Initial Participation Rate, which is the percentage of the change in the designated index credited to the Account Value at the end of a specified term, and (c) a percentage cap on interest credited to whatever portion of the Account Value is allocated to the S&P 500 index account.

---

[3]https://www.globenewswire.com/news-release/2012/04/02/1218653/0/en/Security-Benefit-Launches-Innovative-Total-Value-Annuity.html (last visited on December 13, 2019).

41.    The Secure Income and Total Value Annuities also provide for a "Bonus" added to the Account Value, ranging from 8-10% of the initial premium paid by the owner. A specified percentage of the Bonus is recaptured, however, if the Annuity is surrendered or if withdrawals exceeding 10% of the accumulated Account Value are taken during the first 10 years after the Secure Income or Total Value Annuity is issued.

42.    Security Benefit rolled out the Secure Income Annuity in March of 2011, describing the annuity as a long-term, low-risk product designed for retirement savings:

> "This annuity is designed for policyholders who intend to hold it for the long-term and who want their interest linked to the stock market without the risk of losing money in the stock market…." Some of the basics of the annuity are that it can be bought by individuals up to the age of 80. It can be purchased through a traditional or Roth IRA, which works well for individuals wanting to rollover money…when they retire or separate from service….

> "One of the exciting features of Secure Income Annuity is the optional Guaranteed Lifetime Withdrawal Benefit (GLWB) that can be selected at purchase….the effect of the [GLWB] roll-up and the annual increase in the lifetime withdrawal percentage working together can have a significant impact on the amount of lifetime annual income the policyholder can take and can help people be better prepared for their retirement years…"

"Security Benefit Debuts New Fixed Index Annuity With Optional Guaranteed Income for Life."[4]

43.    On February 3, 2014, Security Benefit added the MSDA Index as an allocation option for the Secure Income Annuity. The MSDA Index, which is a

---

[4] https://www.winkintel.com/2011/03/security-benefit-debuts-new-fixed-index-annuity-with-optional-guaranteed-income-for-life/ (last visited on December 13, 2019).

rules-based, excess return index representing equities, short-term treasuries, bonds and alternatives, had launched less than 5 months earlier on September 19, 2013.

44.    The Secure Income Annuity was smashing success, quickly becoming the number one selling EIA in the industry, generating more than $7 billion in premium for Security Benefit. Nonetheless, Security Benefit was not satisfied with this meteoric rise in the EIA marketplace.

45.    Recognizing that it could achieve even more aggressive represented performance by developing its own synthetic index, Security Benefit enlisted the assistance of Advisors Excel, Innovation Design Group and EAM Partners LP to devise the ALTVI.

46.    Insurance companies issuing EIAs do not purchase positions in the indices underlying the equity-linked crediting options. Instead, the issuing company establishes an "options budget" each year equal to the amount the company would otherwise credit under the operative fixed interest crediting option. The company then acquires options to hedge its obligation to credit interest to the equity-linked account based on movements in the selected index and establishes "caps" or "participation" rates based on the terms of the options purchased by the company. Consequently, the costs to acquire hedging options, which are tied to the volatility associated with the assets encompassed by the particular index, determine the level of the established "caps" or "participation" rates. For this reason, the lower option costs associated with an index having lower volatility allows the company to offer higher "caps" and "participation" rates.

47.    Security Benefit and its associates developed the ALTVI as a crediting option for the new Total Value Annuity designed as a successor to the Secure Income Annuity. As a mechanism to illustrate even more aggressive yet unachievable projected future returns, Security Benefit incorporated several design features in the ALTVI. First, Security Benefit tethered the ALTVI to the "Trader

Vic Index" which tracks a collection of commodities and other futures while adding a "volatility overlay" to reduce anticipated volatility. In addition, Security Benefit designed the "5-Year Annuity Linked TVI Index Account" allocation option ("the ALTV Index") to credit interest only at the end of a designated five-year period while prohibiting any re-allocation during the five-year lock up period (and simultaneously imposing severe penalties on withdrawals during the lock up period).

48.    This design allowed Security Benefit to reduce its own hedging costs, permitting the company to acquire cheaper options due to the reduced volatility associated with the gerrymandered assets tracked by the synthetic ALTVI Index and the volatility control overlay. At the same time, as explained below, Security Benefit selected non-representative benchmark periods during which the Trader Vic Index had reported aberrational high gains in order to project future returns that Security Benefit knew to be unattainable.

49.    In furtherance of the ongoing scheme, Security Benefit launched the Total Value Annuity in 2012, extolling the new product as a successor to the Secure Income annuity designed for accumulation and retirement savings:

> "Our Total Value Annuity targets savers with an eye toward asset accumulation and we believe is a sensible part of our retirement savings and income product strategy," said Doug Wolff, President, Security Benefit Life. "Our TVA extends Security Benefit's fixed index annuity product line that includes the [Secure Income Annuity] and has rapidly become one of the top four selling products in the industry, positioning Security Benefit as one of the fastest growing fixed index annuity providers in the nation."

> The Total Value Annuity comes as close to fully addressing the retirement challenge as any product on the market…The Total Value Annuity was designed to protect retirement savings and provide interest on those savings.

"Security Benefit Launches Innovative Total Value Annuity."[5]

50.    In January 2015, Security Benefit added the BPHD Index to its Total Value Annuity. The BPHD Index is made up of high-dividend stocks, chosen through a so-called "rules-based" strategy that adds "yield-enhancement" and "risk-reduction" overlays to a dividend-focused stock portfolio, and is licensed to Security Benefit by global financial group BNP Paribus.

51.    As planned, Security Benefit uniformly represented to prospective purchasers that, unlike other annuities, the Secure Income Annuity and the Total Value Annuity would both provide contract owners with the opportunity to receive ***uncapped***, ***100% participation*** in the Synthetic Indices. Thus, in contrast to the severely capped S&P 500 index crediting option, Security Benefit presented consumers with the purported opportunity to link some or all of the Account Value in a Secure Income or Total Value Annuity to: (a) "uncapped," 100% participation in the MSDA Index for the Secure Income Annuity; and (b) "uncapped," 100% participation in the ALTV Index and the BPHD Index for the Total Value Annuity.

52.    Security Benefit represents to prospective purchasers that the Synthetic Indices are based on underlying indices reflecting changes in the prices of a diversified collection of futures contracts (including equities, commodities, global currencies and interest rates) or equities.

53.    To induce sales of the Secure Income and Total Value Annuities, Security Benefit prepared and disseminated to prospective purchasers uniform sales illustrations and marketing materials promoting them and the Synthetic Indices. The Security Benefit sales illustrations are computer-generated documents containing columns depicting projected future Account Values for the Secure Income and Total

---

[5]https://www.globenewswire.com/news-release/2012/04/02/1218653/0/en/Security-Benefit-Launches-Innovative-Total-Value-Annuity.html (last visited on December 13, 2019).

FIRST AMENDED CLASS ACTION COMPLAINT

Value Annuities based on assumed allocations of the values among specified interest crediting options, including allocations to the Synthetic Indices. The Security Benefit marketing materials include brochures describing the purported features of the Secure Income and Total Value Annuities. The marketing brochures also contain side-by-side or seriatim comparisons depicting the potential future Account Values of the Secure Income and Total Value Annuities based on assumed allocations to the available interest crediting options. The projected future performance of the equity-linked crediting options is premised on represented historical returns of the applicable index. To ensure uniformity, the sales illustrations and marketing brochures are all prepared by Security Benefit and distributed to prospective purchasers through sales agents or brokers who use these marketing materials to sell the Secure Income and Total Value Annuities.

54.    Security Benefit's objective was to make the Secure Income and Total Value Annuities appear more attractive by steering purchasers into the index account options linked to the Synthetic Indices. The Security Benefit sales illustrations and marketing brochures represent that the potential returns for account values allocated to the "uncapped," 100% participation Synthetic Indices are substantially higher than the returns on account values allocated to the "capped" S&P 500 index option.

55.    Indeed, to drive annuity owners into its own Synthetic Indices, Security Benefit designed the Secure Income and Total Value Annuities to throttle the illustrated performance of the S&P 500 index options with extremely low cap rates of 2.5-3.5%.[6] This paltry cap rate, which was lower than the caps and participation rates being offered by other EIA issuers, was intentionally chosen by

---

[6] During the relevant time, other companies were selling equity-indexed annuities with annual point-to-point crediting options based on the S&P 500 index with caps ranging from 4% to 9.65%.

FIRST AMENDED CLASS ACTION COMPLAINT

Security Benefit to induce annuity owners to allocate a large percentage of their account values to the Synthetic Indices (which were more lucrative for Security Benefit and less favorable to the Secure Income and Total Value Annuity owners).

56.    The low caps and participation rates that Security Benefit imposed on its S&P 500 index option, coupled with stiff surrender penalties, multi-year index terms and bonus claw back penalties also served to lock annuity owners into the Synthetic Indices. The Secure Income and Total Value Annuities contain a ten-year surrender charge schedule with penalties as high as 12% and a corresponding ten-year bonus recapture provision that claws back 100% of the purported "premium bonus" for the first six contract years. Furthermore, the Annuities allocated to the Synthetic Indices did not mature and credit interest until the end of a specified Index Term, usually 2 or 5 years, meaning that the Account Values would not be credited with interest based on changes in the index until the expiration of the specified Index Term. Security Benefit annuity owners thus faced severe financial penalties if they surrendered their Annuities and had no financially viable escape route from the Synthetic Indices because the alternative S&P 500 option offered by Security Benefit carried a significantly below-market, unfavorable cap rate.

57.    Because the ALTV Index is used exclusively with the Total Value Annuities, prospective purchasers have no pre-existing or independent knowledge about the index. Therefore, any decision by an annuity owner to allocate his or her Account Values to the ALTV Index necessarily results from reliance on the representations and omissions made by Security Benefit in its sales illustrations, marketing materials, and contract documents. The same is true for the MSDA Index and the BPHD Index, recently launched obscure proprietary indices known to prospective consumers only through Security Benefit's marketing materials.

58.    Security Benefit's aggressive tactics and misleading sales scheme yielded immediate financial rewards for Security Benefit and its parent,

Guggenheim Partners. As alleged above, after introducing the Secure Income Annuity, Security Benefit rocketed from unranked on January 1, 2011, to number one in EIA sales as of December 31, 2011. And the follow-on Total Value Annuity replaced the Secure Income Annuity as the number one selling product in the EIA marketplace.

### D.    Security Benefit Misrepresents the Features and Performance of the Secure Income and Total Value Annuities

#### 1.    Deceptively Misleading and Incomplete Sales Illustrations and Marketing Brochures

59.    As alleged above, to induce sales prospects to purchase the Secure Income and Total Value Annuities and direct their premium dollars to the Synthetic Indices, Security Benefit prepares and disseminates misleading sales illustrations and marketing materials depicting that the "uncapped," 100% participation feature of the Synthetic Indices will potentially generate outsized above-market returns – with projected annual returns as high as 8% or higher – far exceeding the comparative performance of crediting options based on "capped" indices like the S&P 500.

60.    The Security Benefit illustrations and marketing materials are deceptive and materially misleading for a variety of reasons. The Synthetic Indices are not established reference indices, like the S&P 500. To the contrary, they are proprietary "indices" employed by Security Benefit as a mechanism to depict inflated, unattainable future returns using the artifice of purported "uncapped" 100% participation.

61.    Moreover, Security Benefit intentionally employed the Synthetic Indices as a fraudulent artifice to overstate and misrepresent the projected or reasonably attainable future performance of the Secure Income and Total Value Annuities and to intentionally induce prospective purchasers and owners of the Annuities to allocate their Account Values to the Synthetic Indices.

62.    To achieve the unattainably high future returns depicted in its illustrations and marketing materials, Security Benefit and its associates cherry-picked the historical period used as the benchmark to project the future illustrated values of the Secure Income and Total Value Annuities. Security Benefit used such so-called "backtesting" (or "backcasting") to project future returns based on the non-representative historical performance of a hypothetical collection of assets to a past period beginning years *before the Synthetic Indices even came into existence*.

63.    At the same time, though, Security Benefit intentionally selected Synthetic Indices that produce near-zero returns, simultaneously thereby reducing its own hedging costs. Thus, the Synthetic Indices were heavily concentrated, either by origin or periodic rebalancing, in cash or cash-like commodities or assets with expected returns close to zero. Security Benefit further eroded even the meager expected returns by spreads deducted by the index managers from the actual annual performance and structuring the Synthetic Indices as "excess return" vehicles (meaning that the actual gross returns are reduced by an amount based on the risk-free rate).

64.    At the same time that Security Benefit and its associates cherry-picked the benchmark reference periods to correspond with years when the index asset components exhibited non-representative gains, they inconsistently assumed a 100% participation rate over the entire backcast period even though the hedging costs associated with such market conditions would preclude full participation in the out-sized returns.

65.    In short, Security Benefit with the assistance of Advisors Excel and Innovation Design Group knowingly and falsely rigged the illustrated future performance of the Secure Income Annuity and Total Value Annuity by backcasting performance of the artificial, Synthetic Indices and applying unsupported

FIRST AMENDED CLASS ACTION COMPLAINT

assumptions – deliberately depicting future returns in its sales illustrations and marketing materials that it knew could not in fact be replicated going forward.

