## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**ELLA CLINTON, et al.,**

     **Plaintiffs,**

     **v.**

**SECURITY BENEFIT LIFE INSURANCE COMPANY,**

     **Defendant.**

**Case No. 5:20-cv-04038-HLT-KGG**

---

## MEMORANDUM AND ORDER

Plaintiffs are several individuals who purchased annuities from Defendant Security Benefit Life Insurance Company. They have filed this class-action lawsuit alleging that the annuities they purchased were the result of a fraudulent scheme by Defendant and other organizations not a party to this case. Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, as well as state-law claims under California, Illinois, Arizona, Nevada, and Florida law. Defendant moves to dismiss the case. Doc. 31.[1] For the reasons discussed below, the Court finds that Plaintiffs' allegations of fraud are neither particular nor plausible. The Court therefore grants the motion to dismiss and dismisses the case without prejudice.

## I.    BACKGROUND

The following facts are taken from the well-pleaded allegations of Plaintiffs' first amended complaint. *See* Doc. 16. Consistent with the standards for evaluating motions to dismiss under Rule 12(b)(6), the Court assumes the truth of all well-pleaded factual allegations.

---

[1]   This case was originally filed in the Southern District of Florida. It was transferred to the District of Kansas on July 21, 2020, while the motion to dismiss was pending. *See* Doc. 75. On December 9, 2020, the case was transferred to the undersigned. Doc. 99.

Both parties have also asked the Court to take judicial notice of various documents that are either appropriate for judicial notice or referenced or quoted in the first amended complaint. *See* Doc. 30; Doc. 49. Both requests are unopposed. *See* Doc. 49 at 1-2. Accordingly, the Court grants these motions and has considered these documents. *See Hodgson v. Farmington City*, 675 F. App'x 838, 840-41 (10th Cir. 2017) ("[F]acts subject to judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment." (internal quotations omitted)); *Ice Corp. v. Hamilton Sundstrand Inc.*, 444 F. Supp. 2d 1165, 1169 n.8 (D. Kan. 2006) ("A document referred to in the complaint and central to the plaintiff's claim may be considered in a motion to dismiss if the defendant submits an indisputably authentic copy, even though the document is not incorporated by reference or attached to the complaint."). To the extent any judicially noticed documents contradict facts alleged in the first amended complaint, the Court does not accept those allegations as well-pleaded or as true. *See GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1385 (10th Cir. 1997) (noting that "factual allegations that contradict such a properly considered document are not well-pleaded facts that the court must accept as true").

### A.  Equity-Indexed Annuities

This case is about a specific type of annuity issued by Defendant, a life-insurance company. Deferred annuities are contracts between the annuity holder and an insurance company. The holder purchases the annuity with an up-front payment, which is deposited into an account and invested for a certain number of years. During this deferral period, earnings grow tax-deferred on the premium payment.

For equity-indexed annuities,[2] the premium can be allocated among several different crediting options, depending on the annuity holder's risk tolerance. It can be linked to an index tied to the prices of stocks, bonds, commodities, or other assets. Deferred annuities are long-term investments, meaning that premiums can be locked up for years. Thus, the investment option for that period can be a crucial investment decision.

Annuities linked to stock market indexes, like the S&P 500, typically come with caps. This means that the interest credited to the annuity account is capped at a certain percent no matter how much the index grows. These annuities can also carry a participation rate. This limits the annuity holder's "participation" in an index's performance. For example, if the participation rate is 70%, and the index increases 10%, the annuity account is only credited with 70% of that increase, or 7%. Thus, cap levels and participation rates are important features of an annuity. The higher the cap level and participation rate, the more the annuity can earn from the growth of the index.

Insurance companies issuing equity-indexed annuities do not actually purchase positions in the indexes. Rather, they develop options budgets and acquire options to hedge their obligations to credit the accounts linked to the equity-indexed annuities. The cost of these options is tied to the volatility of the index, which subsequently determines the cap level and participation rate offered. An index with a lower volatility carries lower option costs and allows an insurance company to offer higher caps and higher participation rates.

## B.    Defendant's Annuity Products

In 2010, a private-equity firm acquired Defendant. Shortly thereafter, Defendant began developing and marketing a series of equity-indexed annuities. Many of these annuities came with

---

[2]    The Court uses the phrase "equity-indexed annuities" here because that is the term used by the first amended complaint. Defendant's briefing and some of the underlying documents use the phrase "fixed index annuity." These appear to refer to the same thing. *See Ogles v. Security Benefit Life Ins. Co.*, 401 F. Supp. 3d 1210, 1213 (D. Kan. 2019) (addressing same annuity product).

the option to be linked to certain proprietary indexes that claimed to protect annuity holders from market volatility. Defendant developed these products with independent marketing organizations and insurance-product design firms. Defendant first developed the Secure Income Annuity in 2011. In 2012, Defendant introduced the Total Value Annuity. Although these are distinct products, for purposes of this order the distinction is not significant, and the Court will generally refer to them as the "equity-indexed annuities" or "annuities" unless otherwise specified.

Both annuities are marketed and sold as retirement or investment vehicles. Both came with the option to select a Guaranteed Lifetime Withdrawal Benefit Rider ("GLWB Income Rider"), which provided an option for lifetime annual income during retirement. The charge for the rider was deducted each year from the annuity's account value. The annuities also contained a provision assessing an annual spread, which is a percentage amount deducted from the change in the applicable index. The annuities also included an initial participation rate, as well as a cap that applied to whatever portion of the annuity linked to the S&P 500. The annuities also paid a bonus to the annuity holder, which could be recaptured if the annuity was surrendered or a certain amount of withdrawals were made in the first 10 years.

