**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| **ELLA CLINTON, et al.,**<br><br>**Plaintiffs,**<br><br>**v.**<br><br>**SECURITY BENEFIT LIFE INSURANCE COMPANY,**<br><br>**Defendant.** | **Case No. 5:20-cv-04038-HLT-RES** |

**MEMORANDUM AND ORDER**

Plaintiffs are several individuals who purchased annuities from Defendant Security Benefit Life Insurance Company. They filed this class-action lawsuit alleging that the annuities they purchased were the result of a fraudulent scheme by Defendant and other non-party entities. Plaintiffs assert claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, as well as claims under California, Illinois, Arizona, and Florida law.

Plaintiffs move to certify a nationwide RICO class and several state subclasses. Doc. 260. The Court denies the request to certify a nationwide RICO class after carefully considering the extensive record created by the parties. A key element of RICO is causation, and Plaintiffs have not presented a valid causation theory that can be proved with common evidence. Individualized questions of causation will predominate. The state subclasses fail for essentially the same reason. The Court therefore denies Plaintiffs' class-certification motion. The Court also denies Defendant's motion for leave to file a sur-reply (Doc. 378) and denies as moot and without prejudice Defendant's other substantive motions (Docs. 303, 305, 308, 374, 376, and 377).

## I. BACKGROUND[1]

Defendant is an insurance company. This case involves deferred annuities issued by Defendant. Deferred annuities are contracts between the annuity holder and an insurance company. The holder purchases the annuity with an up-front payment. The up-front payment is deposited into an account and invested for the deferral period. The insurance company then credits the balance according to the terms of the contract.

There are different crediting options for annuities. Relevant here are equity-indexed annuities, which give consumers the option to allocate their annuity funds among stocks, bonds, commodities, or different market indices, like the S&P 500. Credits to the annuities are based on the performance of the associated index and are subject to the contractual terms of the annuity. Declines in the index generally do not decrease the original value of the annuity.

In 2010, a private-equity firm acquired Defendant and sought to use Defendant for financial gain by selling annuities. With the help of consulting and marketing partners, Defendant developed and sold two annuity products: the Secure Income Annuity ("SIA") and the Total Value Annuity ("TVA").

The SIA and TVA had optional riders. One optional rider was the Guaranteed Lifetime Withdrawal Benefit Rider ("GLWB Rider"), which provided purchasers with the right to withdraw lifetime annual income. A significant portion of SIA and TVA contracts included the GLWB Rider. Another optional rider was the Guaranteed Minimum Death Benefit Rider ("GMDB Rider"), which increased the amount paid upon the death of the annuity holder. The annuities came

---

1 The Court accepts as true the allegations in the complaint when resolving a class-certification motion, but it does not accept conclusory allegations that parrot the standards of Rule 23. *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010). It may also be necessary to "probe behind the pleadings" in evaluating certification. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011). These facts are therefore taken from the complaint and the class-certification briefing. *See Sherman v. Trinity Teen Sols., Inc.*, 84 F.4th 1182, 1188 n.3 (10th Cir. 2023). The Court discusses additional facts in the analysis.

with other benefits and guarantees such as bonuses, penalty-free withdrawals, annuitization, death benefits, and nursing home and terminal illness endorsements.

The SIA and TVA gave customers the chance to link their annuities to some new proprietary indices. These proprietary indices were crafted using complex parameters. Because the indices were new, they did not have actual historical performance. Defendant instead used "backcasted" returns to show potential performance. A backcasted return is a simulation of past performance—what an index's performance would have been over a specific timespan in the past. The backcasted returns for the indices at issue were impressive, especially compared to the performance of other more traditional indices for the same timespan. Plaintiffs contend the formulas and parameters used to create the indices were "cherry-picked" to generate enhanced backcasted returns.

Some of the backcasted returns were very high. But lower backcasted returns, i.e. historical periods where the indices would not have performed as well, were also included in marketing materials. The materials also included disclaimers that the values were hypothetical and not guaranteed and could not be relied on as a measure of future performance.

Plaintiffs contend Defendant never believed the annuities linked to the new indices would perform as shown in the backcasted returns. In calculating its own costs, Defendant assumed significantly lower returns. And although the backcasted returns contained disclosures, Defendant did not tell customers it expected lower returns.

The backcasted returns were essential to selling the annuities because higher returns are easier to sell. The backcasted returns were the "sizzle" that helped sales agents (called "producers") sell the annuities. The backcasted returns were also highlighted in the training offered to producers. But higher returns are also more expensive. Because Defendant believed the annuities would return

less than the backcasted returns suggested, the annuities were still affordable for Defendant to hedge.

Sales of the SIA and TVA were significant. The marketing materials relied on the backcasted returns. The materials included illustrations, online calculators, and allocation examples,[2] all based on the backcasted returns. Defendant did not require producers to use any of these materials. But the backcasted returns were the only performance information producers had because the indices were new and had no actual historical performance.

Defendant worked with independent marketing organizations ("IMOs") on the annuities. The annuities were distributed through independent producers who had relationships with Defendant's IMOs. The IMOs were not required to limit producers to Defendant's products. The producers could sell financial and insurance products from numerous companies, including Defendant's competitors. Producers thus had a variety of financial and insurance products to offer customers.

Approximately 5,000 different producers sold annuity contracts to the putative class. Producers conducted individual presentations for their customers. Defendant did not control producers or dictate what products to sell. Defendant's marketing and sales materials were available to producers, but producers were not required to show these materials to customers. Defendant did not require producers to use sales scripts or to use any particular marketing materials in their sales presentations.

Purchasers of annuities also had to submit suitability forms. Producers acknowledged in the suitability forms that they had not made any promise about the future value of the annuity. The suitability forms asked prospective purchasers to identify their financial objectives in purchasing

[2] Allocation examples showed possible performance assuming annuities were credited to multiple crediting options.

an annuity, such as income guarantees, guaranteed interest rates, interest based on the market, tax concerns, and probate avoidance. Purchasers' answers varied.

The Statement of Understanding ("SOU") was the only form Defendant required producers to provide to purchasers. SOUs contained disclosures about the features, benefits, limitations, and costs of the annuities. Each annuity purchaser was given an SOU to sign. The purchaser had to certify that he or she read the SOU, that the producer had explained the SOU, that he or she understood the features of the annuity, and that the values shown were for explanatory purposes only and not guaranteed. A purchaser was also required to sign the SOU. Plaintiffs contend the SOUs misrepresented the indices in three ways.

First, Plaintiffs contend the SOUs portrayed the indices as "rules based," meaning an index's rules had various purposes, goals, and benefits. For example, the stated goal of one of the indices was to protect against market volatility by changing allocations among stocks and bonds. Other features were explained as ways to lower hedging costs for Defendant. But Plaintiffs contend the real purpose of the indices' rules were to maximize backcasted returns.

Second, Plaintiffs contend the SOUs distinguished the indices from the S&P 500-based crediting options by suggesting the new indices were better options. But the SOUs failed to disclose that Defendant believed the indices would perform similar to the S&P 500-based options.