66.    For example, to induce Plaintiff Webber to select the ALTV Index crediting option, Security Benefit provided to him a sales illustration prepared on April 22, 2014. The Security Benefit illustration depicted results for a $535,000 premium payment allocated 75% to the ALTV Index and 25% to the S&P 500 index based on the most recent 10-year history. As the following excerpt shows, the illustration depicted the ALTV Index yielding a 38.62% return over 5 years (more than 7.7% per year) with the S&P 500 index yielding only between 0-3.25% during the same time:

### TOTAL VALUE — ANNUITY HYPOTHETICAL ILLUSTRATION

**Most Recent 10 years Scenario Illustrated Values\***

Age Lifetime Income St: **66**

| Start of Year | Primary / Secondary Attained Age | Withdrawals (1) | S&P 500® Index Acct Annual Point to Point | | ALTVI Index Acct 5 year Point to Point | | Total Account Value (6) |
|---|---|---|---|---|---|---|---|
| | | | Index Int Rate (2) | Account Value (3) | Index Int Rate (4) | Account Value (5) | |
| 1 | 63 / 53 | $0 | | $147,125 | | $441,375 | $588,500 |
| 2 | 64 / 54 | $0 | 3.25% | $146,047 | 0.00% | $441,375 | $587,422 |
| 3 | 65 / 55 | $0 | 3.00% | $144,292 | 0.00% | $441,375 | $585,667 |
| **4** | **66 / 56** | **$29,934** | **3.25%** | **$112,615** | **0.00%** | **$441,375** | **$553,990** |
| 5 | 67 / 57 | $29,934 | 3.25% | $79,405 | 0.00% | $441,375 | $520,780 |
| 6 | 68 / 58 | $29,934 | 0.00% | $42,535 | 38.62% | $611,856 | $654,391 |

20
FIRST AMENDED CLASS ACTION COMPLAINT

67.    In reality, as the following excerpt from Plaintiff Webber's Annual Statement for 2019 shows, over its 5-year term the ALTV Index exhibited a *negative* index change of -4.56% resulting in an Index Interest Rate credit of *"0.00%."*

| 5 Year Annuity Linked TVI Index Accounts | | | | | | |
|---|---|---|---|---|---|---|
| Index Term | Initial Index value | 6/17/2019 Index Value | Index Change through 6/17/2019 | Annual Spread | Participation Rate | Index Interest Rate Before Vesting Percentage |
| 06/17/2014 - 06/17/2019 | 297.00 | 283.47 | -4.56% | 0.50% | 100% | 0.00% |

68.    Security Benefit's uniform marketing materials contained similar false projections of the future returns potentially achieved through allocation of annuity values to the "no cap" crediting options linked to the Synthetic Indices. These uniform marketing materials also contained misleading comparisons falsely depicting that the future returns available through the Synthetic Indices would be substantially more favorable than those achieved using established indices like the S&P 500.

69.    For example, a Security Benefit marketing brochure from 2014 contained the following graph purporting to compare the performance of a Secure Income Annuity allocated entirely to the MSDA Index to one allocated entirely to the S&P 500, for the period from December 1999 through December 2013:



70.    According to this projection, a Secure Income Annuity funded with an initial $100,000 premium payment would produce a gain of $97,000 over the 14-year period (an annual return of about 7%), while the same annuity allocated to the S&P 500 would have produced a gain of only $27,867.

71.     Again, these unreasonably aggressive backcasted returns for the MSDA Index depicted in the Security Benefit marketing materials stand in sharp contrast to the index's actual real-world performance. The following chart shows the actual comparative performance of the MSDA Index in juxtaposition to the performance of the S&P 500, Dow Jones and NASDAQ indices over the period from 2014 through 2018:



72.     Similarly, despite hyping the BPHD Index as one that would produce strong returns with a reduced level of volatility and risk, as shown below in blue, the BPHD Index's actual performance compared to the Dow Jones and the S&P 500 Indices from July 2014 (when the BPHD Index was created) until the present shows a different, much bleaker picture:

FIRST AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13



14
15    73.    Security Benefit was thus able to represent the favorable returns for
16    the Synthetic Indices depicted in its misleading illustrations and marketing
17    materials only by using selectively engineered backcasting techniques to
18    misrepresent the expected future performance of the rigged Indices. Security
19    Benefit knew that the illustrated future returns for the Synthetic Indices based on its
20    intentionally distorted backcasting models was impossible to achieve because
21    standard economic models using recognized statistical methods (such as the monte
22    carlo analysis) demonstrate that the expected returns for the assets underlying the
23    Synthetic Indices are nearly zero once the spreads and costs of the Secure Income
24    and Total Value Annuities are taken into account.
25    74.    Security Benefit's pernicious use of the spiked Synthetic Indices has
26    had a particularly deleterious impact on annuity owners who purchased the
27    Annuities with the GLWB Income Rider. Security Benefit represents that the
28    GLWB Income Rider "is designed to help address longevity risk by providing you

FIRST AMENDED CLASS ACTION COMPLAINT

with a guaranteed stream of income you cannot outlive."[7] Nonetheless, according to Security Benefit's marketing materials, the GLWB Income Rider provides a "Lifetime Annual Income" based on an "Income Benefit Base ... equal to your purchase payments, plus the bonus on purchase payments in the first year, plus the Stacking Roll-up, reduced for partial withdrawals…. The Stacking Roll-up is calculated by adding together the weighted interest rates applied to your Account Value with the guaranteed 4% stacked on top" applied each contract anniversary. The actual Lifetime Annual Income amount is determined as a percentage of the Income Benefit Base dependent on the age at which the owner begins taking the Lifetime Annual Income.

75.    There are numerous restrictions undermining the true value of the GLWB Income Rider. For example, withdrawals taken before the Lifetime Annual Income begins or any "Excess Withdrawals" exceeding the Lifetime Annual Income Amount will reduce or potentially eliminate the entire benefit available under the GLWB Income Rider. These restrictions are obscured by the confusing prolix language of the GLWB Income Rider itself, which contains a plethora of interrelated defined terms.

76.    However, even if annuity owners scrupulously comply with these inadequately disclosed restrictions, those who allocate a portion of their Account Values to the Synthetic Indices will not receive the illustrated Lifetime Annual Income because the Synthetic Indices are designed and administered to generate near-zero returns that are, in turn, eroded by annual spreads and the Income Rider charges (an initial annual fee equal to .95% of the accumulated Account Value which can increase to 1.80%).

---

[7]  https://www.sbelitepartners.com/products/total-value-annuity.aspx  (last visited on December 13, 2019).

77. In short, Security Benefit knowingly misrepresented the performance of the Secure Income and Total Value Annuity crediting options by using Synthetic Indices deliberately designed to generate *near-zero* long-term returns to the annuity owner, through materially false and misleading backcasted demonstrations of the purported advantages of allocating all or a portion of the Account Value of the Secure Income or Total Value Annuity to those crediting options.

78. As Security Benefit knew and anticipated, the actual returns associated with the Synthetic Indices have in fact hovered near zero, lagging far below the returns associated with legitimate, non-proprietary indices like the S&P 500 or the Dow Jones Industrial Average.

79. Regulators and regulatory bodies, including the National Association of Insurance Commissioners (the "NAIC"), have recognized the potentially misleading nature of back-casted proprietary indices used to illustrate or promote annuities. For example, the following Bulletin issued by the Iowa Insurance Commissioner to insurance companies issuing annuities in Iowa highlights the very abuses associated with the Annuities:

> The Division has observed that some IMOs are aggressively promoting indexed annuities in potentially deceptive manners.
>
> First, IMOs are emphasizing high-interest lifetime withdrawal benefit riders. Some of the advertising claim the withdrawal benefit rider has an annual rate of return, *e.g.*, "client earns 8%." This statement is misleading if the consumer is not equally informed of the restrictions imposed by the rider.
>
> Second, the Division reviewed advertisements on annuity products in which the advertisements offer "uncapped" rates of return. …[I]f the advertising is viewed by a consumer, it has the capacity to contribute to inflated consumer expectations of future performance of the annuity product….[I]n reality, the referenced rate is actually limited by spreads, participation rates, or the design of volatility controls, significantly

reducing the actual return. The use of "uncapped" terminology without additional disclosures of limitations is misleading….

Similarly, some marketing materials depict charts of recently developed "proprietary indices," which did not exist during the illustrated time frame, but are back-casted and hypothetically demonstrate how they would have outperformed traditional indices. … Using these hypothetical performance charts is misleading if they, directly, or indirectly through subsequent representations by producers, are used to project future performance and contribute to inflated consumer expectations.

"Bulletin 14-02" issued September 15, 2014.

80.    Similar concerns about the use of back-casted proprietary indices in sales illustrations and marketing materials were voiced by New York Life, MetLife and Northwestern Mutual in submissions to the NAIC:

[M]any market participants utilize the practice of calculating hypothetical historical returns. These hypothetical look back calculations take into account the past performance of the underlying index, but not interest rates, volatility or option prices, which are drivers of the non-guaranteed elements. In certain economic environments, the hypothetical look back approach may allow maximum illustrated rates that are not appropriate for general account life insurance policies and, if used improperly, could be misleading to purchasers….

Statement to NAIC on "Actuarial Guidelines on IUL Illustrations" dated September 5, 2014.

81.    Finance experts have acknowledged the actual and potential abuses stemming from backcasted projections, including those made by Security Benefit using the ALTV Index, resulting from the selection of unrepresentative benchmark time periods, overfitting, data mining, volatility filters and similar assumptions. *See e.g.*, G. Deng, C. McCann and M. Yan, "Structured Products and the Mischief of Self-Indexing," The Journal of Index Investing (Spring 2017); O. Sarfati,

"Backtesting: A Practitioner's Guide to Assessing Strategies and Avoiding Pitfalls," CBOE 2015 Risk Management Conference.

### E.    Misleading and Incomplete Statements of Understanding

82.    To ensure uniformity in sales presentations, Security Benefit requires that each purchaser of a Secure Income or Total Value Annuity acknowledge and sign a "Statement of Understanding" ("SOU"). Security Benefit made the SOUs available to the selling agent and the purchaser through the mail and wire facilities of the United States, and required the SOUs to be signed by the agent and the purchaser and returned to Security Benefit using the same mail and wire facilities of the United States. The SOUs effectively ensured the consistency of Security Benefit's misleading representations and omissions regarding the Annuities and the Synthetic Indices described below.

83.    Each Security Benefit SOU purports to describe the nature, attributes and operation of each interest crediting option available to the annuity owner, including the Synthetic Indices. These descriptions are critically important because the interest crediting allocation made by the owner will determine the future returns creating growth in the Account Value, which is the most critical purported benefit of the Secure Income or Total Value Annuity. Where the owner has purchased the GLWB Income Rider, the importance of the future rate of return is magnified because the Stacking Roll Up feature, which determines the amount of Lifetime Annual Income available to the owner, is tied to the level of accumulated Account Value.

84.    Furthermore, the standardized disclosures describing the Synthetic Indices contained in the SOUs are of paramount importance because this information, coupled with the illustrations projecting the future performance of the Synthetic Indices and the descriptions in the marketing brochures, are as a practical

matter the only information about the Synthetic Indices conveyed or reasonably available to prospective purchasers of the Secure Income or Total Value Annuities.

85.    Given the complexity of the Secure Income and Total Value Annuities, which are opaque, incomplete instruments that obfuscate the operative provisions through a maze of complicated and inter-related defined terms, prospective purchasers need accurate, adequate and clearly disclosed information about the Annuities and Synthetic Indices presented in an understandable format explaining the true costs, risks and values associated with the interest crediting options tied to those indices.

86.    Rather than providing the information necessary for a consumer to make an informed decision whether to purchase a Secure Income or Total Value Annuity or to allocate funds to an account tied to performance of the Synthetic Indices, the SOUs contain misleading information and fail to disclose material information about the Synthetic Indices. As shown below, the partial and fragmentary disclosures in the SOUs are accompanied by the willful concealment of material and qualifying facts, and as such are no less fraudulent than a direct misrepresentation -- which, in effect, they are.

## 1.    The SOU Deceptively Describes the ALTV Index

87.    The uniform Security Benefit SOU represents that the ALTV Index is based on the Trader Vic Index ("TVI"), which is described as "a published index on Bloomberg." The SOU fails to disclose, however, that the ALTV Index was in fact developed by Security Benefit in collaboration with Advisors Excel and the Innovation Design Group, who are contracted to sell the Secure Income and Total Value Annuities and Alpha Artists LP which holds an exclusive license to distribute the ALTV Index. It further fails to disclose that the ALTVI was chosen and designed using a selectively designated backcast period so that Security Benefit

FIRST AMENDED CLASS ACTION COMPLAINT

1    could depict outsized future returns in its uniform sales illustrations and marketing

2    materials that Security Benefit knew were not reasonably attainable.

3    88.    The Security Benefit SOU describes the ALTV Index as an "index that

4    is based on the Trader Vic Index Excess Return Index (TVI) modified by an index

5    cost fee and a volatility control overlay." This statement is a materially misleading

6    misrepresentation that omits critically important facts. The SOU does not disclose

7    or explain that, as an excess return index, the actual returns of the TVI will be

8    reduced not only by the 1.25% index cost spread, but also by an additional amount

9    corresponding to the risk-free rate of return. Furthermore, because as alleged above

10    the collection of commodities comprising the ALTV Index already have an

11    expected near-zero return, deduction of the risk free rate has a far greater adverse

12    impact on performance than would be the case for a traditional excess return index,

13    which would have an expected gross annual return closer to 7-9% before reduction

14    by the risk free rate (of about 1%).[8]

15    89.    The Security Benefit Annuities carry multiple spreads, costs and

16    performance dampening features referenced at disparate locations throughout the

17    prolix SOU and other contract documents that operate collectively to essentially

18    offset the already below-market returns of the ALTV Index. The collective impact

19    of these spreads and charges – which include the annual spread deducted at the

20    index level, the excess return reduction, the annual spread deducted by Security

21    Benefit and the fact that interest is not credited until the end of the applicable Index

22    Term – is not meaningfully disclosed in the ALTV Index SOU or the other

23    standardized contract documents.

24    _____

25    [8] The SOU fails to disclose that the TVI itself was designed by RBC in collaboration
with Victor Sperandeo (nicknamed "Trader Vic"), a commodities trader and index

26    developer whose controversial views have been widely criticized for his dogmatic
fixation on gold and other commodities as investment opportunities despite a long-

27    standing and persistent trend of low inflation.

28
FIRST AMENDED CLASS ACTION COMPLAINT

90.    Similarly, the SOU fails to disclose the operation, impact or import of the "volatility control overlay." The volatility control overlay has at least two effects, neither of which is disclosed or explained in the ALTV Index SOU. First, the volatility control overlay operates to effectively reduce the participation rate when the TVI is volatile. Because there already is a 0% floor on the credited interest rate, the owner actually benefits from volatility, which translates into an effective higher participation rate in higher-yielding assets. When the index is less volatile, the volatility control overlay provides only minimal additional positive performance.

91.    In addition, the volatility control overlay impacts the index cost spread, scaling the fee higher when volatility is lower and scaling the fee lower with increased volatility. These changes in the index cost fee tend to offset any positive impact of the changes in participation rates resulting from the volatility control overlay.