At issue in this case are three indexes that were crediting options for these annuities. The first is the 5 Year Annuity Linked TV Index ("ALTV Index") for the Total Value Annuity. The ALTV Index is tied to the Trader Vic Index, with an added volatility overlay to reduce anticipated volatility. Annuities linked to the ALTV Index only credited interest at the end of a five-year period. Reallocation to a different index during this five-year period was prohibited. The second is the Morgan Stanley Dynamic Allocation Index Account ("MSDA Index") for the Secure Income Annuity. The third is the BNP Paribas High Dividend Plus Annual Point to Point Index Account

("BPHD Index") for the Total Value Annuity. The BPHD Index was composed of high-dividend stocks chosen though a "rules-based" strategy.

Plaintiffs allege that Defendant knew these indexes would generate "near-zero" returns. Plaintiffs also allege that Defendant presented annuities linked to these indexes as "uncapped" and with 100% participation, when in fact the annuities were more economically equivalent to traditional annuities with caps and lower participation rates.

### C.      Hypothetical Illustrations

To induce sales of these annuities, Defendant prepared and disseminated hypothetical illustrations and marketing materials. The hypothetical illustrations depicted projected future account values based on historical performances of the given index. To project future returns, Defendant relied on "backcasting." This involves relying on a historical period of performance to project potential future returns. In the case of the indexes at issue here, these time periods were for years that the indexes did not actually exist because they were only recently developed by Defendant and others. In other words, the hypothetical illustrations created projected future returns based on simulated historical performance, not actual. Plaintiffs allege the time periods used in these backcasted hypothetical illustrations were "cherry-picked . . . to correspond with years when the index asset components exhibited non-representative gains." They claim that these "selectively engineered backcasting techniques" were misleading and misrepresented expected future performance. Plaintiffs allege that insurance groups have "recognized the potentially misleading nature" of backcasting. They cite a bulletin from the Iowa Insurance Commissioner stating that use of "hypothetical performance charts [are] misleading if they, directly, or indirectly through subsequent representations by producers, are used to project future performance and contribute to

inflated consumer expectations." They also cite statements by certain insurance companies that "the hypothetical look back approach . . . if used improperly, could be misleading to purchasers."

Similarly, marketing materials like brochures compared the hypothetical performance of the indexes to other more traditional crediting options like the S&P 500, Dow Jones, and NASDAQ. These illustrations also suggested that annuities linked to the indexes would perform better returns than those linked to more traditional crediting options. Despite the projected performance in these hypothetical illustrations, Plaintiffs' actual annuities did not see any returns like those projected.

### D.     Statements of Understanding

As part of each annuity sale, the selling agent and purchaser (annuity holder) signed a Statement of Understanding ("SOU"). The SOU described the nature, attributes, and operation of the crediting options available. Plaintiffs contend that the SOUs contained misleading information and failed to disclose material facts.

#### 1.     Volatility Overlays

Each of the indexes has a volatility overlay. Plaintiffs claim the SOU falsely states that "[t]he volatility control overlay reduces the impact of a fall in price, as well as increases in the price of the [index]." They say this is false because it "misleadingly suggests that the volatility control overlay has a symmetrical impact on performance," when in reality the annuities have a 0% floor on the credited interest rate (meaning the interest rate never goes negative and an annuity holder always preserves their initial investment). Thus, any protection offered by the volatility overlay when values fall is less significant because the interest rate will never drop below 0%.

### 2.      Allocation of Assets

Plaintiffs also claim the SOUs fail to adequately disclose the allocation of assets and asset classes within each index. For the ALTV Index, Plaintiffs claim that the SOU only says it is tied to futures contracts on physical commodities, global currencies, and interest rates. But it fails to disclose that these the commodities and currencies have a "near-zero return" rate. For the MSDA Index, Plaintiffs acknowledge that the SOU discloses four asset classes: equities, bonds, short-term treasuries, and alternatives. But it fails to disclose that equities make up only 15% of the allocations, and that the rest of the classes have expected returns of near zero. For the BPHD Index, Plaintiffs claims that the asset classes were not disclosed.

### E.      Plaintiffs' Annuity Purchases

There are nine Plaintiffs. Each purchased at least one annuity and linked it, at least in part, to either the ALTV Index, the MSDA Index, or the BPHD Index.

Plaintiff Ella Clinton purchased five Total Value Annuities in Florida in 2015 for a total of $500,000 and allocated 100% of the account value to the BPHD Index. After an initial two-year period, Plaintiff Clinton's account was credited with 0% interest. She ultimately reallocated 75% into a different index before surrendering all five annuities.

Plaintiff William Carrick purchased a Total Value Annuity in Florida in 2014 for $1,051,049.97 and allocated 50% of its account value to the ALTV Index. After the five-year period, the portion attributable to the ALTV Index was credited with 0% interest.

Plaintiff Howard Rosen purchased a Secure Income Annuity in California in 2014 for $53,475.64. He allocated 75% of his account value to the MSDA Index. After a two-year term, he was credited with 0% interest. During a subsequent two-year period, the portion of the account linked to the MSDA Index was credited with 1.68% interest.

Plaintiff Terri Stauffer-Schmidt purchased a Total Value Annuity in Illinois in 2013 for $248,657.84 and allocated 75% of her account value to the ALTV Index. After a five-year term, the account was credited with 0% interest. As of one year into a second five-year term, the account is still earning 0% interest.