Third, the SOUs disclosed the "spread," which was a percentage deducted by Defendant from the returns. But Defendant did not disclose that there was a different "product spread" generated when Defendant invested annuity funds in products other than the indices while buying options to cover hedge costs. The options were cheaper than the returns generated by Defendant's investments.[3]

---

[3] Plaintiffs state this was a "charge to consumers." But the cited material only states that the product spread was not disclosed to consumers. *See* Doc. 261 at 20-21 n.70. The cited material does not indicate whether or how it is a

Ultimately, the annuities tied to the indices showed poor returns compared to the backcasted returns. Plaintiffs sued and now seek to certify a class for a RICO claim, state-law claims under consumer protection laws in California, Illinois, and Arizona, and common-law fraud claims under California, Illinois, Arizona, and Florida law.

## II. STANDARD

A class action is an exception to the rule that litigation is usually conducted by the named parties only. *Wal-Mart Stores*, 564 U.S. at 348. Rule 23 helps determine when to depart from that rule. *See id.* A district court must perform a "rigorous analysis" to ensure the standards of Rule 23 are met. *CGC Holding Co., LLC v. Broad & Cassel*, 773 F.3d 1076, 1086 (10th Cir. 2014). "[T]he requirements of Rule 23 are heavily scrutinized and strictly enforced." *Id.*

Rule 23 sets out a two-step process. First, a plaintiff seeking class certification must establish the four threshold requirements of Rule 23(a):

> (1) the class is so numerous that joinder of all members is impracticable;
> (2) there are questions of law or fact common to the class;
> (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
> (4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a). These requirements are known as numerosity, commonality, typicality, and adequacy. *CGC Holding Co.*, 773 F.3d at 1086.

A plaintiff must also satisfy at least one of the situations in Rule 23(b). *Id.* Relevant here is the situation in Rule 23(b)(3), under which a plaintiff must show "that the questions of law or fact common to class members predominate over any questions affecting only individual members,

---

charge to consumers. A description of the product spread in the record indicates it is the difference between the cost of Defendant to hedge an invested annuity and the returns Defendant received when it invested the annuity funds in a different investment. It's not clear how this would be a charge to consumers rather than a description of Defendant's profit.

and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3); *see also Cline v. Sunoco, Inc. (R&M)*, 159 F.4th 1171, 1184-85 (10th Cir. 2025) ("There are four Rule 23(a) factors that all class actions must satisfy, and, in a case seeking damages under Rule 23(b)(3), two additional factors must be met: predominance and superiority."). Ultimately, "class status is appropriate as long as plaintiffs can establish an aggregation of legal and factual issues, the uniform treatment of which is superior to ordinary one-on-one litigation." *CGC Holding Co.*, 773 F.3d at 1086.

In deciding whether to certify a class, a court accepts the substantive allegations of the complaint as true. *Shook v. El Paso Cnty.*, 386 F.3d 963, 968 (10th Cir. 2004). But a court is not limited to the pleadings and can examine the facts and evidence in the case. *Tabor v. Hilti, Inc.*, 703 F.3d 1206, 1227-28 (10th Cir. 2013). Rule 23 is not a pleading standard; rather, a party seeking class certification "must be prepared to prove that there are in fact sufficiently numerous parties, common questions of law or fact, etc." *Sherman*, 84 F.4th at 1187.

Whether to certify a class is a matter within a district court's discretion. *CGC Holding Co.*, 773 F.3d at 1085-86. A district court's class-certification ruling is entitled to deference so long as the court "applies the proper Rule 23 standard" and the "decision falls within the bounds of rationally available choices given the facts and law involved in the matter at hand." *Id.* at 1086.

## III. ANALYSIS

Plaintiffs seek to certify classes under (1) RICO, 18 U.S.C. §§ 1962(c), 1964(c), (2) the California Unfair Competition Law ("UCL"), (3) the Illinois Consumer Fraud Act ("ICFA"), (4) the Arizona Consumer Fraud Act ("ACFA"), and (5) common-law fraud under the laws of California, Illinois, Arizona, and Florida. They seek certification of a nationwide class, as well as

California, Illinois, Arizona, and Florida subclasses. *See* Doc. 260 at 1-2. The nationwide class would be defined as:

> All owners of a TVA or SIA annuity issued by Security Benefit on or before December 31, 2016, for which any portion of the Initial Purchase Payment was allocated to the ALTVI, TVBI, or MSDA Index Accounts.

*Id.* at 2.

If a nationwide class is not certified, Plaintiffs alternatively seek certification of a nationwide "backcasting match" class or a nationwide "backcasting receipt" class. *Id.* at 2-3. If either alternative class is certified, Plaintiffs seek certification of similar subclasses for California, Illinois, and Arizona. *Id.* at 3.[4]

Mindful of its obligation to analyze class certification under the standards set out in Rule 23, the Court begins the analysis with the four factors in Rule 23(a) before turning to the standard in Rule 23(b)(3).[5] For purposes of predominance, the Court discusses the proposed classes separately. But the analysis under Rule 23(a) is generally the same for all proposed classes and subclasses.

### A. Rule 23(a)

As noted above, Rule 23(a) has four requirements for class certification: numerosity, commonality, typicality, and adequacy. *CGC Holding Co.*, 773 F.3d at 1086. Although the parties do not meaningfully dispute these factors, the Court discusses each one in turn.

---

4 Plaintiffs also suggest the possibility of subdividing a nationwide class into subclasses based on the particular index involved. Doc. 260 at 3. Plaintiffs do not otherwise provide analysis on these proposed subclasses, and the Court does not address it further.

5 Plaintiffs don't argue any other provision in Rule 23(b) applies.

**1. Numerosity**

The first requirement of Rule 23(a) is numerosity: "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). There is no specific number of class members required to satisfy the numerosity factor. *Cline*, 159 F.4th at 1185 n.3. A class of 40 or more is generally sufficient. *Id.*

Defendant does not contest this element. *See* Doc. 311 at 47 (addressing elements other than numerosity).[6] Plaintiffs argue the nationwide class likely has over 60,000 members. Doc. 261 at 26. The subclasses are all likely sufficiently large as well. The numerosity requirement is satisfied.

**2. Commonality**

Rule 23(a)(2) requires a party seeking class certification to show "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality looks to whether a claim is "dependent upon a common contention" that is "capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores*, 564 U.S. at 350; *see also Sherman*, 84 F.4th at 1192 (requiring that a plaintiff show that a claim relies on a "common contention . . . capable of classwide resolution" (internal quotation and citation omitted)). It is not enough that all plaintiffs share common questions—the litigation must "generate common <u>answers</u>" that can resolve the litigation. *Wal-Mart Stores*, 564 U.S. at 350 (internal quotation and citation omitted). In deciding this factor, courts should scrutinize the class for common issues rather than looking for

---

[6] Defendant does challenge ascertainability, which it characterizes as "a sub-requirement of numerosity." Doc. 311 at 48. Rule 23 does not carry an express ascertainability requirement, and the Tenth Circuit has concluded that "administrative feasibility" is not a required factor in determining ascertainability. *Cline*, 159 F.4th at 1195-96. Rather, to be ascertainable, "the class definition must (1) be defined clearly and cannot be defined too vaguely, and (2) be defined objectively and cannot be based on subjective criteria, such as by a person's state of mind." *Id.* at 1196. Plaintiffs' proposed class definitions satisfy this standard.

individualized issues. *See Sherman*, 84 F.4th at 1193. Ultimately, commonality under Rule 23(a) "requires only a single question of law or fact common to the entire class." *Id.* at 1192.