92.    None of these material facts are disclosed in the SOU. To the contrary, the SOU falsely states that "[t]he volatility control overlay reduces the impact of a fall in price, as well as increases in the price of the TVI." In truth there is no or minimal impact on the Total Value Annuities based on a fall in the level of the TVI because the Total Value Annuities have a 0% floor on the credited interest rate. On the other hand, the volatility control overlay does reduce the positive impact of an increase in the value of the TVI. The ALTV SOU misleadingly suggests that the volatility control overlay has a symmetrical impact on performance of the ALTV Index credits when it does not.

93.    The SOU also represents that "[b]ecause it is based on the TVI, the [ALTV] Index Account provides you with the opportunity to receive index interest credits in times when an index crediting option based on equity or bond markets would not." This statement is false and misleading. The imposition of a 5-year term

makes the ALTV Index less advantageous than an annual point-to-point stock or equity index because the 0% floor applied to more traditional annual point-to-point interest crediting options operates to exclude negative annual returns as the index reference point is reset each year, while the 5-year term applicable to the ALTV Index incorporates interim negative returns in determining the applicable interest credit at the end of the Index Term. If a bond index were chosen, there is no scenario under which the ALTV Index would provide an interest credit when the fixed interest index would not. If an equity index were chosen, there has been no time in history when an annual equity crediting method would not have generated a positive interest credit over a 5-year term.

94.    Another glaring omission of the Security Benefit SOU is its utter failure to disclose or describe the actual composition of the assets underlying the ALTV Index or the "rules-based adjustment" applied by the volatility control overlay in computing the asset values underlying the ALTVI Index. The SOU states only that the ALTV Index is based on the Trader Vic Index, which "measures the movements in prices of futures contracts on physical commodities, global currencies and U.S. interest rates that are publicly traded on a U.S. exchange that publishes the contracts' daily settlement prices" and that the volatility overlay is a rules-based methodology. The SOU fails to disclose that the futures contracts tracked by the Trader Vic Index are concentrated in commodities and currencies having an expected near-zero return and to the extent a minor portion of the indexed futures are tied to interest rates, any potential return exceeding the risk-free rate is offset by the spreads and charges exacted by the Royal Bank of Scotland and Security Benefit.

95.    Without information disclosing the initial composition and allocation of the 24 futures contracts comprising the ALTVI or the rules used to re-allocate the futures contracts, it is impossible for any consumer – even those who might be

finance experts – to understand the risks and potential returns associated with the ALTVI or to discern that the projected returns depicted in the illustrations and other marketing materials described above are false and misleading.

96.     In fact, the SOU not only fails to disclose the foregoing critical facts, it affirmatively misrepresents that the non-correlation of the ALTV Index to equity and bond markets is a positive feature without disclosing that attribute is a drag on future returns for the Total Value Annuities. The SOU states that "[b]ecause the TVI is based on the 24 futures contracts on commodities, global currencies and U.S. interest rates, the daily values of the TVI are likely to be independent from the price movement of equity and bond indices." Such non-correlation in fact results in lower returns because, as alleged above, the non-correlated futures contracts are concentrated in asset classes producing expected returns no higher or little higher than the risk-free rate attainable through treasuries.

97.     The SOU thus misleadingly represents that the ALTVI is based on the Trader Vic Index Excess Return index, while failing to meaningfully disclose: (a) that the assets underlying the ALTVI were cherry-picked to yield returns that Security Benefit knew were unrepresentative and unattainable by virtue of the undisclosed facts alleged above; (b) the nature, mechanics and adverse impact of the "excess return" reduction formula applicable of the ALTVI, particularly in relation to the near-zero expected performance of the index tethered to commodities comprising the index; (c) the inevitable crippling impact of the annual 125 basis point spread on the already near-zero expected performance of the ALTVI; (d) the cumulative adverse impact of the "volatility overlay" on the performance of the ALTVI or the quantitative objective or other material information relating to the "rules-based adjustment[s]' resulting from the volatility overlay.

98.     The misleading nature of the misrepresentations, half-truths and corresponding omissions of the SOUs and marketing materials for the Security

1    Benefit Annuities based on the ALTVI Index is shown by the stark divergence in

2    the performance of the ALTVI and that of the TVI over the past four years In the

3    chart below, the orange line represents the performance of the TVI while the black

4    line represents the grossly underperforming ALTVI:



15       99.    This drastic underperformance of the ALTVI in comparison to the TVI

itself is a direct result of the undisclosed cumulative adverse impacts of the "excess

return" and "volatility overlay" constraints and the annual spreads applied to the

ALTVI. Analyzing the composition and performance of the ALTVI, one financial

commentator observed:

> Perhaps most embarrassing of all….[the ALTVI] "index", which
> is "designed to capture both rising and falling price trends by
> taking long and short positions on a monthly basis in 24 futures
> markets across the commodity, fixed and foreign exchange asset
> classes" which utilizes a "volatility control overlay" has been
> consistently crushed since its inception … Returns are negative
> over a 1 (-5.6 percent annualized), 3 (-15 percent annualized and
> 5-year (-12.3 percent annualized) periods…. As a supposed
> hedge against what has been deemed a sure thing since 2005, it's
> hard to imagine a worse result. Historical backtesting suggests
> that the "index" shouldn't be expected to provide more than half
> the expected returns of stocks – that's okay for a hedge during

particularly tough times or in small positions but quite dangerous when played in size and over extended periods.[9]

100.   This harsh reality is a far cry from the favorable future returns and other positive representations about the ALTVI depicted in the uniform illustrations, marketing brochures and the SOUs used by Security Benefit and the other members of the RICO enterprise described below to promote sales of the Annuities through the U.S. Mail, internet postings, emails, wire transmissions and other interstate electronic media.

### 2.    The SOU Deceptively Describes the MSDA Index

101.   The Security Benefit SOU for the MSDA Index is similarly misleading. Like the description of the ALTV Index, the Security Benefit SOU description of the MSDA Index fails to disclose any information concerning the actual or anticipated allocation of the asset classes underlying the index. The SOU states only that the MSDA Index "consists of U.S.-listed Exchange Traded Funds which track four distinct asset classes: (1) Equities, (2) Bonds, (3) Short-Term Treasuries and (4) Alternatives. The allocation among the asset classes is determined by the rules-based strategy."

102.   The SOU fails to disclose that, over the past two decades, the MSDA Index on average has allocated *only about 15% or so* of the underlying asset classes to equities, with the balance allocated to short-term treasuries, bonds and commodities with expected returns no higher than the risk-free rate or, respectively, near zero. And once again, any meager expected future returns are further offset by spreads and other charges at the index or annuity level.

103.   In addition, just as with respect to the ALTV Index, the SOU falsely misstates the true nature and impact of the volatility control overlay, because the

---

[9] R Seawright, "Lessons from 'Trader Vic'" Above the Market (May 4, 2013) https://rpseawright.wordpress.com/2013/05/04/lessons-from-trader-vic/ (last visited January 20, 2020)

1  Secure Income Annuities have a 0% floor on the credited interest rate, while the
2  volatility control reduces the positive impact of an increase in the value of the
3  MSDA. The MSDA SOU misleadingly suggests that the volatility control overlay
4  has a symmetrical impact on performance of the MSDA Index credits when it does
5  not.

6      104.   Furthermore, the SOU states only that the MSDA Index allocates
7  assets based on a "rules-based strategy" without describing or disclosing the
8  operative rules or strategic goals. The SOU does not disclose that, in comparison to
9  other annuities using such rules-based volatility overlays, the MSDA Index actually
10  uses low volatility as an asset class selection tool to select equities or asset classes
11  with the lowest volatility.

12      105.   The Security Benefit SOU suggests that for additional information
13  consumers should obtain and refer to a brochure entitled *A Closer Look at the*
14  *Morgan Stanley Dynamic Allocation Index* (the "MSDA Brochure"). The MSDA
15  Brochure contains additional information concerning the MSDA Index (although
16  much of that information is relegated to small font language at the back of the
17  brochure), but like other marketing materials it paints a distorted picture of the
18  MSDA performance. For example, the current MSDA Brochure contains a chart
19  depicting the allocation of asset classes from 1999 through 2018 juxtaposed against
20  the performance of the S&P 500 Index. Because the MSDA began its existence in
21  2014, all of the performance prior to that date is itself the product of back-casting
22  performance that never occurred. In any event, the portion of the chart
23  corresponding to the period from 2014-2019 is set forth below:

24
25
26
27
28

FIRST AMENDED CLASS ACTION COMPLAINT



106.    Conspicuously and intentionally absent from this chart, however, is a comparison of the performance of the MSDA Index itself to that of the S&P 500 over the same time period, which is shown in the chart below:



37
FIRST AMENDED CLASS ACTION COMPLAINT

1
2
3
4
5
6
7
8
9
10



11      107.    A non-misleading chart depicting the performance of the MSDA Index
12  in relation to the performance of the S&P 500 index over the period from 1999-
13  2018 would have looked like this:
14
15
16
17
18
19
20
21
22



23
24
25
26
27
28

108.   In short, to the extent Security Benefit references potential purchasers to the MSDA Brochure for a further description of the MSDA Index, doing so does not cure but rather exacerbates the deceptive description of the MSDA in the SOU.[10]

### 3.    The SOU Deceptively Describes the BPHD Index

109.   The Security Benefit SOU for the BPHD Index is also misleading and omits material information necessary for consumers to make an informed decision whether to purchase the Annuities and allocate Account Values to the BPHD. Like the description of the ALTV and MSDA Indices, the Security Benefit SOU description of the BPHD Index fails to disclose any information concerning the actual or anticipated allocation of the asset classes underlying the index.

110.   The SOU further fails to disclose that the BPHD Index was only launched in July 2014 and had no demonstrated performance record from which annuity owners could make any assessments regarding the risks or benefits of allocating any portion of their Account Value to it.

111.   The SOU for the BPHD Index states that the index results are "subject to an annual spread" but fails to disclose the amount of the spread, how the spread is determined or adjusted or any other information about the spread. Similarly, the SOU discloses only that "a participation rate may also apply in the future" without disclosing the amount or potential range or nature of any such participation rate or

---

[10] The relative performance of the respective indices is a materially relevant consideration for prospective purchasers of the Security Benefit Annuities. In addition, a meaningful comparison of the reasonably expected potential performance of the Security Benefit Annuities to alternative equity-indexed annuities would factor in the relative reasonably expected performance taking into account the respective caps, participation rates, spreads and other expenses associated with available annuity products. During the relevant period, commercially available competitive annuities based on the S&P 500 index recorded average annualized returns of about 4% (as compared to the near-zero returns of the Security Benefit Annuities).

the circumstances that would result in imposition of such a participation rate. The SOU omits any information concerning the actual or expected adverse impact of the undisclosed annual spread and/or potential participation rates. This omitted information is both material and necessary for consumers to understand the actual risks and adverse facts associated with the BPHD Index. Indeed, the undisclosed annual spread imposed by the BPHD, which is 1%, is the highest service fee charged by any company selling volatility-controlled annuities, with some companies charging fees as low as .25%.[11]

112. Furthermore, the Security Benefit SOU fails to disclose that the BPHD Index is a volatility-controlled index, let alone the nature and impact and nature of the volatility overlay. The Security Benefit SOU describing the BPHD Index contains no disclosures whatsoever apprising consumers of the existence of the volatility control overlay, let alone that the very design of the volatility control is designed to limit the future interest index credits to the Annuities while reducing Security Benefit's own hedging costs. This misleading omission is exacerbated by Security Benefit's representation that the Annuities are "uncapped" or provide "100 percent participation" because the volatility overlay operates as a governor limiting the future expected returns.

113. In addition, the Security Benefit SOU fails to disclose that the BPHD Index is an excess return index such that the actual returns will be reduced by both the index cost spread and also by an additional amount corresponding to the risk free rate of return. In the prevailing interest rate environment the undisclosed excess

---

[11] "AMS FIA Volatility Control Index Overview" Advantage Compendium Ltd. (Spring 2019) https://amsfsg.com/email/AMS_2019_FIA_Volatility_Control_Index_Overview.pdf (last visited January 20, 2020)

FIRST AMENDED CLASS ACTION COMPLAINT

1   return reduction effectively subtracts 2% or more from the gross return of the BPHD
2   Index, even before the annual spread and any participation rate is applied.

3      114.   Compounding the foregoing undisclosed facts, because the Security
4   Benefit SOU does not disclose that the BPHD is a rules-based index, the SOU
5   provides no information allowing consumers to evaluate or assess the impact of the
6   undisclosed rules on the composition of assets underlying the BPHD Index (which
7   include dividend stocks, cash and call options) or the expected or potential impact
8   that the rules-based regime on the performance of the index.

9                      **FEDERAL RICO ALLEGATIONS**

10      115.   RICO provides a civil cause of action for private plaintiffs and
11   authorizes substantial remedies, including the availability of treble damages and
12   attorneys' fees. Establishing a RICO violation requires proof by a preponderance of
13   the evidence of "(1) conduct (2) of an enterprise (3) through a pattern (4) of
14   racketeering activity." *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496–97 (1985)
15   (interpreting § 1964(c)), *Klay v. Humana,* 382 F.3d 1241 (11th Cir. 2004).

16      **A.  The Enterprise**

17      116.   Security Benefit, each IMO Associate, and EAM Partners LP are
18   "persons" within the meaning of 18 U.S.C. § 1961(3). Plaintiffs and the other
19   members of the National Class defined below are each "persons" within the
20   meaning of 18 U.S.C. §1961(3), and each of them has sustained injury to their
21   business or property as a result of the acts and the conduct of Security Benefit and
22   the IMO Associates described herein.

23      117.   The following group of individuals associated in fact as an "enterprise"
24   within the meaning of 18 U.S.C. §1961(4) to develop, market and sell the Annuities:
25   (a) Security Benefit, (b) Advisors Excel, (c) Creative Marketing, (d) Gradient
26   Financial, (e) Impact Partnership, (f) Innovation Design Group, and (g) EAM
27   Partners LP. This association in fact is referred to herein as the "Enterprise." As

28

alleged more fully in the following paragraphs, the Enterprise has an ascertainable and hierarchical decision-making structure, an ongoing and continuous existence that is separate from the alleged pattern of racketeering activities and members who have existences and activities that are separate and distinct from those of the Enterprise.