Plaintiff Wai Hee Yuen purchased a Total Value Annuity in Illinois in 2012 for $100,000 and allocated 75% of the account value to the ALTV Index. After a five-year term, the account was credited with 0% interest.

Plaintiffs Donald and Martha Cox purchased three Total Value Annuities in Arizona in 2013 and allocated 75% of their account value (approximately $275,000) to the ALTV Index. After a five-year term, their accounts have been credited with 0% interest.

Plaintiff Michael Webber purchased two Total Value Annuities in Illinois in 2014 for $491,815.81 and $116,000. He allocated 50% of his account value to the ALTV Index. But after a five-year term, his accounts were credited with 0% interest.

Plaintiff Jean Wright purchased a Total Value Annuity in Nevada in 2013 for $97,724.90 and allocated 100% of her account value to the ALTV Index. After a five-year term, her account was credited with 0% interest. As of one year into a second five-year term, the account is still earning 0% interest.[3]

### F.    Claims

Plaintiffs, on behalf of themselves and various classes, assert seven claims against Defendant. The first and second claims asserts violations of RICO on behalf of all Plaintiffs and a national class. The third claim asserts a violation of the California Unfair Competition Law on

---

[3]   It does not appear that any Plaintiffs lost any of their initial investment, as the annuities' interest rate had a floor of 0%. But they failed to earn interest and lost the use of their funds during the annuities' set term.

behalf of Plaintiff Rosen and a California subclass. The fourth claim asserts a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act on behalf of Plaintiffs Stauffer-Schmidt and Webber and an Illinois subclass. The fifth claim asserts a violation of the Arizona Consumer Fraud Act on behalf of Plaintiffs Cox and Yuen and an Arizona subclass. The sixth claim asserts a violation of the Nevada Deceptive Trade Practices Act on behalf of Plaintiff Wright and a Nevada subclass. The seventh claim seeks "Rescission and Restitutionary Relief Pursuant to Common Law Fraud" on behalf of all plaintiffs and all subclasses.

## II.    STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if it is accompanied by sufficient factual content to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotations omitted).

In undertaking this analysis, the Court accepts as true all well-pleaded allegations in the first amended complaint, though it need not accept legal conclusions. *Id.* Likewise, conclusory statements are not entitled to the presumption of truth. *Id.* at 678-79. Additionally, where a plaintiff asserts a RICO claim, certain heightened pleading standards apply. Specifically, predicate acts of mail or wire fraud must be pleaded with particularity under Federal Rule of Civil Procedure 9(b). *See George v. Urban Settlement Servs.*, 833 F.3d 1242, 1254 (10th Cir. 2016). This means that

"plaintiffs must set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Id*. (internal quotations and citations omitted).

## III.   ANALYSIS[4]

Defendant moves to dismiss the first amended complaint and makes several arguments. Defendant first argues that Plaintiffs' RICO claims are reverse-preempted under the McCarran-Ferguson Act. Alternatively, Defendant argues that Plaintiffs' RICO claims suffer from pleading deficiencies and specifically are neither pleaded with particularity nor plausible. Defendant also seeks dismissal of Plaintiffs' state-law claims for similar reasons.

### A.   Plaintiffs' RICO claims are not reverse-preempted under the McCarran-Ferguson Act.

The McCarran-Ferguson Act states that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). It bars application of a federal statute if three conditions are met: first, the federal statute relied on must not relate to the business of insurance; second, a state statute regulates the business of insurance; and third, "the federal statute would invalidate, impair, or supersede the state statute." *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1098 (10th Cir.

---

[4] On September 15, 2020, after this case was transferred to the District of Kansas but before this case was transferred to the undersigned, Plaintiffs filed a request for oral argument. Doc. 97; *see also* D. Kan. Rule 7.2 (stating that the court "may set any motion for oral argument or hearing at the request of a party or on its own initiative"). Plaintiffs noted that oral argument may assist the Court given the volume of submissions and the issues to be resolved. Defendant did not oppose the request. Doc. 98. Although the Court generally tries to accommodate requests for oral argument, it will deny Plaintiffs' request in this instance. The Court previously issued an opinion in *Ogles*. Although there are different parties and slightly different allegations, the subject matter, issues, and arguments are similar. Additionally, given the ongoing pandemic, all in-person hearings in the District of Kansas are suspended through March 31, 2021, absent an emergency. *See* Administrative Order 2021-02. Although the parties both expressed a willingness to proceed by videoconference, the Court is confident the issues can be more efficiently and effectively resolved based on the briefing, which the Court closely reviewed. Accordingly, Plaintiffs' request for oral argument is denied.

1999). When the McCarran-Ferguson Act applies, the federal claim is reverse-preempted, meaning it is preempted in favor of state regulation. *See W. Ins. Co. v. A & H Ins., Inc.*, 784 F.3d 725, 727 (10th Cir. 2015) ("Thus, the McCarran-Ferguson Act gives rise to the doctrine of 'reverse preemption,' which, if applicable, can cause state insurance laws to trump federal laws that interfere with them.").

RICO—the federal statute asserted in this case—does not specifically relate to the business of insurance. *See Humana Inc. v. Forsyth*, 525 U.S. 299, 307 (1999). It is also undisputed that the states at issue in this case all regulate the business of insurance in some way. But determining whether a federal statute would invalidate, impair, or supersede the state statute requires more specificity. Determining whether a RICO claim is reverse-preempted requires an examination of a plaintiff's precise claims and the theories of liability asserted because the analysis is a fact-intensive one. *Negrete v. Allianz Life Ins. Co. of N.A.*, 927 F. Supp. 2d 870, 877-78 (C.D. Cal. 2013). The analysis turns on whether the type of conduct complained about is regulated by state law, and whether allowing a RICO claim on that conduct would "invalidate, impair, or supersede the state statute." *BancOklahoma*, 19 F.3d at 1098.