Plaintiffs pose some questions on which they contend commonality exists. Doc. 261 at 27. These include:

- "Were the 'rules' of the Synthetic Indices cherry-picked to inflate backcasted returns?"
- "Did SBL's standardized marketing materials and policy documents overstate the expected potential performance of the Synthetic Indices?"
- "Were the returns shown in SBL's standardized marketing documents significantly higher than SBL's internal expected returns?"
- "Are SBL's boilerplate, misleading disclaimers enough to exculpate the fraud?"
- "Did SBL's SOUs deceptively characterize the Synthetic Indices as 'rules-based,' beneficial to customers, superior to S&P 500-based options, and low-spread crediting options?"
- "Did SBL have the intent to defraud purchasers?"
- "Did SBL form a RICO enterprise with [the IMOs]?"
- "Did SBL use the mails or wires to execute its fraudulent scheme?"
- "Would SBL and producers have sold the Synthetic Indices without having fraudulent backcasting available?"

*Id.* at 26-27. The Court agrees that at least some of these questions are common to the class even though the questions are phrased a bit dramatically. The commonality requirement is satisfied.

Defendant disputes commonality. Doc. 311 at 27-29. But its arguments focus on the degree to which individualized causation questions predominate. Defendant does not meaningfully dispute that at least <u>some</u> of the questions identified above are common questions that could generate common answers for the class. *See id.* And Rule 23(a)(2) merely requires <u>one</u> common question. *Wal-Mart Stores*, 564 U.S. at 359 ("We quite agree that for purposes of Rule 23(a)(2)

even a single common question will do." (citation modified)). The Court finds Plaintiffs have satisfied the commonality requirement of Rule 23(a)(2).[7]

### 3. Typicality

Rule 23(a)(3) requires that the claims of the representative parties must be typical of the claims of the class. *Sherman*, 84 F.4th at 1193. This "requires only that the claims of the class representative and class members are based on the same legal or remedial theory." *Id.* Identical fact situations are not required. *See id.*

Defendant argues Plaintiffs have not met their burden of showing typicality because proof that a named plaintiff was "exposed to and . . . somehow misled by any of the subject SBL marketing materials . . . would not establish that the putative class members were likewise exposed and misled." Doc. 311 at 47. This argument conflates commonality and typicality and is essentially a restatement of Defendant's predominance argument. Plaintiffs and the proposed class proceed under the same legal theory. *See Sherman*, 84 F.4th at 1193. Typicality is satisfied.

### 4. Adequacy

Adequacy asks whether the representative parties will protect adequately the interests of the class. Fed. R. Civ. P. 23(a)(4). Defendant does not challenge adequacy. Plaintiffs state their interests are consistent with those of the class and that they can and have actively participated in the litigation. Doc. 261 at 28-29. The Court finds Plaintiffs have satisfied this requirement.

## B. Rule 23(b)

All the requirements of Rule 23(a) are satisfied. But a class action still cannot be maintained unless one of the three standards in Rule 23(b) is met. As relevant here, Rule 23(b)(3) states that a

[7] As discussed further below, the Court does not find that commonality exists as to all questions in this case. Further, whether common questions predominate is different from the question of commonality under Rule 23(a)(2). *See Nieberding v. Barrette Outdoor Living, Inc.*, 302 F.R.D. 600, 609-10 (D. Kan. 2014). Predominance is discussed below.

class action may not be maintained unless "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3) (emphasis added). The Court considers predominance and superiority in turn.

**1. Nationwide RICO Class**

**a. Predominance**

Predominance is like Rule 23(a)'s commonality requirement, but it is more demanding. *Sherman*, 84 F.4th at 1194. It judges not just the existence of common questions but the relationship between common and individual questions. *Id.* Predominance does not require that all elements of the claim share common questions of law or fact; it also does not require that the answers to common questions be dispositive. *CGC Holding Co.*, 773 F.3d at 1087. But the "common, aggregation-enabling[] issues" must be more prevalent or important than non-common issues. *Id.* (internal quotation and citation omitted). Common issues are those that can rely on classwide proof, meaning "the same evidence will suffice for each member to make a prima facie showing." *Sherman*, 84 F.4th at 1194 (internal quotation and citation omitted). Non-common issues are those for which each individual class member "will need to present evidence that varies from member to member." *Id.* Predominance is generally "the greatest obstacle to class certification, especially in fraud cases." *CGC Holding Co.*, 773 F.3d at 1087.[8]

[8] Determining predominance may also require a court to consider the merits of a particular claim. *Sherman*, 84 F.4th at 1195. But the merits of a claim may be considered only to the extent the merits are relevant to deciding if Rule 23 has been satisfied. *Id.*; *see also Wal-Mart Stores*, 564 U.S. at 350-51 ("Frequently, that 'rigorous analysis' [under Rule 23] will entail some overlap with the merits of the plaintiff's underlying claim. That cannot be helped.").

A court analyzing predominance must first identify the elements of the underlying claim. *Id*. Once the elements are identified, the Tenth Circuit has instructed that courts should "characterize the issues in the case as common or not, and then weigh which issues predominate." *Id*.

Here, Plaintiffs' primary claim arises under RICO. RICO provides a civil cause of action for those injured by racketeering activity. *Id.* at 1088. A RICO violation requires a plaintiff to show (1) that the defendant substantively violated RICO, and (2) the plaintiff was injured "by reason of" that violation." *Id.* (citing 18 U.S.C. §§ 1962, 1964(c)). The commonality and predominance of the first element—a substantive RICO violation[9]—is generally not at issue in the briefing. But whether the second element—the "by reason of" element—can be shown by common evidence is a key point of dispute.

The "by reason of" element requires a plaintiff to show that the RICO predicate offense was both the but-for and proximate cause of the injury. *Id.* Causation "is crucial to proving any violation of RICO." *Id.* And a plaintiff seeking to certify a RICO class "cannot succeed unless the proposed class can demonstrate by generalized proof that the defendant's misconduct was both the but-for cause and the proximate cause of each class member's injury." *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 87 (2d Cir. 2015) (emphasis added).

Causation is not necessarily synonymous with reliance because "reliance is not an explicit element of a civil RICO claim." *CGC Holding Co.*, 773 F.3d at 1088; *see also Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 661 (2008) (holding that "a plaintiff asserting a RICO claim

---

[9] The substantive elements of a RICO claim are the (1) conduct (2) of an enterprise (3) by a pattern of (4) racketeering activity. *CGC Holding Co.*, 773 F.3d at 1088. Racketeering activity for purposes of RICO includes mail and wire fraud. *Id.*; *see also Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006).

predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation, that it relied on the defendant's alleged misrepresentations"). But "reliance remains relevant to RICO's causation—its 'by reason of'—requirement." *Gaddy v. Corp. of the President of the Church of Jesus Christ of Latter-Day Saints*, 148 F.4th 1202, 1218 (10th Cir. 2025).