**B. Ascertainable Structure**

118. The Enterprise is an ongoing and continuing organization of entities associated for the common or shared purpose of marketing and selling the Annuities. Each member of the Enterprise has a clearly defined role in the affairs of the Enterprise.

119. The Enterprise was first formed by Security Benefit, Advisors Excel and Innovation Design Group in 2011 with the development and launch of the Secure Income Annuity. As reported at the time:

> Three Topeka-based companies have joined forces on an innovative retirement product and expect their efforts to have far-reaching benefits, ranging from thousands of new customers nationwide to dozens of new jobs in Topeka. On Friday, officials from Security Benefit, Advisors Excel and Innovation Design Group celebrated the launch of their new home-grown effort at Security Benefit's home office….
>
> The product, Secure Income Annuity, is designed to help people reach their financial goals during retirement. The annuity will be offered to customers nationwide by independent financial planners who work with Advisors Excel and Innovation Design Group.

https://www.cjonline.com/article/20110304/NEWS/303049748.    (last    visited January 15, 2020).

120. As the foregoing news report made clear, Security Benefit, Advisors Excel and Innovative Design Group worked closely together, performing their respective roles, to develop and launch the Secure Income Annuity. "Derek

Thompson, one of the three founders of Advisors Excel, said his group began talking with Canfield (founder of Innovation Design Group) about plans for the new product about a year and a half ago." *Id.*

121.    Security Benefit formed the Enterprise to re-enter the market for EIA products:

> Smaller life insurers – battered by the recession but ready to get back into the annuity business – have begun to outsource the manufacturing of fixed annuities to marketing groups…While the idea of selling insurance products through field-marketing organizations is nothing new, turning over manufacturing to them is – and perhaps marks a sign of the times.

***

> Security Benefit and Advisors Excel kicked off the spring with the release of the Secure Income Annuity…Teaming with Advisors Excel as a distributor and with Innovation Design Group on product creation helped Security Benefit make its debut into the retail market as a fixed-indexed-annuity seller. Doug Wolf, president of the retail retirement group [at Security Benefit said]… "Innovation Design Group and Advisors Excel took a new entrant [Security Benefit] into the space, knew that we have a lot of capital and saw that we're serious about growing."[12]

122.    In addition to the developing Secure Income Annuity, Security Benefit also partnered with Enterprise members Advisers Excel, Innovation Design Group and EAM Partners LP to develop the Total Value Annuity. According to its website, Innovation Design Group in April 2012 "introduced a commodities-based index [the ALTVI] that is non-to negatively correlated to the S&P. Thus, for the first time in the Fixed Indexed Annuity Marketplace, clients have an alternative to strictly

---

[12] "New Insurance Alliances Spawn Annuity Innovations," Investment News, April 24, 2011.   https://www.investmentnews.com/article/20110424/REG/304249983 (last visited on January 2, 2020).

FIRST AMENDED CLASS ACTION COMPLAINT

fixed interest or equities-based crediting with a cap on the upside potential."[13] The Innovation Design Group website further describes its role in developing the ALTVI and similar proprietary indices:

> We introduce another solutions-based product [in 2d Quarter 2012]. This product, featuring the first of our alternative proprietary indexes, was distributed through only the top FMOs in the industry…And with the uncapped interest crediting option available in addition to minimum guaranteed growth, this product rocketed to #1 in the FIA space in a few short months. Not the type to rest on our laurels, we made this product even more compelling by introducing our second proprietary index in the Summer of 2013.

http://www.innovationdesigngroup.com/idg-proven-success.php. (last visited January 15, 2020).

123.   As the sale of the Security Benefit Annuities soared, the Enterprise recruited the other IMO Associates as members and granted them the exclusive right to market and sell the Annuities. According to CEO, Michael P. Kelly, Security Benefit was "eager to again partner with Advisors Excel, together with the three other elite marketing organizations, Creative Marketing, Gradient Financial and Impact Partnership" to develop and market the Annuities.[14]

124.   The Enterprise has an ascertainable structure with each of its members performing clearly defined roles:

- Security Benefit disseminates uniform marketing materials for those products, directs the activities of the IMO Associates and collects the proceeds of the Enterprise.

---

[13] http://www.innovationdesigngroup.com/innovation.php. (last visited January 15, 2020)

[14] https://www.globenewswire.com/news-release/2012/04/02/1218653/0/en/Security-Benefit-Launches-Innovative-Total-Value-Annuity.html (last visited on December 13, 2019).

FIRST AMENDED CLASS ACTION COMPLAINT

- Security Benefit contracts with the IMO Associates and produces sales and marketing materials used by members of the Enterprise.

- Advisors Excel, Innovation Design Group and EAM Partners LP perform advisory services for the Enterprise in connection with design of the Annuities, including with respect to the development of synthetic indices such as the ALTV Index.

- Each of the IMO Associates markets and sell the Annuities throughout the United States based on producer agreements with Security Benefit. In addition to their marketing and distribution activities, the IMO Associates provide input into the features of the Annuities and the development of new annuity products.

125.    There is a hierarchical operating and decision-making structure governing the activities of the Enterprise. Security Benefit supervises operational, actuarial, marketing, administrative, compliance, legal and management functions in connection with the sale of the Annuities, including those associated with the affairs of the Enterprise.

126.    A small core of executives at Security Benefit control the financial affairs of the Enterprise and the decisions made by those executives are likewise implemented by Security Benefit in a hierarchical fashion.

127.    In addition, as part of the Enterprise's hierarchical decision-making structure, Security Benefit directs and controls the activities of the IMO Associates through formal agency contracts, compliance rules and written policies and procedures.

128.    The producer agreements prohibit any IMO Associate from in any way modifying Security Benefit's forms, policies, procedures, timelines, premiums, credited rates, or making any guarantees regarding current interest rates, the

1  continuance of any practice or procedure currently utilized by the IMO Associate

2  without Security Benefit's express authorization.

3      129.    Security Benefit provides the IMO Associates with and require the use

4  of uniform sales and marketing materials. Security Benefit instructs the IMO

5  Associates not to elaborate on the information presented in its form annuity

6  contracts and uniform pre-printed sales illustrations and marketing materials when

7  making a sales presentation to prospective customers.

8      130.    Security Benefit retains authority to review and approve all marketing

9  materials used by the IMO Associates and to audit their books and records. Security

10  Benefit also determines agent compensation and requires agent training and internal

11  compliance procedures.

12      131.    Security Benefit communicates regularly with the IMO Associates by

13  disseminating policies and procedures, product information and other information

14  on an ongoing rather than *ad hoc* basis through product materials, web postings,

15  emails and internal publications.

16      132.    Security Benefit directs the IMO Associates in their activities in a

17  hierarchical fashion by requiring them to follow Security Benefit's directives in the

18  marketing and sales of the Annuities, including the requirement that all written

19  statements or materials given to prospective purchasers of these deferred annuity

20  products must receive advance approval from Security Benefit.

21      133.    Security Benefit thus exercises substantial control over the direction of

22  the Enterprise by, *inter alia*:

23      •  designing and issuing the Annuities offered for sale to consumers

24          throughout the United States;

25      •  designing and distributing marketing and sales materials describing

26          the features of the Annuities;

27

28

- developing uniform sales and marketing materials, standardized contracts, and uniform sales techniques and presentations including, but not limited to, those materials developed by Security Benefit for use by the IMO Associates;
- instructing and requiring IMO Associates to use standardized sales materials, uniform sales techniques and presentations developed and/or authorized by Security Benefit; and
- rewarding IMO Associates staff with perks and high commissions for selling the Annuities.

134.   The IMO Associates, in turn, participate in the decision-making structure of the Enterprise in an ongoing fashion in order to maximize distribution and sales of the Annuities through use of the Synthetic Indices.

135.   Advisors Excel, Innovation Design Group and EAM Partners LP, in turn, participate in the decision-making structure of the Enterprise by assisting Security Benefit in developing its the Synthetic Indices, such as the ALTV Index.

**C. Continuous Existence**

136.   The Enterprise has had an ongoing and continuous existence during the Class Period.

137.   Throughout the Class Period, the members of the Enterprise associated in fact to market and sell the Security Benefit Annuities. Security Benefit developed, marketed and sold a continuous stream of annuity products using the Synthetic Indices and sold through the IMO Associates.

138.   Likewise, the IMO Associates associated with the Enterprise on an ongoing rather than *ad hoc* basis. The IMO Associates marketed Security Benefit's Annuities to consumers on an ongoing basis each year during the Class Period, they participated actively in the affairs of the Enterprise on an ongoing basis through their marketing of and promotional activities for the Annuities. Associates Advisors

1  Excel and EAM Partners LP furthermore continuously assisted Security Benefit in
2  monitoring and refining the Synthetic Indices used in the Annuities.

3      139.   The Enterprise has displayed a continuity of membership during the
4  Class Period. Security Benefit has acted continuously in its leadership role in the
5  Enterprise, while the IMO Associates and EAM Partners LP have provided services
6  to the Enterprise throughout the Class Period, such that there has been a stable
7  network of participants in the Enterprise year after year.

8      140.   As recently as October 19, 2019, Security Benefit launched two new
9  annuity products. Confirming the continued existence of the Enterprise, Security
10 Benefit announced that the new products are "[o]ffered through Security Benefit's
11 exclusive      distribution      group      of      select      IMOs"      and      that
12 "financial representatives can visit www.sbelitepartners.com to learn more about
13 the new products."[15] The "sbelitepartners.com" website, which is maintained by
14 Security Benefit on behalf of the Enterprise, identifies the IMO Associates as
15 members of the "elite partners" group and provides marketing materials,
16 illustrations, sales documents and other support for producers who market or desire
17 to market the Annuities.

18 **D. Separate Existence**

19     141.   Each member of the Enterprise has an existence separate from their
20 participation in the racketeering activities of the Enterprise.

21     142.   Security Benefit, each IMO Associate, and EAM Partners LP are
22 organized and operated as separate corporations with separate Boards, separate
23 books and records, separate accounts and separate existences for legal and
24 regulatory purposes.

25

26

27   [15]    https://www.businesswire.com/news/home/20191028005602/en/Security-Benefit-Launches-New-FIA-Series-Americans (last visited January 15, 2020).

28

48

FIRST AMENDED CLASS ACTION COMPLAINT

143.   The Enterprise also has an existence and structure that is separate and distinct from other affairs of its members. Members of the Enterprise engage in legitimate business operations separate and apart from their activities on behalf of the Enterprise. In addition to the Annuities sold by the Enterprise, Security Benefit markets other annuities and insurance products, including variable annuities.

144.   Advisors Excel operates as an independent marketing organization, offering insurance and annuity products issued by many companies other than Security Benefit. Advisors Excel also provides business consulting services wholly unrelated to the Annuities or the affairs of the Enterprise.

145.   Creative Marketing operates as an independent marketing organization, offering insurance and annuity products issued by many companies other than Security Benefit. Creative Marketing also provides financial advice and conduct seminars and sales activities that are wholly unrelated to the Annuities or the affairs of the Enterprise.

146.   Gradient Life Brokerage operates as an independent marketing organization, offering insurance and annuity products issued by many companies other than Security Benefit. Gradient Life Brokerage also provides supportive services and business coaching wholly unrelated to the Annuities or the affairs of the Enterprise.

147.   Impact Partners operates as an independent marketing organization, offering insurance and annuity products issued by many companies other than Security Benefit. Impact Partners also offers an array of business consulting services wholly unrelated to the Annuities or the affairs of the Enterprise.

148.   In addition to serving as an independent marketing organization, Advisors Excel offers its services to non-associates of the Enterprise, offering "business process expertise," product analysis," and sustainable financial platforms."

149.    Similarly, EAM Partners LP offers its index development services to non-associates of the Enterprise, describing itself as "a market leader in developing innovative futures-based indexes."

150.    Many activities engaged in by the members of the Enterprise in furtherance of the racketeering activities are not, however, ordinary legitimate business activities and, in fact, would be inimical to the interests of the Enterprise members if detected by regulatory or law enforcement officials. Where such practices have been detected, insurance regulators and attorneys' general have revoked the licenses of sales agents and have initiated enforcement actions against IMOs and insurance companies selling deferred annuities. Likewise, Security Benefit's actions circumventing insurance regulations to prey upon consumers, as alleged above, are not ordinary business activities of a legitimate insurance company.

151.    The IMO Associates, on behalf of the Enterprise, used Security Benefit and the "Security Benefit" brand to lend an air of legitimacy to their own illicit practices. And by utilizing the IMO Associates rather than its own employees to market the Annuities, Security Benefit gained additional power to perpetrate the fraudulent scheme. In this manner, the members of the Enterprise functioned together to magnify their potential for misconduct, the prototypical activities that the RICO statutes are designed to redress.

152.    The involvement of separate corporations and entities in the Enterprise provides a separate, ascertainable structure to the Enterprise. In addition, because the members of the Enterprise perform activities on behalf of the association-in-fact that are separate from the alleged racketeering activities, including the sale of products other than the Annuities, the Enterprise also has an existence separate from the alleged racketeering activities themselves. Also, because each of the members of the Enterprise engages in separate lawful activities apart from their activities on

behalf of the Enterprise, each of them has a separate existence that extends beyond the Enterprise and beyond the alleged racketeering activities themselves.

153.    However, because the members of the Enterprise engage in conduct on behalf of the Enterprise that are not lawful or regular business activities, the racketeering activities of the Enterprise are not simply the normal business activities of Security Benefit. For all of these reasons, the Enterprise has an ascertainable and continuing existence that is separate from the racketeering activities themselves and the alleged racketeering activities of the Enterprise are not co-extensive with the ordinary business of Security Benefit.

### E. Interstate Commerce

154.    The Enterprise functions, in part, by deceiving consumers nationwide concerning the nature and operation of the Synthetic Indices incorporated into the Annuities sold through and on behalf of the Enterprise. If truly objective and disinterested, and if not used as a ruse to promote and effectuate the sale of the Annuities, many of these services and products could be legitimate and non-fraudulent. However, Security Benefit and its associates and co-conspirators, through the Enterprise, have engaged in a pattern of racketeering activity which also involves a scheme to increase revenue for Security Benefit, for the IMO Associates from commissions, and for EAM Partners LP through the sale of the Annuities through fraudulent misrepresentations and omissions concerning the nature and performance of the Synthetic Indices.