Defendant argues that Plaintiffs' RICO claims would impair the insurance regulatory regimes in the states at issue.[5] The Supreme Court in *Humana* considered what the McCarran-Ferguson Act meant by "impair." In rejecting the extremes, the Supreme Court concluded that Congress did not intend to "cede the field of insurance regulation to the States" completely, nor did it "intend[] a green light for federal regulation whenever the federal law does not collide head

---

[5] Defendant does not argue that RICO <u>invalidates</u> or <u>supersedes</u> any state insurance law. *See Humana*, 525 U.S. at 307 (defining invalidate to mean "render ineffective" and supersede to mean "displace (and thus render ineffective) while providing a substitute rule" (internal quotations and citations omitted)). So the analysis turns on whether the RICO claim in this case would <u>impair</u> state insurance laws in the way the Supreme Court in *Humana* defined that term.

on with state regulation." *Humana*, 525 U.S. at 308-09. Instead, the Supreme Court held that, "[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." *Id.* at 310. Other courts have interpreted this to bar federal claims in instances where courts would have to ask "the same questions as state insurance regulators . . . effectively double-checking their work." *Ludwick v. Harbinger Grp., Inc.*, 854 F.3d 400, 405 (8th Cir. 2017).

Defendant argues that the McCarran-Ferguson Act prevents Plaintiffs' RICO claims because all the states at issue require insurance contracts to be filed with state authorities, who then either approve or disapprove them. Doc. 31 at 15-16; *see also* K.S.A. § 40-216(a)(2)(A) (allowing the insurance commissioner to disprove a contract of insurance if it does not comply with Kansas law); Cal. Ins. Code § 10168.93(a) (requiring filing of annuity contracts with insurance commissioner); 215 Ill. Comp. Stat. 5/143(1) (requiring policies to be filed electronically and approved); Ariz. Rev. Stat. § 20-398(A) (prohibiting use of a policy form unless the form has been filed and approved); Nev. Rev. Stat. § 687B.120(1)(a) (prohibiting use of an annuity contract form unless it has been filed and approved by the insurance commissioner); Fla. Stat. § 624.480(1) (requiring filing and approval of insurance policy forms). Each of these states (except California) can disapprove a form or contract if it does not comply with state law or is otherwise misleading. Defendant argues that, under these statutes, the annuity contracts at issue could not have been sold to Plaintiffs if state regulators concluded that they violated state law. Doc. 31 at 16. It follows, according to Defendant, that allowing Plaintiffs' RICO claims to proceed would require the Court to second-guess state insurance regulators, in violation of the McCarran-Ferguson Act. *See id.*

Plaintiffs dispute that regulatory approval of insurance contracts preempts their federal RICO claims. Plaintiffs argue that they do not allege any misrepresentations in the policy contracts themselves. Doc. 48 at 6-7. Rather, they contend that their RICO claims complement and advance the states' general prohibitions on fraudulent inducement in insurance contracts. *See id.* at 7.

Even if the annuity contracts themselves were approved (or at least not affirmatively disapproved) by state regulators, the Court agrees with Plaintiffs that this approval does not invoke reverse-preemption. Plaintiffs' claims focus on the marketing materials and other documents that they claim fraudulently induced them to buy the annuities and misrepresented the features of the indexes—not on any misrepresentation in the annuity contracts themselves. Defendant does not argue that any state regulators reviewed those other materials and determined that they contained no misrepresentations or material omissions. Defendant only makes the unsupported assertion that the "design of an annuity product is reflected in the terms of the annuity contract." Doc. 57 at 3. Even if this is true, it doesn't address misrepresentations in marketing materials or SOUs.

Nor has Defendant alleged any state policy would be frustrated by allowing the RICO claims to proceed. The fact that all the states at issues regulate insurance <u>generally</u> is not sufficient to preempt Plaintiffs' RICO claims. As the Supreme Court held in *Humana*, Congress did not intend "to cede the field of insurance regulation to the States" completely through the McCarran-Ferguson Act. *Humana*, 525 U.S. at 308-09. Rather, there must be some frustration or interference with a state's administrate regime. *Id.* at 310; *see also BancOklahoma*, 194 F.3d at 1099. Defendant has not shown this to be the case given the Plaintiffs' allegations, and thus it has not shown Plaintiffs' RICO claims are reverse-preempted under the McCarran-Ferguson Act.[6]

---

[6]    This ruling is not inconsistent with this Court's ruling in *Ogles*. In *Ogles*, the Court discerned two distinct theories: one based on a claim that the plaintiff was misled into buying an annuity based on false representations about the financial strength of Security Benefit, and one based on the allegedly fraudulent design of the annuities. *Ogles*, 401 F. Supp. 3d at 1215-16. The financial-strength theory was premised on internal financial transactions between

**B.    Plaintiffs' RICO claim fails to satisfy pleading standards.[7]**

Because the Court finds that Defendant has not demonstrated that Plaintiffs' RICO claims are reverse-preempted, it must address Defendant's argument that Plaintiffs fail to state a claim under RICO. RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The elements of a RICO claim are (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. *George*, 833 F.3d at 1248.