Despite not being a required element, reliance is often the primary means of proving causation in a RICO fraud case. *CGC Holding Co.*, 773 F.3d at 1088-89 ("[I]n cases arising from fraud, a plaintiff's ability to show a causal connection between defendants' misrepresentation and his or her injury will be predicated on plaintiff's alleged reliance on that misrepresentation."). "Put simply, causation is often lacking where plaintiffs cannot prove that they relied on defendants' alleged misconduct." *Id.* at 1089. Thus, proving reliance is not required, but it is often necessary to establish causation. *See id.*; *see also Bridge*, 553 U.S. at 658-59 ("In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation. . . . In addition, the complete absence of reliance may prevent the plaintiff from establishing proximate cause.").

With this understanding of the causation element for a RICO claim, the Court returns to the predominance inquiry. The Court must consider whether causation is susceptible to generalized proof and, if not, whether individualized issues of causation will predominate over common issues. *See CGC Holding Co.*, 773 F.3d at 1088. Plaintiffs argue that they can establish causation with common evidence under two theories.[10] The first theory is that the misleading marketing materials

[10] In their motion, Plaintiffs present two theories of causation susceptible to generalized proof. Doc. 261 at 34 ("Causation is susceptible to generalized proof for two independent reasons." (emphasis added)). Those theories are that (1) common evidence shows that the allegedly fraudulent marketing materials were what enabled Defendant to offer the annuities, and (2) common evidence raises a commonsense inference of reliance for the entire class. *Id.* at 34-39. But in their reply, the number increased to three. Plaintiffs contend they had "three[] independently sufficient theories of classwide causation." Doc. 333 at 2 (emphasis added). The new theory was

allowed Defendant to offer the annuities. The second theory is that common evidence can give rise to an inference of reliance applicable to the entire class.

**i. Allegedly Fraudulent Marketing Materials Allowed Defendant to Offer Annuities**

Plaintiffs first argue that, but for the allegedly fraudulent marketing materials and SOUs, Defendant would not have offered the annuities linked to the new indices. This is because marketing materials featuring "juiced backcasted performance information" were essential to selling customers on the annuities. Doc. 261 at 35-36. But, because Defendant assumed the actual returns would be lower, they were still affordable to Defendant. *Id.* If Defendant had to pay the costs to hedge the "juiced" backcasted returns, Defendant would not have offered the annuities because they would not have been affordable or profitable. *Id.* Thus, but for this alleged fraud (the "juiced" backcasted returns), Defendant "would not have, in the first instance, even issued annuities with the Synthetic Indices and Class members therefore could not have bought them and

---

that producers relied on the marketing materials in selling the annuities, causing Plaintiffs' harm. *Id.* at 5. Defendant sought leave to file a surreply primarily to address this third theory.

Surreplies are generally not permitted. They may be allowed when new arguments are raised for the first time in a reply. *See Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005). But if the court does not rely on the new arguments raised in a reply, it is not an abuse of discretion to deny a request to file a surreply. *Id.* at 1196-97.

The Court concludes a surreply is not needed here because the Court limits its rulings to the arguments presented in Plaintiffs' motion, not the theories raised for the first time in their reply. Plaintiffs did not assert a third-party-reliance causation theory in the motion. Plaintiffs specifically argued causation based on the two theories noted above. On the second theory, some of the common evidence identified by Plaintiffs was that producers had professional obligations to know about the products they were recommending, and that this knowledge could only come from the backcasting returns. Although Plaintiffs cite to *Bridge* for the principle that third-party reliance could satisfy the RICO causation standard, Doc. 261 at 39, it is clear from the briefing that Plaintiffs were making this argument as part of their commonsense-inference theory, not as a separate third-party reliance theory. Thus, the Court declines to consider a third-party reliance theory. This litigation has been protracted and extensive. It is unclear why Plaintiffs did not initially include this theory had they wanted to assert it, particularly given the prolonged discovery and briefing schedules. It is contrary to Rule 1 to countenance new arguments raised in a reply. The Court does, however, address any potential reliance by producers in addressing the commonsense-inference theory.

Because the Court does not consider any new arguments from Plaintiffs' reply, the motion for leave to file a surreply (Doc. 378) is denied. *See also* Doc. 366 at 4 (prior order stating that "defense counsel was informed that the Court does not wish to receive a sur-reply at this time" and if "there are arguments or issues raised by Plaintiffs for the first time in their reply brief, the Court is free to either disregard these new arguments or issues or request that Defendant submit a sur-reply at that time").

allocated to the fraudulent indices." *Id.* at 35; *see also* Doc. 333 at 3 (arguing that classwide causation exists because "nobody could have bought a product that did not exist").[11] Plaintiffs argue this theory is susceptible to common proof because it focuses on Defendant's conduct.

The Court first considers whether this theory is a valid causation theory. *See Sherman*, 84 F.4th at 1195 (explaining that the merits of a claim may be considered to the extent the merits are relevant to deciding if Rule 23 has been satisfied). If it is not a valid causation theory, the existence of common evidence on this point is irrelevant because it is not a common question of law or fact that could lead to meaningful answers in this case.

A RICO claim requires a showing of both but-for and proximate cause. *CGC Holding Co.*, 773 F.3d at 1088. But-for cause is self-explanatory. Proximate cause is a "flexible concept." *Bridge*, 553 U.S. at 654. Determining proximate cause requires "careful consideration of the relation between the injury asserted and the injurious conduct alleged." *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 462 (2006) (internal quotation and citation omitted). "When a court evaluates a RICO claim for proximate causation, the central question it must ask is whether the alleged violation led directly to the plaintiff's injuries." *Id.* at 461; *see also CGC Holding Co.*, 773 F.3d at 1088 (citing *Anza*); *Gaddy*, 148 F.4th at 1218 (same). "Notably, the fact that an injury is reasonably foreseeable is not sufficient to establish proximate cause in a RICO action—the injury must be direct." *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1349 (11th Cir. 2016); *see also Hemi Group, LLC v. City of New York*, 559 U.S. 1, 12 (2010) (plurality opinion) ("Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm.").[12]

---

[11] Plaintiffs assert that their injury in this case is overpaying for the annuities, i.e. that the annuities they bought were worth less than what they paid. Doc. 261 at 34.