155.    The Enterprise engages in and affects interstate commerce because it involves activities across state boundaries, such as the marketing, promotion, advertisement and sale of the Annuities products to consumers nationwide, and the receipt of premiums, commissions, and surrender charges from the sale of those Annuities, including the delivery and return of the SOUs by and to Security Benefit.

156.   At all relevant times, each associate in the Enterprise was aware of the fraudulent scheme to sell the Annuities using the Synthetic Indices, was a knowing and willing participant in the fraudulent scheme, and reaped profits therefrom.

**F.  RICO Conspiracy**

157.   Security Benefit and the IMO Associates have not undertaken the practices described herein in isolation but as part of a common scheme and conspiracy.

158.   Security Benefit and the IMO Associates have engaged in a conspiracy to increase or maintain market share and premium revenue for Security Benefit, to generate additional revenue for the IMO Associates from commissions, and to generate additional revenue to EAM Partners LP, all through the sale of the Annuities through fraudulent misrepresentations and omissions concerning the nature and performance of the Synthetic Indices.

159.   The objects of the conspiracy include: (a) to sell the Annuities nationwide; (b) to maximize premiums and other revenues for Security Benefit; (c) to maximize commissions for IMO Associates; and (d) to maximize the revenues of EAM Partners LP.

160.   Security Benefit and each member of the conspiracy, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in gaining the trust of consumers, persuading them to purchase the Annuities through false and misleading representations and omissions.

161.   Indeed, for the conspiracy to succeed, Security Benefit and its co-conspirators had to agree to implement and use the similar devices and fraudulent tactics against their intended targets. Many instances of common conduct, activity and similar facts evidence the presence of a conspiracy and exist among Security Benefit and its co-conspirators including, but not limited to:

- similar advertisements and marketing materials with material omissions and/or vague, misleading, and incomplete language about the adverse material features and key risks of Annuities;

- similar plans and methods for sales agents to solicit, market, refer, and sell the Annuities, including through the use of standardized SOUs;

- similar tactics for steering purchasers of the Annuities to the Synthetic Indices accounts; and

- similar agreements between and among Defendants and their co-conspirators to sell deferred annuity products to seniors, despite industry standards and governmental warnings.

162.   As a result of the conspiracy, Plaintiffs and the other members of the National Class purchased Annuities that (a) caused them to lose the use of their funds during periods in which they were allocated to the Synthetic Indices, and (b) were not worth what they paid for them.

**G. Predicate Acts**

163.   Section 1961(1)(B) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth herein, Security Benefit has engaged and continue to engage in conduct violating each of these laws to effectuate their scheme.

164.   For the purpose of executing and/or attempting to execute the above-described knowing scheme to sell the challenged Annuities by misrepresenting and omitting material information regarding the critical attributes of the Synthetic Indices, which if disclosed, would reveal these Annuities to be inferior to alternative investments, Security Benefit, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by

the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service and/or commercial interstate carriers, including, but not limited to, the SOUs, deferred annuity marketing brochures, annuity disclosure forms, performance illustrations, applications, contracts, training manuals, video tapes, correspondence, annuitant leads lists, premium and commission payments, reports, data, summaries, statements and other materials relating to the marketing and sale of the Annuities.

165.    For the purpose of executing and/or attempting to execute the above-described knowing scheme to defraud or obtain money by means of false pretenses, representations or promises, Security Benefit, also in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, which include, but are not limited to, the SOUs, consumer brochures, annuitant applications, annuity disclosure forms, field memos, correspondence, prospective lead lists, premium and commission payments, reports, data, summaries, account statements, faxes and other deferred annuity materials. In addition, pursuant to and as part of the scheme to defraud, Security Benefit intended to and did receive payments from Plaintiffs and other members of the National Class that were transmitted or cleared through the use of interstate wires in violation of 18 U.S.C. § 1343.

166.    The IMO Associates and EAM Partners LP aided and abetted violations of the above laws, thereby rendering them indictable as a principal in the 18 U.S.C. §§1341 and 1343 offenses pursuant to 18 U.S.C. § 2.

167.    Many of the precise dates of Security Benefit's fraudulent uses of the U.S. Mail and wire facilities have been deliberately hidden and cannot be alleged without access to its books and records. Indeed, the success of the fraudulent scheme depends upon secrecy, and Security Benefit has withheld details of their scheme from Plaintiffs and other members of the National Class. Generally, however, Plaintiffs can describe the occasions on which the predicate acts of mail

and wire fraud occurred, and how those acts were in furtherance of a scheme. They include thousands of internet postings and communications to perpetuate and maintain the scheme, including, among other things:

- Delivery and return of the SOUs;
- processing applications for the Annuities;
- processing premium payments from purchasers of the Annuities;
- paying and receiving commissions for the marketing, referral and sale of the Annuities;
- disseminating fraudulent and deceptive marketing and sales brochures, illustrations and other materials describing the Annuities to the IMO Associates;
- disseminating training materials for selling the Annuities; and
- sharing information about prospective senior citizen purchasers of the Annuities.

168.   The forgoing materials sent or received by Security Benefit via the U.S. Mail, internet postings, emails wire or other interstate electronic media, contained, *inter alia*:

- misrepresentations and omissions about the nature and performance of the Annuities and the Synthetic Indices; and
- misrepresentations and omissions about historical performance of the Annuities and the Synthetic Indices, through false and misleading "back-casting.

169.   Security Benefit's management at its corporate headquarters have communicated by U.S. Mail, internet postings, emails and by facsimile with various regional offices and subsidiaries, divisions and other insurance entities in furtherance of their scheme with the IMO Associates.

170.   In furtherance of the fraudulent scheme, Security Benefit created and continuously maintained the "sbelitepartners.com" website accessed by current and prospective producers and consumers. The website describes the Total Value Annuity product (and previously described the Secure Income Annuity product), posts for download the false and misleading SOUs and other sales brochures described herein, posts videos describing the Synthetic Indices that contain misrepresentations, half-truths and omissions and contains an interactive "online tool" allowing agents and prospective customers to view and download misleading illustrations purporting to depict the performance of the Annuities based on allocations to the Synthetic Indices. The "sbelitepartners.com" website also includes a "Frequently Asked Questions" tab directed to current and prospective sales agents. The FAQ tab seeks to recruit sales agents to market the Security Benefit Annuities in furtherance of the racketeering activities of the Enterprise, directing interested prospects to contact one of the IMO Associates. The website states that "[t]o become appointed to sell [the Annuities], please contact one of our Elite Marketing Organizations… Advisors Excel… Gradient Insurance Brokerage … [or] The Impact Partnership."[16]

171.   Security Benefit's misrepresentations and omissions of material facts were knowing and intentional and made for the purpose of deceiving Plaintiffs and the other members of the National Class.

172.   Security Benefit and its co-conspirators either knew or recklessly disregarded the fact that their misrepresentations and omissions were material and were relied upon by Plaintiffs and the other members of the National Class as shown by their payments to Security Benefit for the Annuities, as well as their allocation of account value to the MSDA and ALTV Index accounts.

---

[16] https://www.sbelitepartners.com/resources/frequently-asked-questions.aspx#db1 (last visited January 15, 2020),

173.    Although not necessary to make out a violation of the mail or wire fraud statute, *Bridge v. Phoenix Bond & Indemnity Co.*, 128 S. Ct. 2131 (2008), Plaintiffs and the other members of the National Class relied, to their detriment, on Security Benefit's fraudulent misrepresentations and material omissions, which were made by means of Security Benefit's uniform marketing materials. Again, such reliance is evidenced by their purchase of the Annuities and their allocation of account value to the Synthetic Index accounts, which they would have no reason to select absent Security Benefit's misleading description of the Synthetic Indices.

174.    Furthermore, as a direct and proximate consequence of Security Benefit's misrepresentations and material omissions, Security Benefit and its co-conspirators were able to increase the price and cost of the Annuities, including the fees and charges collected by members of the Enterprise, for all members of the National Class, thereby overcharging all such class members. For example, as a direct and proximate result of the misrepresentations and omissions described above, Security Benefit induced members of the National Class to allocate Account Values to the Synthetic Indices charging all class members with annual spreads and other charges that would not apply to allocations made under different options or to premiums paid for annuities that do not use such proprietary indices, thereby increasing the price and cost of the Annuities to all National Class members. Accordingly, even if a relatively insignificant number of those class members did not rely on the material misrepresentations and omissions, they nonetheless sustained losses proximately caused by those misrepresentations and omissions through the overcharges applicable to all  Security Benefit Annuities.

175.    Security Benefit knew Plaintiffs and the other members of the National Class relied on its misrepresentations and omissions about the nature and performance of the Synthetic Indices. Security Benefit knew that the purchasers of the Annuities would incur substantial cost and loss as a result.

176.   Consequently, Security Benefit has obtained money and property belonging to the Plaintiffs and the other members of the national Class, who have been injured in their business or property by Security Benefit's overt acts of mail and wire fraud, and by its aiding and abetting each other unnamed co-conspirators' acts of mail and wire fraud.

**H. Pattern of Racketeering Activity**

177.   Security Benefits has engaged in a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. §§ 1341 and 1343 as described above, within the past ten years. In fact, Security Benefit has committed or aided and abetted in the commission of countless of acts of racketeering activity. Each racketeering act was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including the Plaintiffs and other members of the National Class.

178.   The multiple predicate acts of racketeering activity that Security Benefit committed and/or conspired to, or aided and abetted in the commission of, were related to each other and form part of the Enterprise's ongoing and regular way of doing business. Together they amount to and pose a clear threat of continued racketeering activity since 2011, as evidenced by the ongoing sale of the Annuities using the Synthetic Indices, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5). In other words, the misconduct alleged by Plaintiffs occurred and went on long enough and with enough of a relationship with the Enterprise to constitute a pattern of racketeering activity actionable under RICO.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.  Summary of RICO Allegations

179.   In sum, Security Benefit is a person associated with the Enterprise that is engaged in or affect interstate commerce, and has conducted or participated in the conduct of the Enterprise's affairs through a pattern of racketeering activity while acting with the requisite state of mind, resulting in injury to Plaintiffs and the other members of the National Class.

180.   Security Benefit is alternatively a person who (a) conspired to operate or manage the Enterprise, and/or (b) conspired with the IMO Associates to violate Section 1962(c) from 2011 to the present date, with the object selling the Annuities though a fraudulent scheme to Plaintiffs and other members of the National Class, having taken overt acts in furtherance of the conspiracy through the design and marketing of the Synthetic Indices, and accordingly agreeing to the commission of the predicate acts of mail fraud and wire fraud knowing they were part of a pattern of racketeering activity, causing injury to the business or property of Plaintiffs and other members of the National Class by reason of those predicate acts.

## PLAINTIFF-SPECIFIC ALLEGATIONS

### A.    Plaintiff Clinton

181.   In August 2015, Security Benefit induced Plaintiff Clinton in Florida to purchase five Total Value Annuities for $100,000.00 each, based on the represented advantages and illustrated performance of that Annuity compared to other annuities and alternative investments available elsewhere, including specifically the opportunity to allocate a significant portion of the account value to track the BNP Paribas High Dividend Index.

182.   Security Benefit issued the five Total Value Annuities (No. xxxxxx7002-7006) to Plaintiff Clinton on August 14, 2015.

183.   Plaintiff Clinton immediately allocated 100% of her account value ($500,000) to the BNP Paribas High Dividend Index Account, which Security

FIRST AMENDED CLASS ACTION COMPLAINT

1  Benefit promoted as having no cap and 100% participation. The BNP Paribas High

2  Dividend Index Account has a two-year Index Term.

3       184.   As confirmed by her 2017 Annual Statement, for the two-year period

4  between August 14, 2015, and August 2017, Security Benefit credited Plaintiff

5  Clinton with interest in the BNP Paribas High Dividend Index Account at the rate

6  of 0.00%.

7       185.   Plaintiff Clinton thereafter reallocated 75% into a different index

8  (maintaining 25% in the BNP Paribas High Dividend Index Account), before

9  surrendering all five annuities on September 24, 2018, incurring substantial

10 surrender penalties.

11      186.   In sum, the Total Value Annuity has not only cost Plaintiff Clinton

12 the lost use of $500,000 allocated to the BNP Paribas High Dividend Index

13 Account, plus substantial surrender penalties, but also was worth less than she paid

14 for it on the date of issuance, causing her to suffer injury in fact and loss of money

15 or property as a result of Security Benefit's wrongful actions.

16      **B.     Plaintiff Carrick**

17      187.   In July 2014, Security Benefit induced Plaintiff Carrick in Florida to

18 purchase a Total Value Annuity for $1,051,049.97, based on the represented

19 advantages and illustrated performance of that annuity compared to other annuities

20 and alternative investments available elsewhere, including specifically the

21 opportunity to allocate a significant portion of the account value to track the ALTV

22 Index.

23      188.   Security Benefit issued the Total Value Annuity (No. xxxxxx7999) to

24 Plaintiff Carrick on July 3, 2014.

25      189.   Plaintiff Carrick immediately allocated 50% of his account value to the

26 ALTV Index Account ($525,524.99), which Security Benefit promoted as having

27

28

1  no cap and 100% participation. The ALTV Index Account has a five-year Index
2  Term.

3       190.  As confirmed by his 2019 Annual Statement, for the five-year period
4  between July 3, 2014, and July 3, 2019, Security Benefit credited Plaintiff Carrick
5  with interest in the ALTV Index Account at the rate of 0.00%, consistent with the
6  true expected performance of the ALTV Index for the reasons alleged above.

7       191.  In sum, the Total Value Annuity has not only cost Plaintiff Carrick the
8  lost use of more than $525,000, but also was worth less than he paid for it on the
9  date of issuance, causing him to suffer injury in fact and loss of money or property
10 as a result of Security Benefit's wrongful actions.