A pattern of racketeering activity means that a defendant is alleged to have committed certain predicate acts, which are certain specified state or federal offenses. *In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1322

---

Security Benefit and its parent company that allegedly obscured Security Benefit's true financial condition. *Id.* at 1216. Those internal financial transactions were also highly regulated by state law. *Id.* at 1218 (following the outcome in *Ludwick*, which had "starkly similar" allegations). Only the financial-strength theory was dismissed under the McCarran-Ferguson Act. *Id.* The Court noted that the reverse-preemption analysis might be different as to the fraudulent-design theory, though the defendants were not challenging that theory under the McCarran-Ferguson Act. *Id.* at 1221 n.10. Defendant argues that the same financial-strength theory is alleged here, but the Court disagrees, having carefully reviewed the first amended complaint. Although some introductory paragraphs explain that Defendant had some financial struggles about ten years ago before being acquired by the private equity firm, the Court discerns no similar allegations that Plaintiffs were induced into buying annuities based on representations of Defendant's financial strength. The allegations here, although not identical, are much more akin to the fraudulent-design theory in *Ogles*.

[7]    Resolution of this motion has been complicated by the first amended complaint, which is 92 pages and contains 332 numbered paragraphs, many of which contain multiple sentences and occasionally unnecessarily inflammatory allegations. While there is no outer limit on complaint length, especially in more complex cases like this one, the length, density, and conclusory nature of the first amended complaint has made it difficult to pin down specific allegations, despite the Court's careful review. *See Mann v. Boatright*, 477 F.3d 1140, 1148 (10th Cir. 2007)("Something labeled a complaint but written more as a press release, prolix in evidentiary detail, yet without simplicity, conciseness and clarity as to whom plaintiffs are suing for what wrongs, fails to perform the essential functions of a complaint." (quoting *McHenry v. Renne*, 84 F.3d 1172, 1180 (9th Cir. 1996))); *see also U.S. ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 378 (7th Cir. 2003) ("Rule 8(a) requires parties to make their pleadings straightforward, so that judges and adverse parties need not try to fish a gold coin from a bucket of mud.").

(D. Kan. 2018). Mail fraud and wire fraud are predicate acts under RICO. *See id.* These are the predicate acts alleged by Plaintiffs. *See* Doc. 16 at ¶ 176.[8]

Mail fraud is "(1) the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and (2) use of the United States mails for the purpose of executing the scheme." *BancOklahoma*, 194 F.3d at 1102 (internal citations omitted); *see also Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006). The elements of wire fraud are the same but alleging use of interstate wires to execute the scheme instead of mail. *See In re: EpiPen*, 336 F. Supp. 3d at 1322. The "common thread" in these crimes is the concept of fraud. *BancOklahoma*, 194 F.3d at 1103.

### 1. Plaintiffs fail to allege mail and wire fraud with particularity under Rule 9(b).

A heightened pleading standard is required for allegations of mail and wire fraud. *George*, 833 F.3d at 1254; *see also Robbins v. Wilkie*, 300 F.3d 1208, 1211 (10th Cir. 2002) (noting that while some RICO elements are only subject to general pleading standards, predicate acts must be pleaded in accordance with Rule 9(b)). This means that "plaintiffs must set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *George*, 833 F.3d at 1254 (internal citations and quotations omitted). This is often referred to as the "'who, what, where, and when' of the alleged fraud." *Plastic Packaging Corp. v. Sun Chem. Corp.*, 136 F. Supp. 2d 1201, 1203 (D. Kan. 2001).

Although Plaintiffs do not dispute that Rule 9(b) requires particularity for their allegations of mail and wire fraud, they argue that the rule should "not be applied so stringently" such that it goes beyond its purpose of alerting Defendant about the misconduct alleged so that it can prepare

---

[8]   Defendant does not challenge whether Plaintiffs pleaded the conduct of an enterprise, and thus the Court focuses on whether Plaintiffs adequately pleaded predicate acts.

a defense. Doc. 48 at 16-17. They argue that the Tenth Circuit only requires "enough specificity to put defendants on notice as to the nature of the claim" and "does not require omniscience." Doc. 95 at 4-5 (quoting *George*, 833 F.3d at 1257). But omniscience and particularity are not the same thing. Nor is it correct that there is an alternative to the particularity requirement beyond the familiar who/what/when/where standard. Although courts note that Rule 9(b)'s purpose is to give a defendant fair notice of the claims and facts being asserted, they repeatedly conclude that this is accomplished by "set[ting] forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *George*, 833 F.3d at 1254 (internal quotations and citations omitted); *see also Sorenson v. Polukoff*, 784 F. App'x 572, 578 (10th Cir. 2019) ("But the particularity requirement <u>requires only that</u> the plaintiff 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" (quoting *George*, 833 F.3d at 1254) (emphasis added)).[9] In other words, pleading these details is what gives a defendant the requisite level notice required by Rule 9(b).

Defendant argues that the predicate acts of mail and wire fraud have not been pleaded with particularity. The Court agrees. Although the first amended complaint expounds at length on Plaintiffs' theory that Defendant fraudulently developed and marketed the equity-indexed annuities while using the mail and wires, less prevalent are any specific details of the "time, place and contents of the false representation[s]." *George*, 833 F.3d at 1254.

---

[9]    The Court rejected a similar argument in *Ogles* that Rule 9(b) should be relaxed. *Ogles*, 401 F. Supp. 3d at 1222-23. In *Ogles*, the plaintiff argued that Rule 9(b) should be relaxed because much of the information was in the hands of the defendants and had been hidden from the plaintiff's discovery. *Id.* at 1222. Plaintiffs make a nearly identical allegation in the first amended complaint, Doc. 16 at ¶ 167, but they do not argue that they are unable to provide these details in response to the motion to dismiss. Even still, the Court reiterates the holding in *Ogles* that "conclusory statements that [Plaintiffs] simply cannot obtain any examples because [Defendant has] concealed them is not enough to relax the [particularity] requirement for . . . claims of mail or wire fraud." *Ogles*, 401 F. Supp. 3d at 1223.