[12] Plaintiffs contend they and the class members were the "direct targets" and "natural, foreseeable, and, most importantly, intended victims of the scheme," which they argue establishes proximate cause. Doc. 261 at 36

Plaintiffs' first theory fails to establish causation. At bottom, Plaintiffs have argued common evidence can show why Defendant created or offered the annuities. But while the existence of the annuities is perhaps a literal prerequisite to anyone buying them, it does not follow that Plaintiffs' harm—overpaying for the annuities—occurred simply "by reason of" the existence of the annuities. A RICO plaintiff cannot just rely on the existence of a misrepresentation. *See Ray*, 836 F.3d at 1350. "The mere fact of having been misled does not ineluctably give rise to a RICO cause of action unless the act of misleading the plaintiffs actually caused them injury . . . that they would not otherwise have suffered." *Id.*; *see also Poulos v. Caesars World, Inc.*, 379 F.3d 654, 665 (9th Cir. 2004) ("The misrepresentations standing alone have little legal significance. To connect the dots between the bare allegations and the injury, the class needs something more."). The missing step here is what caused Plaintiffs to purchase the annuities. Plaintiffs didn't purchase the annuities simply because they existed. And the Court cannot simply presume Plaintiffs bought the annuity because of the fraudulent material. The decision to purchase the annuities could have been driven by several considerations, which are likely to vary from class member to class member as investment decisions are highly personalized and can be motivated by a variety of considerations. *See Anza*, 547 U.S. at 454-59 (finding no proximate cause where harm was distinct from RICO violation and decreased sales could have had multiple causes).

Certainly, causation could be present if Plaintiffs were to contend that they relied on the allegedly misleading marketing materials in making their annuity purchases. But Plaintiffs seem to be avoiding any such contention at this stage because reliance would likely require

---

(internal quotation and citation omitted). But as explained above, the question is not whether Plaintiffs were foreseeable victims of the alleged scheme, but whether the alleged wrongful conduct led directly to Plaintiffs' injuries. *See CGC Holding Co.*, 773 F.3d at 1088; *Ray*, 836 F.3d at 1349.

individualized proof, which would be a problem for class certification.[13] *See CGC Holding Co.*, 773 F.3d at 1089 (noting that reliance as a means of establishing RICO causation "takes on uncommon gravity when it arises in the context of establishing predominance under Rule 23"). Without reliance, however, it is difficult to see a path to causation in this case.

The Court acknowledges that reliance is not a required element of a RICO claim. *See Bridge*, 553 U.S. at 653. But there still must be a causal link to satisfy RICO's "by reason of" element. And reliance is often the only way to make that showing, especially in fraud cases. *CGC Holding Co.*, 773 F.3d at 1088-89 ("[I]n cases arising from fraud, a plaintiff's ability to show a causal connection between defendants' misrepresentation and his or her injury will be predicated on plaintiff's alleged reliance on that misrepresentation."). Even when the Supreme Court explained in *Bridge* that reliance was not a required element of a RICO claim, it acknowledged that reliance is often necessary:

> Of course, none of this is to say that a RICO plaintiff who alleges injury "by reason of" a pattern of mail fraud can prevail without showing that someone relied on the defendant's misrepresentations. . . . In most cases, the plaintiff will not be able to establish even but-for causation if no one relied on the misrepresentation. . . . In addition, the complete absence of reliance may prevent the plaintiff from establishing proximate cause.

*Bridge*, 553 U.S. at 658-59.

In sum, the fact that the annuities existed or were offered for sale did not directly cause Plaintiffs' injuries. It was Plaintiffs' purchase of the annuities that directly led to their injuries (overpayment). Absent any contention that Defendant's allegedly fraudulent conduct caused the purchases, however, there is nothing to complete the causal chain. Because this first theory does

---

[13] Plaintiffs' second causation theory is based on reliance. But under that theory, they contend reliance can be shown with common evidence that gives rise to a classwide inference of reliance. The Court addresses that theory below.

not connect the allegedly fraudulent marketing materials to Plaintiffs' decision to purchase them, it is not a valid causation theory and does not create a common question of law for the purposes of class certification.

### ii. Commonsense Inference of Reliance

Plaintiffs' second theory of causation is based on reliance. Plaintiffs contend that generalized, classwide evidence can give rise to a commonsense inference that each class member relied on allegedly fraudulent marketing materials, without the need for individualized evidence of reliance. Doc. 261 at 36-39.

Reliance as a means of showing causation is often a hurdle to class certification because it requires "unique evidence from individual plaintiffs" and that evidence can predominate. *CGC Holding Co.*, 773 F.3d at 1089. But "[s]ometimes issues of reliance can be disposed of on a classwide basis without individualized attention at trial," including "where circumstantial evidence of reliance can be found through generalized, classwide proof." *Id.* Such "circumstantial evidence of reliance is sufficient to allege RICO causation for purposes of Rule 23." *Id.* at 1090. In such a situation, common questions predominate and class certification may be warranted. *Id.* at 1089. The Tenth Circuit has found that an inference of reliance based on common evidence is permissible "where the behavior of plaintiffs and the members of the class cannot be explained in any way other than reliance upon the defendant's conduct." *Id.* at 1089-90 (internal quotation and citation omitted).[14]

[14] Allowing an inference based on circumstantial evidence does not shift the burden of proof at trial. *CGC Holding Co.*, 773 F.3d at 1093. It operates only on an evidentiary basis in that class plaintiffs can rely on common evidence, rather than individualized evidence, to convince the fact finder to draw the inference that all class members' damages were caused by the RICO violations. *Id.*; *see also Torres v. S.G.E. Management, L.L.C.*, 838 F.3d 629, 645 (5th Cir. 2016) ("The inference of reliance to which the plaintiffs are contingently entitled is simply the common mechanism by which they seek to prove their affirmative case."). "[P]laintiffs will still have to prove RICO causation by a preponderance of the evidence to win on the merits." *CGC Holding Co.*, 773 F.3d at 1093. And a factfinder can reject the inference. *Id.* The parties sometimes use "inference" and "presumption"

Plaintiffs argue that there is common evidence in this case that can give rise to "a circumstantial [classwide] inference [that] they relied on SBL's fraudulent representations in overpaying for the Synthetic Indices." Doc. 261 at 37. They point to four pieces of common evidence from which they contend a jury could infer reliance classwide:

- The allegedly misleading marketing materials were the "only performance information producers were permitted to use."
- Backcasted returns were "THE sizzle point" in selling the annuities.
- "All Class members were required to read and sign the SOUs," which allegedly fraudulently emphasized the benefits of the index-linked annuities compared to S&P 500-linked annuities.
- Producers were required to have knowledge about the products they were recommending, including having adequate knowledge about the potential performance of the annuities, and the only performance information available was the backcasted returns.[15]

Doc. 261 at 37-39. Plaintiffs argue that a jury could infer, based on this evidence, class members relied on the allegedly fraudulent marketing materials in deciding to purchase the annuities. *See id.*

The Court disagrees that these facts are sufficient to give rise to a classwide inference of reliance. First, the fact that the marketing materials were the only materials producers were permitted to use does not show that they did in fact use them, or more importantly, that purchasers relied on those materials in deciding to buy the annuities. Second, and similarly, the fact that producers were required to have knowledge about the potential performance of the annuities,

interchangeably. But there is no presumption of reliance in a RICO fraud case. *Id.* at 1094; *see also id.* at 1094 n.12 (explaining the difference between a presumption and an inference).