11     **C.    Plaintiff Rosen**

12      192.  In November 2014, Security Benefit induced Plaintiff Rosen in
13 California to purchase a Secure Income Annuity for $53,475.65, based on the
14 represented advantages and illustrated performance of that Annuity compared to
15 other annuities and alternative investments available elsewhere, including
16 specifically the opportunity to allocate a significant portion of the account value to
17 track the MSDA Index.

18      193.  Security Benefit issued the Secure Income Annuity (No. xxxxxx6286)
19 to Plaintiff Rosen on November 6, 2014.

20      194.  Plaintiff Rosen immediately allocated 75% of his account value ($40,
21 106.44) to the MSDA Index Account, which Security Benefit promoted as having
22 no cap and 100% participation. The MSDA Index Account has a two-year Index
23 Term.

24      195.  As confirmed by his 2016 Annual Statement, for the two-year period
25 between November 6, 2014, and November 6, 2016, Security Benefit credited
26 Plaintiff Rosen with interest in the MSDA Index Account at the rate of 0.00%.
27
28

196.   As confirmed by his 2018 Annual Statement, for the two-year period between November 6, 2016 and November 6, 2018, Security Benefit credited Plaintiff Rosen with interest in the MSDA Index Account at the rate of 1.68%.

197.   Plaintiff Rosen's overall credited interest in the MSDA Index Account was thus only $696.30 over the first four years of the Secure Income Annuity contract, an effective credited interest rate for MSDA Index Account of only 1.7%, consistent with the near-zero true expected performance of the MSDA Index for the reasons alleged above.

198.   In sum, the Secure Income Annuity has not only cost Plaintiff Rosen the lost use of more than $40,000 allocated to the MSDA Index Account, but also was worth less than he paid for it on the date of issuance, causing him to suffer injury in fact and loss of money or property as a result of Security Benefit's wrongful actions.

**D.    Plaintiff Stauffer-Schmidt**

199.   In April 2013, Security Benefit induced Plaintiff Stauffer-Schmidt in Illinois to purchase a Total Value Annuity for $248,657.84, based on the represented advantages and illustrated performance of that annuity compared to other annuities and alternative investments available elsewhere, including specifically the opportunity to allocate a significant portion of the account value to track the ALTV Index.

200.   Security Benefit issued the Total Value Annuity (No. xxxxxx2358) to Plaintiff Stauffer-Schmidt on April 15, 2013.

201.   Plaintiff Stauffer-Schmidt immediately allocated 75% of her account value to the ALTV Index Account ($186,439.38), which Security Benefit promoted as having no cap and 100% participation. The ALTV Index Account has a five-year Index Term.

202.    As confirmed by her 2018 Annual Statement, for the five-year period between April 15, 2013, and April 15, 2018, Security Benefit credited Plaintiff Stauffer-Schmidt with interest in the ALTV Index Account at the rate of 0.00%, consistent with the true expected performance of the ALTV Index for the reasons alleged above.

203.    As confirmed by her 2019 Annual Statement, for the first year of her new five-year Index Term Plaintiff Stauffer-Schmidt has again experienced a zero percent return in the ALTV Index Account.

204.    In sum, the Total Value Annuity has not only cost Plaintiff Stauffer-Schmidt the lost use of more than $186,000, but also was worth less than she paid for it on the date of issuance, causing her to suffer injury in fact and loss of money or property as a result of Security Benefit's wrongful actions.

### E.    Plaintiff Yuen

205.    In November 2012, Security Benefit induced Plaintiff Stauffer-Schmidt in Illinois to purchase a Total Value Annuity for $100,000, based on the represented advantages and illustrated performance of that annuity compared to other annuities and alternative investments available elsewhere, including specifically the opportunity to allocate a significant portion of the account value to track the ALTV Index.

206.    Security Benefit issued the Total Value Annuity (No. xxxxxx5243) to Plaintiff Yuen on November 16, 2012.

207.    Plaintiff Yuen immediately allocated 75% of his account value to the ALTV Index Account ($75,000), which Security Benefit promoted as having no cap and 100% participation. The ALTV Index Account has a five-year Index Term.

208.    As confirmed by his 2017 Annual Statement, for the five-year period between November 16, 2012, and November 16, 2017, Security Benefit credited Plaintiff Yuen with interest in the ALTV Index Account at the rate of 0.00%,

consistent with the true expected performance of the ALTV Index for the reasons alleged above.

209.   In sum, the Total Value Annuity has not only cost Plaintiff Yuen the lost use of more than $75,000, but also was worth less than he paid for it on the date of issuance, causing him to suffer injury in fact and loss of money or property as a result of Security Benefit's wrongful actions.

**F.     Plaintiffs Cox**

210.   From March 2013 to May 2013, Security Benefit induced Plaintiffs Cox in Arizona to purchase three Total Value Annuities, based on the represented advantages and illustrated performance of that annuity compared to other EIAs and alternative investments available elsewhere, including specifically the opportunity to allocate a significant portion of the account value to track the ALTV Index.

211.   Security Benefit issued to Plaintiffs Cox Total Value Annuity (No. xxxxx1395) on March 21, 2013, Total Value Annuity (No. Xxxxx1154) on April 9, 2013, and Total Value Annuity (No. xxxxx3394) on May 1, 2013.

212.   Plaintiffs Cox allocated to the ALTV Index Account 75% of their account value in No. xxxx1395 ($14,615.48), 75% of their account value in No. 1154 ($185,814.53), and 75% of their account value in No. xxxxx3394 ($75,000.00), which Security Benefit promoted as having no cap and 100% participation. The ALTV Index Account has a five-year Index Term.

213.   As confirmed by their 2018 Annual Statements, for the five years since the purchase of their three Total Value Annuities, Security Benefit credited Plaintiffs Cox in the ALTV Index Accounts interest at the rate of 0.00%, consistent with the true expected performance of the ALTV Index for the reasons alleged above.

214.   In sum, the Total Value Annuities have not only cost Plaintiffs Cox the lost use of more than $275,000, but also was worth less than they paid for them on

the date of issuance, causing them to suffer injury in fact and loss of money or property as a result of Security Benefit's wrongful actions.

### G.    Plaintiff Webber

215.    In June 2014, Security Benefit induced Plaintiff Webber in Illinois to purchase two Total Value Annuities for $491,815.81 and $116,000, respectively, based on the represented advantages and illustrated performance of that annuity compared to other EIAs and alternative investments available elsewhere, including specifically the opportunity to allocate a significant portion of the account value to track the ALTV Index.

216.    Security Benefit issued Total Value Annuity (No. xxxxx8728) to Plaintiff Webber on June 16, 2014, and Total Value Annuity (No. xxxxx8729) to Plaintiff Webber on June 17, 2014.

217.    Plaintiff Webber allocated to the ALTV Index Account 50% of his account value in No. xxxx8728 ($245,907.91), and 50% of his account value in No. xxxxx8729 ($58,000.00), which Security Benefit promoted as having no cap and 100% participation. The ALTV Index Account has a five-year Index Term.

218.    As confirmed by his 2019 Annual Statements, for the five years between June 16/17, 2014 and June 16/17, 2019, Security Benefit credited Plaintiff Webber in the ALTV Index Accounts interest at the rate of 0.00%, consistent with the true expected performance of the ALTV Index for the reasons alleged above.

219.    In sum, the Total Value Annuity has not only cost Plaintiff Webber the lost use of more than $300,000, but also was worth less than he paid for it on the date of issuance, causing him to suffer injury in fact and loss of money or property as a result of Security Benefit's wrongful actions.

### H.    Plaintiff Wright

220.    In January 2013, Security Benefit induced Plaintiff Wright in Nevada to purchase a Total Value Annuity for $97,724.90, based on the represented

advantages and illustrated performance of that annuity compared to other annuities and alternative investments available elsewhere, including specifically the opportunity to allocate a significant portion of the account value to track the ALTV Index.

221.   Security Benefit issued the Total Value Annuity (No. xxxxxx4440) to Plaintiff Wright on January 28, 2013.

222.   Plaintiff Wright immediately allocated 100% of her account value to the ALTV Index Account ($97,724.90), which Security Benefit promoted as having no cap and 100% participation. The ALTV Index Account has a five-year Index Term.

223.   As confirmed by her 2018 Annual Statement, for the five-year period between January 28, 2013, and January 28, 2018, Security Benefit credited Plaintiff Wright with interest in the ALTV Index Account at the rate of 0.00%, consistent with the true expected performance of the ALTV Index for the reasons alleged above.

224.   As confirmed by her 2019 Annual Statement, for the first year of her new five-year Index Term Plaintiff Wright has again experienced a zero percent return in the ALTV Index Account.

225.   In sum, the Total Value Annuity has not only cost Plaintiff Wright the lost use of more than $97,000, but also was worth less than she paid for it on the date of issuance, causing her to suffer injury in fact and loss of money or property as a result of Security Benefit's wrongful actions.

## I.    Accrual of Plaintiffs' Claims under the Discovery Rule

226.   As alleged above, the operation of the Secure Income and Total Value Annuities and the Synthetic Indices are exceptionally complex instruments, which Security Benefit described in an opaque, incomplete and misleading manner,

obfuscating the operative provisions through a maze of complicated and inter-related defined terms.

227.   The true nature and operation of the Secure Income and Total Value Annuities and Synthetic Indices and the structure of the Annuities are so complicated that no reasonable person would have known of Security Benefit's wrongful conduct at the time of sale, let alone that such conduct had caused him or her injury at the point of sale.

228.   Plaintiffs did not know, and were not until retaining undersigned counsel in any position to discover, the nature of Security Benefit's wrongful conduct nor the harm that it worked upon them.

**J.    Fraudulent Concealment and Equitable Tolling**

229.   Alternatively, Security Benefit is by its own wrongful conduct – which was intended to and did obfuscate the deceptive nature and operation of the Synthetic Indices – precluded from asserting any limitations defense against Plaintiffs under the fraudulent concealment doctrine.

230.    Among other things, Security Benefit structured the Secure Income and Total Value Annuities using the Synthetic Indices to credit interest only at the end of the specified Index Term. This structure operated to conceal from annuity owners that the Annuities would not perform as illustrated until the end of the applicable Index Term. As observed on one industry forum, "if your client ever asks how they [ALTV Index] are doing, you will never really know a good answer until their 5th anniversary."[17]

231.    Security Benefit also intentionally restricted sale of the Secure Income and Total Value Annuities to a small group of tightly controlled independent marketing organizations, some of which were active participants in the fraudulent

---

[17]   https://insurance-forums.com/community/threads/annuity-linked-tvi-index-by-security-benefit.47690/ (last visited on December 13, 2019).

FIRST AMENDED CLASS ACTION COMPLAINT

scheme alleged herein, to avoid disclosure of the fraudulent and misleading practices.

232.   In furtherance of its actions to fraudulently conceal its wrongful conduct, Security Benefit developed a subsequent series of interest crediting options that it launched as new alternative "improved" index options to deflect any suspicions when the ALTV and MSDA Indices failed to deliver the promised returns.

233.   To this day, Security Benefit continues to fraudulently conceal the wrongful conduct described herein from the class members and the general public. Security Benefit has refused to disclose or provide information about its practices in a way that Plaintiffs or the class members could have discovered. Although the initial decisions to perpetrate the fraudulent course of conduct alleged herein were made years ago, Security Benefit has continued its active concealment of those fraudulent practices.

234.   Security Benefit's wrongful conduct is continuing in nature. There is a substantial nexus between the fraudulent conduct that has occurred within the applicable limitations periods and Security Benefit's misconduct prior to that time. The wrongful acts involve the same types of illicit practice and are part of a recurring, continuous series of events.

235.   The statutes of limitations applicable to the claims alleged by Plaintiffs and on behalf of the class members as a result of the conduct alleged herein have been tolled as a result of Security Benefit's fraudulent concealment.

## CLASS ACTION ALLEGATIONS

236.   This action is brought by Plaintiffs individually and on behalf of the following plaintiff classes (collectively, the "Classes") pursuant to Rule 23(a) and (b)(2), *Federal Rules of Civil Procedure*.

**The National Class:**

All persons who purchased a Secure Income or Total Value Annuity from Security Benefit within the applicable limitations period.

**The Florida Subclass**:

All persons who purchased a Secure Income or Total Value Annuity from Security Benefit within the applicable limitations period and resided in Florida at the time the Annuity was issued.

**The California Subclass**:

All persons who purchased a Secure Income or Total Value Annuity from Security Benefit within the applicable limitations period and resided in California at the time the Annuity was issued.

**The Illinois Subclass:**

All persons who purchased a Secure Income or Total Value Annuity from Security Benefit within the applicable limitations period and resided in Illinois at the time the Annuity was issued.

**The Arizona Subclass:**

All persons who purchased a Secure Income or Total Value Annuity from Security Benefit within the applicable limitations period and resided in Arizona at the time the Annuity was issued.

**The Nevada Subclass:**

All persons who purchased a Secure Income or Total Value Annuity from Security Benefit within the applicable limitations period and resided in Nevada at the time the Annuity was issued.

A.    **Size of Classes**

237.    There are thousands of members in each of the Classes described in the foregoing paragraph, which are thus so numerous that joinder of all members is

impracticable. The identities and addresses of the members of the Classes can be readily ascertained from business records maintained by Security Benefit.

## B.    Adequacy of Representation

238.    Plaintiffs are willing and prepared to serve the Court and the proposed Classes in a representative capacity. Plaintiffs will fairly and adequately protect the interests of the Classes and have no interest that is adverse to, or which materially and irreconcilably conflicts with, the interests of the other members of the Classes.

239.    Plaintiffs have engaged the services of legal counsel indicated below who are experienced in complex class litigation and life insurance matters, will adequately prosecute this action, and will assert and protect the rights of and otherwise represent Plaintiffs and the other members of the putative Classes.