The first amended complaint generally alleges that Defendant's hypothetical illustrations, marketing materials, and SOUs contained misrepresentations or were misleading in what they did not disclose. But there are very few, if any, specific examples of these alleged misrepresentations, or the time and place they were made. The only specific examples are a reference to a hypothetical illustration prepared for Plaintiff Webber on April 22, 2014, a "marketing brochure from 2014," and a brochure about the MSDA Index.[10] Doc. 16 at ¶¶ 66, 69, 105. Allegations about the SOUs are alleged, but only generally, as are other allegations about marketing materials. This leaves Defendant with the challenge of defending allegations that it defrauded eight plaintiffs and a nationwide class over the past decade using largely unspecified hypothetical illustrations, marketing materials, and SOUs. This does not satisfy Rule 9(b)'s particularity standard.

### 2. Plaintiffs fail to state a plausible scheme to defraud by false representations or omissions in accordance with Rule 12.

Beyond the missing details in the first amended complaint, the Court alternatively finds that it lacks plausibility. "To support the mail and wire fraud allegations, the plaintiffs must plausibly allege 'the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises'" using the mail or wires. *George*, 833 F.3d at 1254 (quoting *Tal*, 453 F.3d at 1263) (emphasis added). This means that there must be sufficient facts from which an inference of fraud can be drawn. *Iqbal*, 556 U.S. at 678. "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal quotations and brackets omitted).

---

[10]   The MSDA Index brochure cited in the first amended complaint is titled "A Closer Look at the Morgan Stanley Dynamic Allocation Index." Doc. 16 at ¶ 105. A brochure by the same name was included in the judicially noticed materials. *See* Doc. 30-28. But the substance of the brochure described in the first amended complaint does not match up with the judicially noticed version. So it is unclear whether the first amended complaint is referring to a different version of the same brochure, or something else altogether.

The parties focus on four alleged misrepresentations or omissions that Plaintiffs contend are at the heart of the alleged fraudulent scheme: (1) misleading claims that the annuities were "uncapped" and had 100% participation; (2) hypothetical illustrations projecting unattainable future performance; (3) representations that the volatility control overlay had a "symmetrical impact"; and (4) omitted information about each index's asset allocation.

**"Uncapped" and 100% Participation.** Plaintiffs' first alleged misleading statement is that the annuities were "uncapped" and had 100% participation. Plaintiffs allege that Defendant touted the equity-indexed annuities as uncapped and having 100% participation to draw customers away from other more traditional annuity products that did have caps and lower participation rates. *See, e.g.*, Doc. 16 at ¶¶ 51, 55-56.

The primary flaw in this allegation is that there are no facts suggesting that the annuities were, in fact, "capped." Indeed, the first amended complaint is not clear on how these statements are misleading, other than perhaps suggesting that because the equity-indexed annuities were such inferior products that describing them in this way was misleading. At most, Plaintiffs repeat their conclusory assertion that the annuities were designed to produce "near-zero" returns. But conclusory allegations are not entitled to a presumption of truth. *See Iqbal*, 556 U.S. at 678-79 ("Rule 8 . . . does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions.").

Likewise, Plaintiffs' contention that Defendant fraudulently marketed the annuities as having 100% participation is belied by the documents themselves. The hypothetical illustration cited by Plaintiffs clearly states that the "current" participation rate is 100% but that the guaranteed minimum participation rate is only 50%. *See, e.g.*, Doc. 30-30 at 3. The SOUs likewise reflect that "[t]he participation rate is guaranteed to never be less than 50%." *See, e.g.*, Doc. 30-21 at 8.

"[F]actual allegations that contradict such a properly considered document are not well-pleaded facts that the court must accept as true." *See GFF Corp.*, 130 F.3d at 1385. These allegations therefore do not support a fair inference of fraud.

**Hypothetical Illustrations.** Plaintiffs' second purported misrepresentation is the use of hypothetical illustrations projecting the performance of the indexes. Plaintiffs allege that Defendant looked back at a period of time before the indexes existed to see how they would have hypothetically performed, i.e., backcasting, and then used that information to project potential future performance. Plaintiffs allege these illustrations were misleading because the time periods selected were "cherry-picked" to represent periods of "non-representative gains" that Defendant knew would not be re-created in the future. *See, e.g.*, Doc. 16 at ¶¶ 4-5, 48, 53, 57, 62, 64. And all the indexes performed much worse in reality than the hypothetical illustrations suggested they would. *Id.* at ¶¶ 67, 71-72. Plaintiffs also allege that "regulators and regulatory bodies" have "recognized the potentially misleading nature of back-casted proprietary indices used to illustrate or promote annuities." *Id.* at ¶ 79 (citing a statement by the Iowa Insurance Commissioner that backcasted projections can be misleading if used to project future performance); *see also id.* at ¶ 80 (noting statements by some insurance companies that "if used improperly" backcasted illustrations "could be misleading").