[15] As noted above, Plaintiffs raised the issue of producer reliance on marketing materials in arguing that common evidence supports an inference of reliance. The motion did not state a separate theory of third-party reliance. But the Court considers this evidence as part of Plaintiffs' theory that a classwide inference of reliance should be permitted.

which necessarily had to come from the marketing materials, does not give rise to an inference that the class members—purchasers of the annuities—relied on those materials in making their purchasing decisions. Third, the fact that backcasting was a "sizzle" point in marketing the annuities does not give rise to an inference that all class members relied on that material in making their decisions about the annuities. Marketing materials in almost every case would be viewed as key to selling a product—that is literally the point of marketing materials. But the simple existence of those materials does not give rise to an inference that anyone in particular relied on them, let alone that every class member did. Fourth, it is true that purchasers had to sign the SOUs. But the SOUs did not contain the backcasted returns that are at the heart of Plaintiff's RICO claim. Even to the extent the SOUs contained other allegedly misleading statements,[16] that does not give rise to an inference of reliance on other marketing materials containing the backcasted returns.

Cases where a classwide inference of reliance was permitted have typically involved "the alleged legitimacy of the counterparty to an agreement, or the fact that all plaintiffs paid fees in exchange for a promise." *CGC Holding Co.*, 773 F.3d at 1090-91. For example, *CGC Holding Co.* involved defendant lenders who misrepresented their willingness and ability to meet financing obligations on promised loans. *Id.* at 1081. The defendant lenders preyed on distressed borrowers and required significant up-front fees. *Id.* at 1082. In an almost universal fashion, the lenders then found reason to terminate the loan agreements while keeping the fees. *Id.* at 1082-83. The

[16] Since the start of this case, the Court has struggled to understand the nature of the alleged fraud, and the recent briefing has not clarified matters much. Plaintiffs' theories have evolved as the case has progressed. The focus of Plaintiffs' ire from the start has primarily been the backcasted returns, which they contend were cherry-picked yet not necessarily inaccurate. In the class-certification briefing, Plaintiffs also point to some statements in the SOUs that apparently distinguished the index-linked annuities from the S&P 500-linked annuity options. But again, it's not clear that those statements were false. Rather, Plaintiffs appear to be arguing that those statements did not clearly explain why the index-linked annuities were essentially no better of an option than the S&P 500-linked annuities. Regardless, the SOUs did not include backcasted returns, which is the focus of Plaintiffs' fraud claim. And signing and acknowledging the SOUs does not give rise to an inference that class members relied on other allegedly fraudulent marketing materials containing the backcasted returns.

mastermind of the scheme was an individual who was a career criminal implicated in similar schemes, despite holding himself out using aliases as a legitimate financial investor and lender. *Id.* The Tenth Circuit found that causation was susceptible to a classwide inference of reliance because "the fact that a class member paid the nonrefundable up-front fee in exchange for the loan commitment constitutes circumstantial proof of reliance on the misrepresentations and omissions" at the heart of the scheme. *Id.* at 1091-92; *see also Peterson v. H & R Block Tax Servs., Inc.*, 174 F.R.D. 78, 84-85 (N.D. Ill. 1997) (finding inference of reliance because it "is inconceivable that the class members would rationally choose to pay a fee for a service they knew was unavailable").

In *Torres v. S.G.E. Management, L.L.C.*, the Fifth Circuit found that if the plaintiffs could prove the existence of a pyramid scheme, a jury could infer that the plaintiffs relied on the defendant's "implicit representation that it [was] a legal multi-level marketing program." 838 F.3d at 643. This was because pyramid schemes are inherently deceptive and operate on concealment, and because "knowingly joining a pyramid scheme requires the individual to choose to become either a victim or a fraudster." *Id.* Both points supported an inference that the plaintiffs who joined the scheme relied on representations that it was, in fact, a legitimate venture. *See id.*

In *Negrete v. Allianz Life Insurance Co.*, 238 F.R.D. 482, 491 (C.D. Cal. 2006), which Plaintiffs rely on heavily, the court considered allowing a causation theory based on a classwide inference of reliance. The claims involved uniform sales marketing materials that were misleading. *Id.* at 491-92. The court pointed to evidence of the defendant's standardized marketing materials and noted that the purchasers were required to sign SOUs for each annuity confirming that he or she had read the material. *Id.* at 492. Importantly, however, the sales agent was also required to sign and aver that he or she had "not made statements that differ from the disclosure form." *Id.* The *Negrete* court found this "evidence of standardized written presentations, coupled with

plaintiffs' allegations that class members purchased annuity products far less valuable than other comparable products or the prices paid for them, adequately establishes proximate causation . . . at the certification stage." *Id.*; *see also In re Nat'l W. Life Ins. Deferred Annuities Litig.*, 268 F.R.D. 652, 665 (S.D. Cal. 2010) (finding inference of reliance where class members all confirmed in writing receipt and review of the written materials containing allegedly untrue statements and the claims at issue involved bonuses and fees that were "the type of statement upon which a buyer would almost certainly rely in making an annuity purchase").

Both *CGC Holding Co.* and *Torres* represent the typical factual scenarios where an inference of reliance has been allowed. *See CGC Holding Co.*, 773 F.3d at 1090-91. But neither *CGC Holding Co.* nor *Torres* are factually similar to this case. *Negrete* and *National Western Life Insurance*, which permitted an inference of reliance, are admittedly more factually like this case. But those cases, neither of which are binding authority, are not completely on all fours with this case. *Negrete* and *National Western Life Insurance* differ in key respects. In those cases, there was evidence confirming receipt of the materials with the allegedly fraudulent representations. Here, however, there is nothing that confirms that every class member (or even most) saw the backcasted returns. It's less clear that the Tenth Circuit would extend a classwide inference of reliance to the circumstances in this case.[17] Class members were required to sign the SOUs. But the SOUs did not contain the backcasted returns. Moreover, in *Negrete*, the sales agents had to sign and aver that they did not make statements that differed from the acknowledged material. There are no similar facts in this case. The record instead contains facts that producers and purchasers engaged in highly individualized sales pitches and decisionmaking.

---

[17] *CGC Holding Co.* did cite to a later decision in *Negrete* as an example of a case that has "supported the application of this inference under the right circumstances." 773 F.3d at 1091 n.8. But given some key differences between this case and *Negrete*, the Court still declines to apply an inference of causation here.

As the Tenth Circuit underscored in *CGC Holding Co.*, an inference of reliance is appropriate were the actions of class members "cannot be explained in any way other than reliance upon the defendant's conduct." 773 F.3d at 1089-90. Here, the alleged misconduct is the so-called cherry-picked backcasted returns designed to look good on paper but which in reality were never expected to materialize. Certainly, in making investment decisions, investors hope for good returns. But nothing is—or was in this case—guaranteed. And given the different features of the annuities at issue (for example, the different income riders and benefits available) and the individualized relationships between producers and purchasers, it is not clear that the <u>only</u> reason class members purchased the annuities was because of the backcasted returns or any other statement by Defendant.

These different motivations advise against a classwide inference of reliance. *See Sergeants Benevolent Ass'n*, 806 F.3d at 89 ("Such an inference may be available if, for example, the class members all faced the same more-or-less one-dimensional decisionmaking process, such that the alleged misrepresentation would have been essentially determinative for each plaintiff." (internal quotation and citation omitted)). Additionally, the Tenth Circuit has cautioned that the "inference [of reliance] would not be appropriate in most RICO class actions." *CGC Holding Co.*, 773 F.3d at 1091 n.9. Under these circumstances, the Court cannot conclude reliance on the backcasted returns is the only explanation for class members' purchasing decisions. Plaintiff's causation theory based on a classwide inference of reliance is therefore not appropriate.