## C.    The Commonality of Questions of the Law and Fact

240.    The claims of Plaintiffs and the members of the classes involve common questions of law and fact arising out of Security Benefit's alleged fraudulent scheme, including:

    a.   Whether Security Benefit uniformly misrepresented and omitted material information regarding the nature and performance of the Synthetic Indices, and thus of the Annuities;

    b.   Whether Security Benefit engaged in mail and/or wire fraud;

    c.   Whether Security Benefit engaged in a pattern of racketeering activity;

    d.   Whether the Enterprise is an "enterprise" within the meaning of 18 U.S.C. §1961(4);

    e.   Whether Security Benefit and the IMO Associates conducted or participated in the affairs of the Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. §1962(c);

f.  Whether Security Benefit conspired with IMO Associates and other unnamed co-conspirators to commit violations of the racketeering laws in violation of 18 U.S.C. §1962(d);

g.  Whether Security Benefit has engaged in unfair business practices in its dealings in California with Plaintiffs and the other members of the Classes;

h.  Whether Security Benefit has engaged in fraudulent business practices in its dealings with Plaintiffs and other members of the Classes;

i.  Whether Security Benefit's conduct is actionable under the ICFA;

j.  Whether Security Benefit's conduct is actionable under the ACFA;

k.  Whether Security Benefit's conduct is actionable under the NDTPA;

l.  Whether Security Benefit's conduct is actionable as common law fraud under the law of the respective states;

m.  Whether Plaintiffs and the other members of the Classes are entitled to equitable relief against Security Benefit, and if so in what form; and

n.  Whether Plaintiffs and the other members of the Classes are entitled to compensatory or punitive damages, and if so in what amount.

**D.     Typicality of the Claims or Defenses of the Class Representatives**

241.  Plaintiffs' claims are typical of the claims and defenses of the other members of the Classes.

**E.     Rule 23(b)(2) Certification**

242.  Under Rule 23(b)(2), a plaintiff may maintain a class where the defendant has acted in a manner applicable to the entire class, making injunctive or declaratory relief appropriate.

243.   This action is appropriate as a class action pursuant to Rule 23 (b)(2) because Plaintiffs seek injunctive relief and corresponding declaratory relief for the benefit of the Classes. Security Benefit has acted in a manner generally applicable to each member of the Classes by utilizing the standardized contract forms and same standardized illustrations for all.

244.   Security Benefit's actions, if not enjoined, will subject Plaintiffs and other members of the Classes to continuing future harm and will cause irreparable injuries to them, denied as they are to access to their funds under the terms of the wrongfully induced Annuities. The adverse financial impact of Security Benefit's unlawful actions is continuing and, unless permanently enjoined will continue to irreparably injure Plaintiffs and the other members of the Classes.

## F.    Rule 23(b)(3) Certification

245.   Rule 23(b)(3) allows for class actions when necessary to achieve economies of time, effort, and expenses, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.

246.   The common issues of law and fact raised in this action readily predominate over any questions affecting only individual members of the Classes.

247.   A class action is superior to other available methods for the fair and efficient adjudication of this controversy, for the following reasons:

a.    Few, if any, members of the Classes could afford to seek legal redress individually for the wrongs that Security Benefit has committed against them, and absent members have no substantial interest in individually controlling the prosecution of individual actions;

b.    Once Security Benefit's liability has been adjudicated with respect to the truthfulness of the alleged uniform misrepresentations and missions made to Plaintiffs, the claims of all members of the Classes can be determined by the Court;

72
FIRST AMENDED CLASS ACTION COMPLAINT

c.    This action will ensure an orderly and expeditious administration of the Classes' claims and foster economies of time, effort, and expense, and ensure uniformity of decisions;

d.    Without a class action, many members of the Classes would continue to suffer injury, and Security Benefit's violations of law will continue without redress while it continues to reap and retain the substantial proceeds and reductions in its future liabilities derived from its wrongful conduct; and

e.    This action does not present any undue difficulties that would impede its management by the Court as a class action.

248.    A class action is superior to other available means for the fair and efficient adjudication of this controversy. The injuries suffered by individual members of the Classes are, though important to them, relatively small compared to the burden and expense of individual prosecution needed to address Security Benefit's conduct. Individualized litigation presents a potential for inconsistent or contradictory judgments. In contrast, a class action presents far fewer management difficulties; allows the hearing of claims that might otherwise go unaddressed; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

**G.    Nature of Notice to the Proposed Class**

249.    The names and addresses of all members of the Classes are contained in the business records maintained by Security Benefit and are readily available to Security Benefit. The members of the Classes are readily and objectively identifiable, and membership readily ascertainable. Plaintiffs contemplate that notice will be provided to members of the Class by e-mail and direct mailed notice.

**FIRST CAUSE OF ACTION**

(*Violation of RICO, 18 U.S.C. § 1962(c) – National Class*)

250.    Plaintiffs refer to paragraphs 1–249 of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

251.   This claim arises under 18 U.S.C. §1962(c), which provides in relevant part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

252.   In violation of 18 U.S.C. §1962(c), Security Benefit has conducted or participated, directly or indirectly, in the conduct of the affairs of the Enterprise through a "pattern of racketeering activity," as defined by 18 U.S.C. §1961(5). Therefore, Security Benefit has violated 18 U.S.C. §1962(c).

253.   As a result and by reason of the foregoing, Plaintiffs and the other members of the National Class have been injured, suffered irreparable harm and sustained damage to their business and property, and are therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

254.   In addition, because Security Benefit has violated 18 U.S.C. §§ 1962 (c), and absent equitable relief from the Court will continue to do so in the future, enjoining Security Benefit from committing these RICO violations in the future and/or declaring their invalidity is appropriate pursuant to 18 U.S.C. § 1964(a), which authorizes the district courts to enjoin violations of 18 U.S.C. § 1962

## SECOND CAUSE OF ACTION

(*Violation of RICO, 18 U.S.C. § 1962(d) – National Class*)

255.   Plaintiffs refer to paragraphs 1–254 of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

256.   This claim arises under 18 U.S.C. §1962(d), which provides in relevant part:

> It shall be unlawful for any person to conspire to violate any of the provisions of subsection …(c) of this section.

257.   Security Benefit engaged in a conspiracy to defraud the Plaintiffs and the other members of the National Class of their money and property from the sale of inferior deferred annuities pursuant to the fraudulent scheme described above, in violation of 18 U.S.C. § 1962(d).

258.   As a result and by reason of the foregoing, the Plaintiffs and the other members of the National Class have been injured, suffered irreparable harm and sustained damage to their business and property, and are therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

259.   In addition, as set forth above, because Security Benefit has violated 18 U.S.C. §§ 1962 (d), and absent equitable relief from the Court will continue to do so in the future, enjoining Security Benefit from committing these RICO violations in the future and/or declaring their invalidity is appropriate pursuant to 18 U.S.C. § 1964(a), which authorizes the district courts to enjoin violations of 18 U.S.C. § 1962.

## THIRD CAUSE OF ACTION

*(UCL Violation – California Subclass)*

260.  Plaintiffs refer to paragraphs 1–249 of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

261.  The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising." Cal. Bus. & Prof. Code § 17200.

262.  Security Benefit committed acts of unfair competition by engaging in the wrongful practices alleged above, which are alternatively actionable under all three prongs of the UCL.

- **Unlawful Prong**

263.   The "unlawful" prong of the UCL treats violations of other federal, state, regulatory, or court-made law as unlawful business practices independently actionable under state law.

264.   The standardized illustrations, marketing materials, and SOUs used to market the Secure Income and Total Value Annuities were unlawful and in violation of Cal. Ins. Code §§ 790.02 ("No person shall engage in this State in any trade practice which is defined in this article as, or determined pursuant to this article to be, an unfair method of competition or an unfair or deceptive act or practice in the business of insurance.") and 790.03(a) (defining as unfair methods of competition and unfair and deceptive acts or practices in the business of insurance the "[m]aking, issuing, circulating, or causing to be made, issued or circulated, any estimate, illustration, circular, or statement misrepresenting the terms of any policy issued or to be issued or the benefits or advantages promised thereby ...."), Cal. Ins. Code § 780 ("An insurer ... shall not cause or permit to be issued, circulated or used, any statement that is known, or should have been known, to be a misrepresentation of the ... terms of a policy issued by the insurer [or] ... [t]he benefits or privileges promised thereunder...."), Cal. Ins. Code § 332 ("Each party to a contract of insurance shall communicate to the other, in good faith, all facts within his knowledge which are or which he believes to be material to the contract and as to which he makes no warranty, and which the other has not the means of ascertaining."), and § 331 ("Concealment, whether intentional or unintentional, entitles the injured party to rescind insurance."), and Cal. Civ. Code 1709 ("One who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers.").

265.   Specifically with respect to his citation to Cal. Ins. Code § 790.03(a), Plaintiff Rosen further alleges that the UCL violation occurred in the specific context of first-party false advertising and fraudulent inducement by Security

FIRST AMENDED CLASS ACTION COMPLAINT

Benefit, conduct that gives rise to independently actionable claims of common law fraud as well as violations of Cal. Ins. Code §§ 780 and 331-32, and Cal. Civ. Code § 1709. Security Benefit thus engaged in misconduct that allegedly violated § 790.03 in addition to obligations imposed by other statutes and the common law.

266.    Plaintiff Rosen is informed and believes and, on that basis, alleges that the "unlawful" practices alleged above are continuing in nature and are widespread practices engaged in by Security Benefit.

- **Unfair Prong**

267.    A claim under the UCL's "unfair" prong is predicated on a business practice that violates established public policy or is immoral, unethical, oppressive or unscrupulous and causes injury to consumers which outweighs its benefits.

268.    Security Benefit violated the "unfair" prong by engaging in the business acts or practices alleged above by which it has been unjustly enriched. Because the utility of Security Benefit's conduct (zero) is outweighed by the gravity of harm to Plaintiff Rosen and the other members of the California Class, and the market, Security Benefit's conduct is "unfair" having offended an established public policy.

269.    As alleged above, Security Benefit has engaged in immoral, unethical, oppressive, and unscrupulous activities that are reasonably avoidable and substantially injurious to the public at large. There were reasonably available alternatives to further Security Benefit's legitimate business interests other than the conduct described herein.

270.    Security Benefit furthermore violated UCL unfairness prongs based on its violations of Cal. Ins. Code §§ 790.02 & 790.03(a), Cal. Ins. Code § 780, Cal. Ins. Code §§ 331-32, and Cal. Civ. Code § 1709.

271.   Plaintiff Rosen is informed and believes and, on that basis, alleges that the "unfair" practices alleged above are continuing in nature and are widespread practices engaged in by Security Benefit.

- **Fraudulent Prong**

272.   Conduct is deceptive within the meaning of the UCL's fraudulent prong when members of the public are likely to be deceived by the practice.

273.   Security Benefit's materially misleading use and description of the Synthetic Indices in its standardized illustrations, marketing materials, and SOUs used to market the Secure Income and Total Value Annuities is likely to deceive members of the public, as confirmed by Bulletin 14-02 issued by the Iowa Insurance Division, *supra*, Paragraph 68. Plaintiff Rosen and other similarly situated persons in California have suffered economic injury as a result of the deception.

274.   Reliance on Security Benefit's uniform misrepresentations and omissions concerning the description of the Synthetic Indices and the depicted performance of the Secure Income or Total Value Annuity in its illustrations, marketing materials, and SOUs is reasonably inferred because such information is something a reasonable man would attach importance to in determining his choice of action in the transaction in question.

275.   Plaintiff Rosen is informed and believes and, on that basis, alleges that the "fraudulent" practices alleged above are continuing in nature and are widespread practices engaged in by Security Benefit.

- **UCL Standing**

276.   Under the UCL, private standing is afforded to any person "who has suffered injury in fact and has lost money or property as a result of the unfair competition." Cal. Bus. & Prof. Code § 17204. To satisfy this standing requirement, a plaintiff must: (1) establish a loss or deprivation of money or property sufficient

to qualify as injury in fact, i.e., economic injury, and (2) show that the economic injury was the result of, i.e., caused by, the unfair business practice or false advertising that is the gravamen of the claim.

277.    As alleged above, since the date of issuance the Secure Income Annuity has cost Plaintiff Rosen not only the lost use of tens of thousands of dollars allocated to the MSDA Index Account, but the Secure Income Annuity he purchased was itself worth less than he paid for it on the date of issuance, causing him to suffer economic injury in fact and loss of money or property as a result of Security Benefit's wrongful actions. Plaintiff Rosen thus has statutory standing to assert his UCL claim on behalf of himself and the other members of the California Class.

- **UCL Relief Sought**

278.    Cal. Bus. & Prof. Code § 17203 authorizes courts to make: "such orders or judgments … as may be necessary to prevent the use or employment by any person of any practice which constitutes unfair competition, as defined in this chapter, or as may be necessary to restore to any person … any money or property … which may have been acquired by means of such unfair competition."

279.    Cal. Bus. & Prof. Code § 17535 provides: "Any person, corporation, firm, partnership, joint stock company, or any other association or organization which violates or proposes to violate this chapter may be enjoined by any court of competent jurisdiction. The court may make such orders or judgments, including the appointment of a receiver, as may be necessary to prevent the use or employment by any person, corporation, firm, partnership, joint stock company, or any other association or organization of any practices which violate this chapter, or which may be necessary to restore to any person in interest any money or property, real or personal, which may have been acquired by means of any practice in this chapter declared to be unlawful."

FIRST AMENDED CLASS ACTION COMPLAINT

280.   Plaintiff Rosen accordingly seeks restitution, rescission, and injunctive relief for Security Benefit's UCL violations, the appropriateness of which will be determined by common evidence.

281.   On behalf of the general public and the California Class, Plaintiff Rosen respectfully requests that this Court order that Security Benefit make available to the Plaintiff and other members of that Class equitable relief in the form of either:

    a.   rescission and restitution of all amounts wrongfully acquired, obtained and collected as the result of Security Benefit's alleged misconduct, but subject, as always in the case of equitable rescission, to offset for any benefits received in the interim; or

    b.   court-ordered payment of the "intrinsic value" relief based on the estimated values of the Secure Income and Total Value Annuity illustrations under different factual scenarios to calculate the impact on the illustrated values of the annuity features that Plaintiffs contend was misleadingly or fraudulently depicted in the illustration, plus

    c.   prejudgment interest.

282.   Cal. Bus. & Prof. Code §17203 authorizes Plaintiff Rosen to pursue representative claims for injunctive relief. On behalf of himself and the California Class, Plaintiff Rosen respectfully requests that the Court issue an injunction against Security Benefit permanently enjoining it from continuing to engage in its alleged unlawful, unfair and fraudulent conduct.