Defendant argues that Plaintiff has failed to identify anything about the hypothetical illustrations that was actually false.[11] Although Plaintiffs state in their response that the hypothetical illustrations "falsely depicted historical performance," nowhere do they explain

---

[11] The first amended complaint includes a statement that Defendant "knew" that the backcasted illustrations were "impossible to achieve because standard economic models using recognized statistical methods (such as the monte carlo analysis) demonstrate that the expected returns for the assets underlying the Synthetic Indices are nearly zero once the spreads and costs of the [annuities] are taken into account." Doc. 16 at ¶ 73. The first amended complaint contains no other references or factual allegations regarding what "standard economic models" would show and if or how they are different than the models used by Defendant. Neither party address this statement in the briefing.

precisely what was false about them, other than that they did not materialize into actual returns. As the Court noted in *Ogles*, which had similar allegations about "fraudulent simulations" of the ALTV Index, this does not lead to an inference of fraud:

> But the fact that actual, real-world performance of the ALTVI has trended significantly downward compared to the simulated historical data does not lead to a fair inference of fraud. There are any number of reasons why past performance—real or simulated— would not match future performance, the most obvious being a change in the economy.

*Ogles*, 401 F. Supp. 3d at 1225. Likewise, here, the simple fact that the projections did not actually come to fruition, *see* Doc. 16 at ¶¶ 67, 71-72, does not plausibly support an inference of fraud.

To the extent Plaintiffs allege that the hypothetical illustrations were misleading because they were based on "cherry-picked" time periods of "non-representative historical performance" that Defendant "knew" could not be repeated, *id.* at ¶¶ 48, 62, the Court finds no factual support in the first amended complaint that backs up these conclusory allegations. This claim is actually at odds with the underlying theme of Plaintiffs' case—that Defendant <u>knew</u> the indexes would generate "near-zero returns." *Id.* at ¶ 8. If the indexes were designed to produce near-zero returns, it is unclear why the ten or so years before their creation would show "non-representative historical performance," let alone how the years immediately preceding Plaintiffs' annuity purchases could constitute "cherry-picked" time periods. *See Iqbal*, 556 U.S. at 679 (determining whether a complaint states a plausible claim for relief "requires the reviewing court to draw on its judicial experience and common sense"). To the extent Plaintiffs challenge the use of backcast illustrations altogether, the only factual support in the first amended complaint are statements by the Iowa Insurance Commissioner and other insurance companies and finance experts that backcast projections are <u>potentially</u> misleading. But again, there are no allegations that the hypothetical illustrations given to Plaintiffs were <u>actually</u> fraudulent. *See Ogles*, 401 F. Supp. 3d at 1225 n.19.

Finally, and significantly, the Court has taken judicial notice of some examples of the hypothetical illustrations, including Plaintiff Webber's April 22, 2014 illustration—the only specific example cited in the first amended complaint. *See* Doc. 30-30; *see also* Doc. 16 at ¶ 66. The illustration is clearly labeled "hypothetical." Doc. 30-30 at 2. It also states, "The values in this illustration are not guarantees or even estimates of the amounts you can expect from your annuity." *Id.* at 4. And contrary to Plaintiffs' repeated assertions that the hypothetical illustrations are based on "cherry-picked" time periods, the illustration provides simulations for the ALTV Index for the most recent ten-year period, and then three additional ten-year periods representing the ten years with the median index increase, the least index increase, and the best index increase. *Id.* The illustration also provides a "Guaranteed Illustrated Values" chart representing 0% interest credits to Plaintiff Webber's ALTV Index account—exactly what he claims to have earned. *Id.* at 5; Doc. 16 at ¶ 218. This contradicts Plaintiffs' allegations that they were given only projections of non-attainable gains or that the illustrations were based on "cherry-picked" time periods. *See GFF Corp*, 130 F.3d at 1385 (noting that "factual allegations that contradict such a properly considered document are not well-pleaded facts that the court must accept as true"). The hypothetical illustrations therefore do not support a fair inference of fraud.

**Volatility Overlays.** Plaintiffs' third alleged misrepresentation is that Defendant, in the SOUs, "misleadingly suggests that the volatility control overlay has a symmetrical impact on performance . . . when it does not." Doc. 16 at ¶ 92. This is because the volatility overlay acts to mute gains in the index, while offering no "symmetrical" beneficial impact when the index falls in value because the annuities had a 0% floor on interest. *Id.* In other words, the volatility overlay could infinitely limit gains in value, but its impact on drops in value stops at 0%.

The problem is that the SOUs do not actually say that the volatility overlays have a "symmetrical impact." Instead, they state "volatility control overlay reduces the impact of a fall in price, as well as increases in the price of the [index]." *See id.* at ¶ 92.[12] Although Plaintiffs interpret this to imply a "symmetrical impact," it does not say that. Nor have Plaintiffs pleaded facts to show that the volatility overlay did not operate as stated. Accordingly, this does not support a fair inference of fraud.

**Disclosure of Asset Allocation.** Plaintiffs' fourth allegation of fraud is that Defendant failed to disclose the composition of assets in the ALTV Index and BPHD Index. *See, e.g.*, Doc. 16 at ¶¶ 94-95, 101-102, 111. As to the MSDA Index, the first amended complaint initially states that its asset allocation was also not disclosed, but then acknowledges that it did disclose that it consisted of four asset classes (equities, bonds, short-term treasuries, and "alternatives"). However, Plaintiffs contend Defendant failed to disclose that only 15% of the assets in the MSDA Index were allocated to equities. *Id.* at ¶¶ 101-102. Similarly, where indexes allocated assets using a "rules-based strategy," Plaintiffs allege those rules were not disclosed. *Id.* at ¶¶ 95, 104.