**iii. Individual Questions of Causation Predominate**

The Court has found that Plaintiffs have not shown that causation for their RICO claim can be shown through common evidence. Because causation will need to be shown using

individualized evidence, the Court must determine whether that issue will predominate over other common issues. The Court concludes that individualized questions of causation will predominate.

"Weighing involves a qualitative assessment of the relative importance of the issues." *Dunn v. Santa Fe Nat. Tobacco Co., Inc.*, 185 F.4th 999, 1017 (10th Cir. 2026). "Causation lies at the heart of a civil RICO claim." *Poulos*, 379 F.3d at 664. "Reliance, as a means of establishing RICO causation and beyond, takes on uncommon gravity when it arises in the context of establishing predominance under Rule 23." *CGC Holding Co.*, 773 F.3d at 1089 (explaining that class certification in RICO cases "often turn[s] on whether the class can demonstrate that reliance is susceptible to generalized proof"); *Sergeants Benevolent Ass'n*, 806 F.3d at 87 ("Because proving causation will ordinarily require proving reliance, and because of the difficulty of proving reliance using 'generalized proof,' it is quite difficult, though not impossible, to certify a class in a RICO mail-fraud case." (internal citation omitted)). "In terms of Rule 23 doctrine, individualized issues of reliance often preclude a finding of predominance." *CGC Holding Co.*, 773 F.3d at 1089.

As reflected in the briefing, the class claims in this case would involve thousands of annuity purchases from thousands of producers. The circumstances and motivations for those purchases are likely all different and nuanced. Given the importance of causation in proving a RICO claim, especially where it turns on reliance, the Court finds that individualized questions of reliance and causation will predominate over common issues in this case. This warrants denial of Plaintiffs' request to certify a nationwide class.

**b. Superiority**

Rule 23(b)(3) includes a superiority requirement and lists factors courts should consider in the superiority analysis. *Rider, Trustee of Cherry Rider Fam. Tr. v. OXY USA, Inc*, 175 F.4th 1214, 1232 (10th Cir. 2026); *see also* Fed. R. Civ. P. 23(b)(3)(A)-(D). Class treatment is superior if "it

will achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *CGC Holding Co.*, 773 F.3d at 1096 (internal citation and quotation omitted). Because the Court has found predominance is not satisfied, it does not reach superiority.[18]

### 2. Alternative Nationwide Classes

Plaintiffs briefly discuss two alternative nationwide classes. Doc. 261 at 41-42. The first is the "Alternative Backcasting Match Class," composed of "individuals who allocated their funds consistently with form sales allocation examples prepared by SBL." *Id.* at 41. Plaintiffs argue a jury could reasonably infer classwide reliance where class members allocated their funds in the same manner as Defendant's "default, pre-set allocation examples (e.g., 75% to the ALTVI index, 25% to the S&P 500 AP2P index)." *Id.* at 41-42.

This is not sufficient to infer classwide reliance. The allocation examples set out in Plaintiffs' expert declaration are not so unusual that a factfinder could infer that class members must have relied on the examples to allocate their own funds. The allocation examples are common percentages. For example, 100% to the MSDA, 0% to the S&P 500; 50% to the MSDA, 50% to the S&P 500; 75% to the MSDA, 25% to the S&P 500; or equal thirds to three different options. *See* Doc. 263-10 at 133, 139-40, 143, 152.[19] A reasonable factfinder could not infer reliance on any particular marketing material because a class member allocated their funds using common percentages.

---

[18] The parties also spill considerable ink on the issue of damages, as well as potential defenses. Because the Court finds individual issues of causation will predominate, it does not reach those issues.

[19] The only factual support Plaintiffs cite for this theory is 32 pages of one of its expert's declarations. Doc. 261 at 42 nn. 125-126 (citing § VI of Rouse's declaration). The Court has reviewed these pages. To the extent Plaintiffs contend something more specific would support this argument, they do not clearly cite it.

The second is the "Alternative Backcasting Receipt Class" composed of class members "who received backcasted performance materials." Doc. 261 at 42. Plaintiffs argue reliance is easier to satisfy for those who could submit proof of receipt of backcasted returns, and that receipt of backcasted returns gives rise to a classwide inference of reliance. *Id.*; Doc. 333 at 14-15. But receipt of the backcasted materials does not show reliance on that information or give rise to an inference of reliance.

In sum, Plaintiffs' alternative nationwide classes suffer from the same problem as their primary nationwide class: reliance (as means of establishing causation) cannot be shown on a classwide basis.

### 3. State Subclasses[20]

Plaintiffs seek certification of several state subclasses. These include subclasses for California, Illinois, Arizona, and Florida for claims under state consumer protection statutes and for common-law fraud.[21]

#### a. California Subclass

Plaintiffs seek certification of a California subclass based on violation of the California Unfair Competition Law ("UCL") and common-law fraud. The UCL prohibits "unlawful, unfair or fraudulent" business practices. *In re Tobacco II Cases*, 207 P.3d 20, 29 (Cal. 2009). It appears Plaintiffs seek to proceed under the fraudulent business practices portion of the UCL. Doc. 261 at 44 (discussing the UCL claim as arising out of a fraudulent business practice and deceptive

---

[20] Because the parties do not argue otherwise, the Court assumes without deciding that the state subclasses all satisfy Rule 23(a) and focuses the analysis on Rule 23(b)(3).

[21] To the extent Plaintiffs seek certification of state subclasses for their RICO claims, that request is denied for the same reason certification of a nationwide class is denied.

advertising). Fraudulent business practices extend to deceptive advertisements and misrepresentations about a product. *In re Tobacco*, 207 P.3d at 29.

UCL claims include a causal element. *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 630 (9th Cir. 2020). For purposes of standing, only named plaintiffs must show proof of "actual reliance" at the certification stage. *Id.* This has led to "what amounts to a conclusive presumption of reliance in UCL cases" that "serves to relieve UCL plaintiffs of their obligation to establish absent class members' reliance." *Id.* at 630-31 (internal quotation and citation omitted).

However, that presumption is not warranted in every case. *Id.* at 631. Where there is "no cohesion" among class members who "were exposed to quite disparate information from various representatives of the defendant," a presumption would not be warranted. *See id.* Rather, "to establish a reliance presumption, the operative question has become whether the defendant so pervasively disseminated material misrepresentations that all plaintiffs must have been exposed to them." *Id.*

As discussed above, there is no evidence of widespread dissemination of the allegedly fraudulent marketing materials. At most, Plaintiffs have pointed to evidence that those were the only marketing materials available. But that doesn't establish that those materials were in fact "pervasively disseminated" to class members. *See id.* at 631. For the same reason an inference of classwide reliance is not warranted for Plaintiffs' RICO claim, a presumption of reliance is not warranted for Plaintiffs' UCL claim.