283.   Plaintiff Rosen finally respectfully requests an award of attorneys' fees as the prevailing party in his request for restitutionary and injunctive relief against Security Benefit on behalf of himself and the other members of the California Class,

under a "substantial benefit," "private attorney general," "catalyst," or "common fund" theory.

## **FOURTH CAUSE OF ACTION**

### *(Violation of the ICFA – Illinois Subclass)*

284.   Plaintiffs refer to paragraphs 1–249 of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

285.   The ICFA is a regulatory and remedial statute intended to protect consumers against fraud, unfair methods of competition, and other unfair and deceptive business practices.

286.   The ICFA prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, … in the conduct of any trade or commerce," regardless of whether any person has in fact been misled, deceived or damaged thereby. 815 ILCS 505/2.

287.   As alleged above, here Security Benefit made numerous statements concerning the nature, operation, and expected performance of the Synthetic Indices, and thus of the Annuities, in the illustrations, marketing materials and SOUs which were untrue statements of existing or future material fact, which Security Benefit knowingly made for the purposes of inducing the reliance of Plaintiffs Stauffer-Schmidt and Webber, on which Plaintiffs did rely and were damaged thereby.

288.   And as a result of Security Benefit's fraudulent misrepresentations and omissions, Plaintiffs Stauffer-Schmidt and Webber have at a minimum suffered actual damages in the form of the lost use of funds in their respective Account Values allocated to the ALTV Index.

289.    Alternatively, Security Benefit's conduct at a minimum supports an ICFA "unfairness" claim.

290.    A plaintiff may predicate an ICFA unfairness claim on violations of other statutes or regulations that themselves do not allow for private enforcement.

291.    Security Benefit's deceptive practices alleged above (1) offend public policy; (2) are immoral, unethical, oppressive, or unscrupulous; or (3) cause substantial injury to consumers.

292.    In addition, Security Benefit's conduct "offends public policy" in that it violates both (a) the Illinois Insurance Code's prohibition against the misrepresentation of policy benefits under 215 ILCS 5/149, and (b) the prohibitions set forth in Illinois' enactment of the NAIC's Model Regulation on Advertisements of Life Insurance and Annuities, 50 Ill. Admin. Code Part 909.

293.    Security Benefit's breach of the foregoing Illinois Insurance Code and Illinois Administrative Code provisions thus constitutes actionable "unfairness" under the ICFA.

294.    Section 10a(a) of the Illinois Insurance Code, 815 ILCS 505/10a(a), provides that "[a]ny person who suffers actual damage as a result of a violation of this Act committed by any other person may bring an action against such person." Section 10a (a) furthermore places the appropriate remedy, including injunctive relief, in the discretion of the trial judge. *Id.* ("The court, in its discretion may award actual economic damages or any other relief which the court deems proper;…"); 815 ILCS 505/10a(c) ("…in any action brought by a person under this Section, the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIFTH CAUSE OF ACTION**

(*Violation of the ACFA – Arizona Subclass*)

295.    Plaintiffs refer to paragraphs 1–249 of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

296.    At all times relevant hereto, there was in full force and effect the Arizona Consumer Fraud Act ("ACFA"), A.R.S. § 44-1521, *et seq.*

297.    Section 44-1522(A) of the ACFA provides:

> The act, use or employment by any person of any deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby.

298.    Security Benefit is a "person" within the meaning of the ACFA, and, at all pertinent times, were subject to the requirements and proscriptions of the ACFA with respect to all of its business and trade practices described herein. A.R.S. § 44-1521(6).

299.    The Annuities constitute "merchandise" within the meaning of the ACFA. A.R.S. § 44-1521(5).

300.    Security Benefit made the false promises, misrepresentations, and omissions set forth above in connection with the sale, offers to sell, attempts to sell and advertisement of the Annuities.

301.    Security Benefit's knowing and intentional false promises, misrepresentations, and omissions set forth above constitute unfair and deceptive acts or practices prohibited by the ACFA. *See* A.R.S. § 44-1522.

302.   Security Benefit's development and of the Synthetic Indices designed to produce a zero return to Arizona customers in the Synthetic Index accounts is an unfair and deceptive act or practice prohibited by the ACFA. *See* A.R.S. § 44-1522.

303.   Security Benefit's false promises, misrepresentations, omissions and practices described herein were designed to, and did in fact, deceive and mislead members of the public, including Plaintiffs Cox and Yuen and the other members of the Arizona Class, to their detriment.

304.   Security Benefit has engaged in deceptive and unfair acts or practices by, *inter alia*, knowingly misrepresenting the expected performance of the Synthetic Indices and the Annuities, which was deceptive, misleading, and likely to deceive the public.

305.   Security Benefit's deceptive and unfair marketing campaign detailed herein was uniform to consumers, including Plaintiffs Cox and Yuen and the other members of the Arizona Class. Through this extensive and exhaustive marketing campaign, Security Benefit conveyed a uniformly deceptive and misleading message to give the overall impression that the Annuities were worth what Plaintiffs Cox and Yuen and the other members of the Arizona Class paid for them.

306.   Security Benefit intended to deceive and be unfair to Plaintiffs Cox and Yuen and the other members of the Arizona Class by engaging in the practices described herein so that Security Benefit could obtain money from them.

307.   Security Benefit intended that Plaintiffs Cox and Yuen and the other members of the Arizona Class rely on its false promises, misrepresentations, and omissions concerning the design and performance of the Synthetic Indices and the Annuities.

308.   Plaintiffs Cox and Yuen and the other members of the Arizona Class relied on Security Benefit's false promises, misrepresentations and omissions to their detriment by purchasing the Annuities.

309.   Security Benefit's representations regarding the Synthetic Indices, and the Annuities, were material to the decision by Plaintiffs Cox and Yuen and the other members of the Arizona Class to purchase the Annuities, and Security Benefit had a duty to truthfully and accurately disclose that information.

310.   The above-described deceptive and unfair acts and practices were part of a widespread and systematic pattern and/or practice.

311.   Plaintiffs Cox and Yuen and the other members of the Arizona Class are entitled to restitutionary, injunctive and other equitable relief under the AFCA.

312.   Alternatively, as a direct and proximate result of the foregoing, Plaintiffs Cox and Yuen and the other members of the Class have been damaged in an amount to be determined at trial.

## SIXTH CAUSE OF ACTION

### (*Violation of the NDTPA – Nevada Subclass*)

313.   Plaintiffs refer to paragraphs 1–249 of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

314.   The NDTPA is a remedial statutory scheme, to be liberally construed so as to accomplish its beneficial intent of protecting consumers.

315.   Under NRS 41.600, an action may be brought by any person who is a victim of consumer fraud, and "consumer fraud" means any deceptive trade practice prohibited by the NDTPA.

316.   A person engages in a "deceptive trade practice" when in the course of his or her business or occupation he or she … [a]dvertises or offers an opportunity for investment and:

(a) Represents that the investment is guaranteed, secured or protected
in a manner which he or she knows or has reason to know is false or
misleading;

(b) Represents that the investment will earn a rate of return which he or she knows or has reason to know is false or misleading;

(c) Makes any untrue statement of a material fact or omits to state a material fact which is necessary to make another statement, considering the circumstances under which it is made, not misleading;

. . . .

NRS 598.092(5).

317. "A person engages in a 'deceptive trade practice' if, in the course of his or her business or occupation, he or she ... [k]nowingly makes a false representation as to affiliation, connection, association with or certification by another person." NRS 598.0915(3).

318. "A person engages in a 'deceptive trade practice' if, in the course of his or her business or occupation, he or she ... [k]nowingly makes a false representation as to the characteristics … of goods or services for … or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith." NRS 598.0915(5).

319. "A person engages in a 'deceptive trade practice' if, in the course of his or her business or occupation, he or she ... [a]dvertises goods or services with intent not to sell … them as advertised." NRS 598.0915(9).

320. "A person engages in a deceptive trade practice' when, in the course of his or her business or occupation, he or she knowingly ... [f]ails to disclose a material fact in connection with the sale … of goods or services." NRS 598.0923(2).

321. "A person engages in a 'deceptive trade practice' if, in the course of his or her business or occupation, he or she ... [k]nowingly makes any other false representation in a transaction." NRS 598.0915(15).

322. As alleged in with particularity above, Security Benefit has engaged in each of the forgoing deceptive trade practices in connection with its fraudulent

scheme to market the Annuities through common and uniform misrepresentations and omissions made to Plaintiff Wright and the other members of the Nevada Class regarding the design and performance of the Synthetic Indices.

323.    Pursuant to NRS 41.600, Plaintiff Wright and the other members of the Nevada Class are accordingly entitled to recover "[a]ny damages" they have sustained, "[a]ny equitable relief that the court deems appropriate," and their costs in the action and reasonable attorney's fees.

### SEVENTH CAUSE OF ACTION
*(Rescission and Restitutionary Relief Pursuant to Common Law Fraud*
*– All State-wide Classes)*

324.    Plaintiffs refer to paragraphs 1–249 of this Complaint and incorporate those paragraphs as though set forth in full in this cause of action.

325.    Under California Civil Code Section 1709, "[o]ne who willfully deceives another with intent to induce him to alter his position to his injury or risk, is liable for any damage which he thereby suffers." Cal. Civ. Code § 1709. Because fraud is an intentional tort, a plaintiff must under California law plead and prove the following elements of fraud: (1) misrepresentation; (2) knowledge of falsity; (3) intent [to] induce reliance; (4) justifiable reliance; and (5) resulting damage.

326.    Under Florida, Illinois, Arizona and Nevada common law, the elements of common law fraud are essentially the same: (1) a false statement of material fact; (2) known or believed to be false by the party making it; (3) an intent to induce the other party to act; (4) action by the other party in reliance on the truth of the statement; and (5) damage to the other party as a result of the reliance.

327.    As alleged above, here Security Benefit in its standardized illustrations, marketing materials, and SOUs used to market the Secure Income and Total Value Annuities has made false statements and omissions of material fact, known or believed by Security Benefit to be false, with the intent to induce Plaintiffs

to purchase the Secure Income and Total Value Annuities in reliance on the truth of the statements, causing damages to Plaintiffs as a result of their reliance.

328.   Because the Synthetic Indices are used exclusively with the Annuities, prospective purchasers have no pre-existing or independent knowledge about them. Therefore, Plaintiffs in deciding to buy their Annuity and to allocate account values to those Indices necessarily relied on the representations made by Security Benefit concerning the performance of the Synthetic Indices in its sales illustrations, marketing materials and contract documents.

329.   As a result of Security Benefit's fraudulent misrepresentations and omissions, Plaintiffs not only collectively lost the use of hundreds of thousands of dollars in their Account Values during the periods their funds were allocated to the Synthetic Indices, but they also purchased Secure Income and Total Value Annuities worth less than what they paid for them on the date of issuance, causing them to suffer injury in fact and loss of money or property as a result of Security Benefit's wrongful actions.

330.   As the remedy for Security Benefit's fraudulent scheme, Plaintiffs seek an order giving them and each member of the Classes the option (a) to rescind his or her Secure Income or Total Value Annuity, entitling them to a refund of premiums paid, plus interest, subject to an offset for any interim benefits received, or (b) to rescind his or her allocation of the account value to the Synthetic Indices, and recover as restitutionary relief interest with respect to the amounts so allocated at the rate they would have received had allocated to funds to the Annuity's fixed account.

331.   Plaintiffs reiterate that they seek rescission and restitution based on Security Benefit's uniformly misleading Annuity contract terms and illustrations, not based on the circumstances of any individual transaction.

332.   Plaintiffs in the alternative seek compensatory and punitive damages to the extent permitted under respective state law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the respective Classes, pray for relief as follows as applicable for the particular cause of action alleged:

A.     An Order certifying this action to proceed on behalf of the Classes, and appointing Plaintiffs and the counsel listed below to represent the Classes;

B.     An Order awarding Plaintiffs and Class Members entitled to such relief restitution and/or rescissionary and such other equitable relief as the Court deems proper;

C.     An Order enjoining Security Benefit, its representatives, and all others acting with it or on its behalf from misrepresenting or concealing the expected performance of the Synthetic Indices over the terms required under the Secure Income and Total Value Annuities, and other appropriate injunctive relief as necessary to fully remedy Security Benefit's misconduct.

D.     An Order alternatively awarding Plaintiffs and Class Members entitled to such relief compensatory, punitive, and such other relief as the Court deems proper;

E.     An Order awarding Plaintiffs' attorneys' fees, expert witness fees and other costs pursuant to federal and respective state law; and

F.     An Order awarding such other and further relief as may be just and proper, including pre-judgment and post-judgment interest on the above amounts.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial of all issues so triable.

Dated: January 21, 2020.

By: */s/Adam M. Moskowitz*
**THE MOSKOWITZ LAW FIRM, PLLC**
Adam M. Moskowitz
Florida Bar No. 984280
adam@moskowitz-law.com
Howard M. Bushman
Florida Bar No. 0364230
howard@moskowitz-law.com
Joseph M. Kaye
Florida Bar No. 117520
joseph@moskowitz-law.com
2 Alhambra Plaza
Suite 601
Coral Gables, FL 33134
Telephone: (305) 740-1423

**BONNETT FAIRBOURN FRIEDMAN**
 **& BALINT, PC**
Andrew S. Friedman (*to be admitted Pro Hac Vice*)
Francis J. Balint, Jr. (*to be admitted Pro Hac Vice*)
2325 East Camelback Road, Suite 300
Phoenix, AZ 85016
Tel: (602) 274-1100
afriedman@bffb.com
fbalint@bffb.com

**EVANS LAW FIRM, INC.**
Ingrid M. Evans (*to be admitted Pro Hac Vice*)
3053 Fillmore Street #236
San Francisco, CA 94123
Tel: (415) 441-8669
Ingrid@evanslaw.com

*Attorneys for Plaintiffs*

90
FIRST AMENDED CLASS ACTION COMPLAINT

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 21, 2020, a true and correct copy of the foregoing was electronically filed with the Clerk of Court using CM/ECF, which automatically sends an electronic notification to all counsel of record and other CM/ECF participants.

By: */s/Adam M. Moskowitz*
Adam Moskowitz

FIRST AMENDED CLASS ACTION COMPLAINT