Defendant argues that Plaintiffs have not sufficiently pleaded that they had a duty to disclose this information, and that the sales brochures do explain the anticipated allocation of assets for the index. Doc. 31 at 19, 24. On this latter point, the brochures for the ALTV Index, BPHD Index, and MSDA Index have been judicially noticed. All of them explain the components of each index. *See* Docs. 30-26 at 7-8; 30-27 at 3, 5; and 30-28 at 5.

---

[12] For the BPHD Index, the first amended complaint states that the SOU failed to disclose that the index had a volatility overlay at all. Doc. 16 at ¶ 112. But Plaintiff Clinton's SOU—the only Plaintiff who had an annuity linked to the BPHD Index—refers to the BPHD Index as either the HD Plus Index or BNPP Index. Do. 30-17 at 37. It goes on to state that the "volatility control applied by BNPP may reduce the potential positive change in the HD Plus Index and thus the amount of interest that will be credited by the SBL fixed index annuity that includes the HD Plus Index." *Id.*

On the issue of whether Defendant had a duty to disclose <u>additional</u> information about the indexes, Plaintiffs contend Defendant had a duty to correct the mistaken and misleading impressions it created about the indexes. Doc. 48 at 13-14; Doc. 95 at 5. Plaintiffs rely on *Negrete v. Allianz Life Ins. Co.* In *Negrete*, the court rejected the defendant's argument that it had no duty to disclose certain information about premium pricing. This was because there were facts suggesting that the sales materials had <u>affirmatively misrepresented</u> certain features of the annuities at issue. The court held that "[s]uch affirmative misrepresentations would give rise to a duty to fully disclose all material facts necessary to make full and complete disclosure." *Negrete v. Allianz Life Ins. Co. of N.A.*, 2011 WL 4852314, at *13 (C.D. Cal. 2011); *see also United States v. Gallant*, 537 F.3d 1202, 1228 (10th Cir. 2008) ("Although nondisclosure is not actionable as fraud absent a duty to speak, 'a misleading omission is actionable as fraud if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled.'" (quoting *United States v. Cochran*, 109 F.3d 660, 665 (10th Cir.1997))). But here, the Court struggles to discern what misleading impressions or half-truths Plaintiffs contend were made by Defendant that required additional disclosures about asset allocations, or why the sales brochures with that information were insufficient. Nor can it discern how this supports an inference of fraud.

In sum, having carefully and repeatedly reviewed the first amended complaint, the judicially noticed documents, and the parties' arguments, the Court concludes that Plaintiffs have failed to allege sufficient facts that would support an inference of fraud sufficient to sustain Plaintiffs' RICO claim. At most, the allegations are "merely consistent with a defendant's liability" but "stop[] short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (internal quotations and citations omitted). This compounds—and likely flows from—

Plaintiffs' failure to plead the predicate acts of mail and wire fraud with particularity. *See George*, 833 F.3d at 1254. And without these predicate acts, there is no plausible RICO claim alleged.

Without a viable RICO claim under 18 U.S.C. § 1962(c), there is no viable RICO conspiracy claim under 18 U.S.C. § 1962(d). *See Tal*, 453 F.3d at 1270 ("If a plaintiff has no viable claim under § 1962(a), (b), or (c), then its subsection (d) conspiracy claim fails as a matter of law."). Accordingly, the Court grants Defendant's motion to dismiss as to Plaintiffs' RICO claims.

### C.    Plaintiffs' state-law claims fail for the same reasons because they are based on the same factual allegations.

The parties both agree that Plaintiffs' state-law claims are based on the same factual allegations of fraud as their RICO claims. Doc. 31 at 25-26; Doc. 48 at 19. Because the Court finds that Plaintiffs' allegations fail for want of both particularity and plausibility, Plaintiffs' state-law claims therefore fail for the same reasons.[13]

## IV.    CONCLUSION

THE COURT THEREFORE ORDERS that Defendant's Motion to Dismiss (Doc. 31) is GRANTED. Plaintiffs' first amended complaint is DISMISSED WITHOUT PREJUDICE.[14]

THE COURT FURTHER ORDERS that Defendant's Request for Judicial Notice and/or Consideration of Certain Documents in Connection with its Motion to Dismiss (Doc. 30) and

---

[13]   The Court therefore does not reach the other arguments raised in Defendant's motion to dismiss.

[14]   Plaintiffs suggest that leave to amend should be granted should the Court find any pleading deficiency in the first amended complaint. Doc. 48 at 30. The Court acknowledges that, at the time Plaintiffs' response was a filed, this matter was pending in the Southern District of Florida. But it has since been transferred, and District of Kansas Local Rule 15.1 sets forth specific requirements for requests to amend pleadings. *See* D. Kan. Rule 15.1(a); *see also Albers v. Bd. of Cnty. Comm'rs of Jefferson Cnty., Colo.*, 771 F.3d 697, 706 (10th Cir. 2014) ("[A] bare request to amend in response to a motion to dismiss is insufficient to place the court and opposing parties on notice of the plaintiff's request to amend and the particular grounds upon which such a request would be based."). Plaintiffs do not comply with this local rule. Plaintiffs also fail to explain what allegations could be added and, instead, apparently ask the Court to resolve the motion and then give them another chance. This is inconsistent with Rule 1. Accordingly, although the Court does not grant leave to amend on the current record, it does note that the dismissal here is without prejudice.

Plaintiffs' Unopposed Request for Judicial Notice (Doc. 49) are GRANTED. Plaintiffs' Request for Oral Argument on Defendant's Motion to Dismiss (Doc. 97) is DENIED.

IT IS SO ORDERED.

Dated: February 12, 2021                    /s/ Holly L. Teeter
                                             HOLLY L. TEETER
                                             UNITED STATES DISTRICT JUDGE