Under California law, common-law fraud requires a showing of reasonable reliance. *In re Tobacco*, 207 P.3d at 29 ("A [common law] fraudulent deception must be actually false, known to be false by the perpetrator and reasonably relied upon by a victim who incurs damages." (brackets in original)). Plaintiffs cannot demonstrate reliance with common evidence on a classwide basis

for the reasons discussed above, and the Court finds individual questions of reliance will predominate.

Plaintiffs' request to certify a California subclass based on the UCL and common-law fraud claims fails for the same reasons as Plaintiffs' nationwide RICO class.[22]

**b. Illinois Subclass**

Plaintiffs seek certification of an Illinois subclass based on statutory and common-law fraud claims. For purposes of a predominance inquiry, the Court considers the elements of those claims. A claim under the Illinois Consumer Fraud Act ("ICFA") requires:

> (1) a deceptive act or practice by the defendant, (2) the defendant's intent that the plaintiff rely on the deception, (3) the occurrence of the deception in a course of conduct involving trade or commerce, and (4) actual damage to the plaintiff that is (5) a result of the deception.

*Dunn*, 185 F.4th at 1032 (citation omitted). The Tenth Circuit recently confirmed that reliance is an element of an ICFA claim. *Id.* at 1033 ("[T]he Illinois Supreme Court has since clarified a plaintiff must prove that he or she was <u>actually deceived</u> by the misrepresentation in order to establish the element of proximate causation." (internal quotation and citation omitted));[23] *see also Tri-Plex Tech. Servs., Ltd. v. Jon-Don, LLC*, 241 N.E.3d 454, 462 (Ill. 2024) ("In order to establish the element of proximate causation, a plaintiff must prove that it was actually deceived by the misrepresentation. If the plaintiff has neither seen nor heard a deceptive statement, it cannot have relied on the statement and, consequently, cannot prove that the statement was the proximate cause of its injury." (internal citation omitted)); *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010)

---

[22] The Court acknowledges that *Walker* approved a class that limited membership to applicants who received certain illustrations and thus were exposed to the allegedly fraudulent information. 953 F.3d at 631. Plaintiffs argue in their reply that their "UCL claims should be certified, at a minimum, for the Alternative Backcasting Receipt Class." Doc. 333 at 22. But the Court has concluded that receipt does not give rise to an inference of reliance.

[23] Plaintiffs filed a Notice of Supplemental Authority acknowledging *Dunn*'s ruling on this point and withdrew any argument that the ICFA does not require a showing of reliance. Doc. 401 at 2.

("But absent proof that but for the defendants' conduct, he would not have purchased the defendants' gasoline, he is not entitled to relief under ICFA."). Common law fraud in Illinois also includes reliance as an element. *Howard v. Dollar Tree Stores, Inc.*, 2024 WL 4333191, at *7 (N.D. Ill. 2024).

Because reliance is an element of both Plaintiffs' ICFA claim and their common-law fraud claim under Illinois law, and because Plaintiffs cannot demonstrate reliance with common evidence, the Court finds individual questions of reliance will predominate. Certification of an Illinois subclass fails for the same reasons as Plaintiffs' nationwide RICO class.

**c. Arizona Subclass**

Plaintiffs seek to certify an Arizona subclass based on the Arizona Consumer Fraud Act ("ACFA") and common-law fraud under Arizona law. Both claims require a showing of reliance. *Garner v. Medicis Pharm. Corp.*, 2023 WL 6295052, at *2 (D. Ariz. 2023) ("Plaintiffs must show reliance to succeed on an ACFA claim."); *Crossfirst Bank v. Vieste SPE LLC*, 2020 WL 1083779, at *1 (D. Ariz. 2020) ("Under Arizona law, fraud and negligent misrepresentation claims require actual reliance."). Plaintiffs' Arizona subclasses thus fail for the same reasons stated above.

**d. Florida Subclass**

Plaintiffs seek to certify a Florida subclass based on common-law fraud under Florida law. Reliance is an element of common-law fraud under Florida law, as Plaintiffs acknowledge. Doc. 261 at 47; *see also Bailey v. Trenam Simmons, Kemker, Scharf, Barkin, Frye & O'Neill, P.A.*, 938 F. Supp. 825, 829 (S.D. Fla. 1996). Plaintiffs' Florida subclass thus fails for the same reasons stated above.

### C. Other Motions

Defendant filed several other motions in the course of briefing the class-certification motion:

- Defendant's Motion to Exclude the Declaration and Opinions of Frederick N. Egler, Esq. (Doc. 303)
- Defendant's Motion to Exclude the Declaration and Opinions of Craig J. McCann, Ph.D. (Doc. 305)
- Defendant's Motions to Take Judicial Notice (Docs. 308, 374)
- Defendant's Motion to Strike and Exclude "Rebuttal" Expert Declaration of Craig J. McCann, Ph.D. (Doc. 376)
- Defendant's Motion to Strike and Exclude "Rebuttal" Expert Declaration of James Rouse (Doc. 377)

These motions do not bear on the class-certification analysis discussed above. The Court therefore finds them moot and denies them without prejudice.[24] The pending motions to seal or redact (Docs. 280, 284, 285, 288, 327, 328, 355, and 398) will be addressed in a separate order.

---

[24] The Court denies these motions without prejudice because the issues discussed therein may become relevant as the case progresses. Although the motions are denied without prejudice, the Court expects that any renewed motions will be focused on the case as it stands at that stage of the litigation. It is worth noting that the record generated by the class-certification briefing was voluminous—unnecessarily so at times. This includes extended page limits, hundreds of exhibits, *Daubert* motions, rebuttal declarations (which led to additional *Daubert* motions and requests to file sur-rebuttal declarations), motions for judicial notice (which often just imported exhibits from other litigation without explanation), and the motion for surreply. Defendant also filed a document titled "Objections to Evidence Submitted in Support of Plaintiffs' Motion for Class Certification," which caused Plaintiffs to respond with their own additional brief. Doc. 307; Doc. 336. It is unclear what the purpose of Defendant's objections are, other than to argue that certain exhibits to Plaintiffs' motion do not satisfy the Federal Rules of Evidence. As the magistrate judge noted in a prior order, stand-alone "'evidentiary objections' are not well taken, as this type of filing appears to be an attempt to circumvent this District's local rules on page limitations by not including all legal and factual arguments, including any purported objections to the opposing side's legal and factual arguments, in the briefing on a motion." Doc. 366 at 5 (denying request to file additional objections or a reply to previously filed objections). The Court has not considered these objections or the response. The Court expects the parties to respect local rules about page limits moving forward and may impose additional briefing requirements as this case moves into the dispositive stage.

## IV. CONCLUSION

THE COURT THEREFORE ORDERS that Plaintiffs' Motion for Class Certification (Doc. 260) is DENIED.

THE COURT FURTHER ORDERS that Defendant's Motion for Leave to File Sur-Reply (Doc. 378) is DENIED.

THE COURT FURTHER ORDERS that Defendant's additional motions (Docs. 303, 305, 308, 374, 376, and 377) are DENIED AS MOOT and WITHOUT PREJUDICE.

IT IS SO ORDERED.

Dated: September 22, 2026

/s/ *Holly L. Teeter*
HOLLY L. TEETER
UNITED STATES DISTRICT JUDGE